IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED

JUN 3 0 2006

Michael N. Milby, Clerk

| | | |
|---|---|---|
| SCOTT Y. WOOD | § | |
| *Plaintiff* | § | |
| | § | H-06 -2198 |
| v. | § | CIVIL ACTION NO. _____ |
| | § | |
| PENNTEX RESOURCES, L.P. | § | |
| AND LANCE T. SHANER | § | |
| *Defendants* | § | |

## COMPLAINT

Scott Y. Wood ("Wood"), Plaintiff, complains against PennTex Resources, L.P. ("PennTex")

and Lance T. Shaner ("Shaner"), Defendants, as follows:

### I.

#### *Parties and Jurisdiction*

1.      Wood is a citizen of the State of Texas.

2.      PennTex is a Texas limited partnership having its principal place of business in the

State of Pennsylvania. PennTex's general partner is PennTex Energy, Inc. ("Energy"). Energy is a

corporation incorporated under the laws of the State of Delaware having its principal place of

business in the State of Pennsylvania. PennTex's limited partners are all citizens of the State of

Pennsylvania. PennTex may be served with a summons and a copy of this Complaint by serving its

registered agent for service in the State of Texas, C T Corporation System, at 350 North St. Paul

Street, Dallas, Texas 75201.

3.      Shaner is a citizen of the State of Pennsylvania. He may be served with a summons

and a copy of this Complaint at his business address, 1965 Waddle Road, State College, PA 16803.

G:\E\ENE06\6977\Complaint001jz.wpd

4.    Jurisdiction is founded on diversity of citizenship and an amount in controversy that exceeds, exclusive of interest and costs, the sum specified by 28 U.S.C. § 1332(a).

## II.

### *Venue*

5.    Venue is proper in the United States District Court for the Southern District of Texas in accordance with 28 U.S.C. § 1391(a).

## III.

### *Wood Is Not A Party to the Defendants' Stock Purchase Agreement*

6.    Wood is the sole remaining Plaintiff in a cause of action styled ERG Illinois, Inc. and Scott Y. Wood v. Tsar Energy II, LLC and Richard M. Cheatham; Cause No. 2004-39584; In the 334th Judicial District Court of Harris County, Texas ("State Court Lawsuit"). The State Court Lawsuit is currently set for trial during the two (2) week period beginning September 25, 2006.

7.    As a summary explanation of Wood's claims in that lawsuit, Wood owned 100% of the stock of ERG Illinois, Inc. ("Illinois"). With an effective date of July 1, 2004. Wood entered into a written contract to sell his stock in Illinois to Isramco, Inc. ("Isramco"). Tsar Energy II, LLC ("Tsar") and Richard M. Cheatham ("Cheatham") actively engaged in a fraudulent scheme to interfere with Wood's contract. As a result of that fraud and interference, Isramco terminated the sale. Wood sues Tsar and Cheatham for damages in the amount of $1,869,365.00. A true and correct copy of Wood's live pleading, Wood's First Amended Original Petition, is attached as Exhibit "A" to this Complaint and incorporated by its reference.

8.    On September 27, 2004, Wood formed ERG Illinois Holdings, Inc. ("ERG") and conveyed his stock in Illinois to ERG. By a Stock Purchase Agreement ("SPA"), dated January 12,

2005, ERG sold its stock in Illinois to PennTex. The SPA states that the "Parties" to the Agreement are PennTex, PennTex Energy, Inc., ERG and Illinois. Wood in his individual capacity is neither a defined "Party" nor a signatory to the SPA. A true and correct copy of the SPA without exhibits is attached as Exhibit "B" and incorporated by its reference.

## IV.

### *Wood Has No Obligation to Dismiss His Claims Against Tsar and Cheatham*

9.      Illinois, now controlled by PennTex's principal, Shaner, has apparently entered into an agreement with Tsar and Cheatham, the exact details of which have not been shared with Wood. In accordance with that agreement, PennTex and Energy have made a demand on Wood to release his claims pending against Tsar and Cheatham in the State Court Lawsuit. As a basis for this demand, PennTex and Energy cite Section 9.4 of the SPA.

10.      Wood has refused the demand. Wood is not a "Party" to the SPA as defined by the SPA. Wood has not filed a lawsuit alleging any claim subject to the SPA or made a claim for any benefit from the SPA. Wood has no obligation to comply with the terms of the SPA.

11.      To the extent that it is argued that Wood is still obligated in some manner under the terms of the SPA, the demand for a release of Wood's claims against Tsar and Cheatham is premature.

12.      The SPA exhibits a comprehensive scheme to assure all claims related to the State Court Litigation are resolved before any party has an obligation to release any claims included in that Litigation. To that effect, the SPA premises the demand for a release on satisfaction of certain conditions precedent:

a. The particular section of the Agreement referred to by PennTex as the basis for its demand, Article 9.4(e), provides that PennTex may only utilize the provision if it is not in breach of the SPA's Indemnity Section. PennTex is currently in breach of that Section by its failure to indemnify and hold Wood harmless from his damages relating and arising out of the State Court Litigation. PennTex has failed to offer that indemnification before making its demand for a release; and

b. Any obligation to either dismiss or release Wood's individual claims is premised on PennTex furnishing a full and complete release of *all* matters in the State Court Litigation. PennTex has not furnished a full and complete release of all matters.

### V.

### *Wood Has No Obligation to Arbitrate with PennTex and Shaner*

13.     Based on Wood's refusal, PennTex and Shaner, have initiated an arbitration proceeding allegedly in accordance with Section 11.6 of the SPA. See attached Exhibit "C" which is a true and correct copy of Claimants' Demand for Arbitration ("Demand") without exhibits which is incorporated by reference. The primary subject matter of the arbitration request is Wood's alleged obligation to release his claims for $1,869,365.00 pending against Tsar and Cheatham in the State Court Litigation.

14.     Beyond the reasons all ready recited above, Wood is not a party to the SPA and the failure to satisfy conditions precedent, there are additional reasons why this arbitration against Wood should not proceed:

a. One of the Claimants that made the Demand has no right to make that Demand. Shaner is not a "Party" to the SPA and has no right to premise an arbitration upon an arbitration provision found in the SPA. Shaner has, however, stated that he took an assignment of Penntex's rights under the SPA, but Shaner has not provided any paperwork to document that alleged assignment and does not describe that assignment in the Demand. If in fact such an assignment exists, then Penntex is no longer a "Party" to the SPA and has no right to premise an arbitration upon an arbitration provision found in

the SPA having assigned all its rights in the SPA to Shaner; and

b.    Section 11.6 of the SPA provides that any arbitration of a Dispute with respect to claims by third Persons will be deferred until any judicial proceedings with respect thereto are concluded. Wood, Tsar and Cheatham are all third Persons to the SPA. PennTex and Shaner's requested arbitration is with respect to a judicial proceeding involving these third Persons which has not been concluded.

## VI.

### *Wood Requests a Declaration that He Has No Obligation to Participate in the Pending Arbitration*

15.    Wood files this action to request declaratory relief to protect his right to proceed to trial against Tsar and Cheatham and seek a recovery of $1,869,365.00.

16.    Wood requests the Court to construe the SPA and to declare that:

a.    He is not a party to the arbitration provision found in the SPA;

b.    Wood is not bound by any award made in the arbitration proceeding; and

c.    To the extent the Court finds that Wood is a party to that arbitration provision, the arbitration is premature for failure to satisfy conditions precedent to the requested arbitration.

17.    Wood believes it is in the interest of judicial economy for the Court to construe the SPA now. If the requested construction is not made now, Wood will subsequently challenge any unfavorable arbitration award based on the arbitrators exceeding the scope of their authority.

Therefore, considering the premises of this Complaint, Wood requests that PennTex and Shaner be cited to appear and after a final hearing, Wood obtain the declaratory relief requested and all other relief he shows himself entitled to receive.

Respectfully submitted,

_____
**JOHN M. ZUKOWSKI**
State Bar No. 22293400
1177 West Loop South, Suite 1100
Houston, Texas 77027
(713) 965-9969
(713) 963-9169 [Telecopier]

ATTORNEY IN CHARGE

**OF COUNSEL**

**ZUKOWSKI, BRESENHAN & SINEX, L.L.P.**
**PASCAL P. PIAZZA**
State Bar No. 15966850
1177 West Loop South, Suite 1100
Houston, Texas 77027
(713) 965-9969
(713) 963-9169 [Telecopier]

**ATTORNEYS FOR SCOTT Y. WOOD**

6

CAUSE NO. 2004-39584

| | | |
|---|---|---|
| ERG ILLINOIS, INC. AND | § | IN THE DISTRICT COURT OF |
| SCOTT Y. WOOD | § | |
|     Plaintiffs | § | |
| | § | |
| v. | § | HARRIS COUNTY TEXAS |
| | § | |
| TSAR ENERGY II, LLC AND | § | |
| RICHARD M. CHEATHAM | § | |
|     Defendants | § | 334TH JUDICIAL DISTRICT |

## WOOD'S FIRST AMENDED ORIGINAL PETITION

Scott Y. Wood ("Wood"), Plaintiff, files this Amended Petition against Tsar Energy II, LLC ("Tsar II") and Richard M. Cheatham ("Cheatham"), Defendants, as follows:

### I.

### *Discovery Control Plan*

1.    Wood continues his request that discovery be conducted in accordance with Tex. R. Civ. P. 190.3, Level 2.

### II.

### *Parties*

2.    Wood is a natural person that resides in Harris County, Texas.

3.    Tsar II is a limited liability company formed under the laws of the State of Texas with its principal office located in Dallas, Texas. Tsar II has entered an appearance in this matter for all purposes.

4.    Cheatham is a natural person that resides in Dallas County, Texas. He has entered an appearance in this matter for all purposes.

G:\E\ENE06\6977\Pet002jz(Wood).wpd



DEFENDANT'S
EXHIBIT

A

## III.

### *Jurisdiction and Venue*

5.    Wood sues the Defendants for damages that are within the subject matter jurisdiction of the Court.

6.    Defendants are both residents of the State of Texas. The Court has personal jurisdiction over the Defendants.

7.    Venue is proper in Harris County, Texas in accordance with Civ. P. & Rem. Code §15.002(a)(1) because all or a substantial part of the events or omissions giving rise to Wood's claims against the Defendants occurred in Harris County Texas.

## IV.

### *Facts Common to All Causes of Action*

8.    ERG Illinois, Inc. ("ERG") purchased the stock of Plains Illinois, Inc. ("Plains"). The two companies then merged with ERG as the surviving entity. Wood owned 100% of ERG's stock at the times relevant to this Petition.

9.    ERG is and Plains was an oil and gas exploration and production company. At the time of ERG's purchase, Plains owned interests in oil and gas properties and oil field related equipment. Plains also operated the oil and gas wells in four (4) field areas. ERG subsequently became the operator of those fields.

10.    On or about March 5, 2004, Tsar Energy, LLC (Tsar) entered into a Letter Agreement with ERG. Cheatham is a co-owner for Tsar and acted for and on behalf of Tsar in entering into the letter agreement.

11.    Under the terms of this letter agreement, in relevant part:

a.  Tsar agreed to buy and ERG agreed to sell, an undivided forty nine percent (49%) working interest in the four (4) field areas that it operated;

b.  ERG agreed to provide a mutually agreeable Joint Operating Agreement ("JOA") naming ERG as operator for the four (4) field areas;

c.  ERG and Tsar stated it was their intent for the JOA to bill actual costs of operations to the joint account; and

d.  ERG and Tsar stated they would enter into a more definitive agreement for the proposed transaction.

12.  The parties did not enter into a more definitive agreement. Tsar failed to perform many of its obligations set out in the letter agreement. ERG ultimately assigned the undivided forty nine percent (49%) working interest to Tsar II, an affiliate of Tsar. Cheatham is again a principal owner of Tsar II and acted for and on behalf of Tsar II in causing the assignment.

13.  After making the assignment to Tsar II, ERG and Wood discovered that one (1) of the four (4) field areas, the North Lawrence Unit, was already being operated under an existing operating agreement ("North Lawrence JOA"). They also discovered that there was another working interest owner in that Unit.

14.  As a consequence of this discovery, the JOA was drafted to make it expressly subject to the terms of the Lawrence Unit JOA. Terms and conditions of the North Lawrence JOA were stated to take precedence over those of the JOA. In relevant part, the North Lawrence JOA authorized ERG to charge Tsar II a monthly producing well overhead rate of $300.00 per well for wells in the North Lawrence Unit. This authorized charge is significant because the North Lawrence Unit contains numerous producing wells.

15.  After reviewing the draft JOA, Tsar II and Cheatham complained to ERG that the overhead provision in the North Lawrence JOA was different than the direct charge provision

contemplated by the letter agreement. However, after extended discussions about this difference, Tsar II signed the JOA containing the following condition:

> **This Operating Agreement** (JOA) **is subject to that certain North Lawrence Unit Operating Agreement** dated January 14, 2003 between Plains Illinois, Inc., as operator, and Pemberton Oil & Gas Company, Inc., as non-operator, recorded in Volume 543, Page 216 of the official records of Lawrence County, Illinois ("North Lawrence JOA"). **Terms and conditions for the North Lawrence JOA shall take precedence over those of the Operating Agreement** (JOA) to which this Exhibit "B" is attached. (Parentheticals and emphasis added).

16.    Thereafter, ERG charged Tsar II with its proportionate share of the monthly producing well overhead rate of $300.00 per well. The payment of that charge was made by Tsar II without further complaint by Tsar II or Cheatham about ERG's right to make the charge until July 6, 2004.

17.    On June 23, 2004, ERG contacted Cheatham and informed him of an agreement by Wood to convey ERG's interest in the subject oil and gas properties to Isramco. Cheatham saw this event as an opportunity to gain financially. He immediately asked his lawyer if there was a way that they could hold up the closing until they obtained unwarranted financial concessions. Cheatham also entered into negotiations with a third party to sell ERG's interests in the subject oil and gas properties should he be able to compel Wood to sell the interests to Tsar II instead of Isramco.

18.    The transaction with Isramco was scheduled to close on July 2, 2004, the Friday before the long Fourth of July holiday weekend. At the last minute, however, the transaction had to be postponed because of the inability to obtain a needed document as a result of the holiday weekend. The closing was rescheduled for the following Tuesday. ERG advised Cheatham on July 2, 2004 that the transaction was postponed until the following week.

19.     On the following Tuesday, July 6, 2004, Cheatham and Tsar II telefaxed a letter to Wood. In this letter, Cheatham, on behalf of Tsar II, set out several "outstanding issues." Among these "outstanding issues" was an allegation that ERG had no right to charge Tsar II with the contractual overhead charge.

20.     Cheatham knew that the overhead charge was a prime economic consideration in the transaction between Wood and Isramco. Though he knew that transaction had not yet closed, he also telefaxed a copy of his letter to a representative of Isramco.

21.     Cheatham obtained his desired result. Upon receipt of Cheatham's telefax, Isramco immediately postponed the closing. Cheatham then attempted to obtain financial concessions from Wood.

22.     Wood and Isramco were unable to convince Cheatham and Tsar II to retract their allegation concerning the overhead charge.  Ultimately, Wood and Isramco were not able to close the transaction because of Isramco's concern about Cheatham and Tsar II's unresolved claim regarding the overhead charge.

23.     Wood has, therefore, been compelled to file this lawsuit.

## V.

### *Wood Sues Defendants for Tortious Interference*

24.     Wood reincorporates and re-alleges ¶¶ 8-23. Defendants have tortiously interfered with the agreement between Wood and Isramco.

25.     Defendants' willful and intentional interference is a proximate cause of damages to Wood. These damages are within the jurisdictional limits of this Court. Wood sues the Defendants for those damages and for exemplary damages.

## VI.

### *Fraud*

26.    Wood reincorporates and re-alleges ¶¶ 8-23. Defendants have defrauded Wood.

27.    Defendants have engaged in the employment of cunning, deception, or artifice to circumvent, cheat, or defraud Wood. As a result of Defendants fraudulent course of action, Wood has been damaged.

28.    Wood sues Defendants, jointly and severally, for damages within the jurisdictional limits of the Court and for punitive damages.

## VII.

### *Other Relief*

29.    Wood reincorporates and re-alleges ¶¶ 8-28. Wood is entitled to recover all remedies, damages or relief at law, in equity, by statute, or otherwise to which he is justly entitled based upon the facts described in this Petition and as developed at trial.

30.    Wood sues Defendants to recover this other relief.

Therefore, considering the premises of this Petition, Wood requests a final hearing and after that hearing that the Court grant Judgment to Wood against Defendants for his damages, exemplary damages, attorney's fees, costs, and pre and post judgment interest, and all relief contained in this or supported by this Petition and all other available relief at law, in equity, by statute or otherwise.

Respectfully submitted,

ZUKOWSKI, BRESENHAN & SINEX, L.L.P.

JOHN M. ZUKOWSKI
State Bar No. 22293400
PASCAL P. PIAZZA
State Bar No. 15966850
1177 West Loop South, Ste. 1100
Houston, Texas 77027
(713) 965-9969
(713) 963-9169 [Telecopier]

**ATTORNEYS FOR SCOTT Y. WOOD**

## CERTIFICATE OF SERVICE

Signature below is certification that on this 28th day of July 2005, a true and correct copy of the foregoing **WOOD'S FIRST AMENDED ORIGINAL PETITION** was served as follows:

**BY CERTIFIED MAIL NO. 7004 1160 0007 2450 4269**
**RETURN RECEIPT REQUESTED**
Mr. Lawrence J. Fossi
Fossi & Jewel
1113 Autrey Street
Houston, Texas 77006

**BY CERTIFIED MAIL NO. 7004 1160 0007 2450 4276**
**RETURN RECEIPT REQUESTED**
Mr. Michael D. Robbins
Doyle, Restrepo,
Harwin and Robbins, L.L.P.
JP Morgan Chase Tower
600, Travis St., Ste. 4700
Houston, Texas 77002

**BY CERTIFIED MAIL NO. 7004 1160 0007 2450 4290**
**RETURN RECEIPT REQUESTED**
Mr. J. Todd Shields
Fulbright & Jaworski, L.L.P.
1301 McKinney Street, Suite 5100
Houston, Texas 77010-3095

John M. Zukowski

STOCK PURCHASE AGREEMENT

by

and

among

PENNTEX RESOURCES, L.P.

PENNTEX ENERGY INC.

ERG ILLINOIS HOLDINGS, INC.

and

ERG ILLINOIS, INC.

Dated: January 12, 2005

DEFENDANT'S
EXHIBIT
B

PENGAD-Bayonne, N.J.

Wood 00003

# TABLE OF CONTENTS

Page

ARTICLE 1.  DEFINITIONS ........................................................................................1

ARTICLE 2.  PURCHASE AND SALE OF SHARES .........................................8
    2.1    Purchase and Sale of Shares .....................................................8
    2.2    Purchase Price. ...........................................................................8
    2.3    The Closing ...............................................................................10
    2.4    Deliveries at the Closing. .......................................................10

ARTICLE 3.  REPRESENTATIONS AND WARRANTIES CONCERNING THE
            TRANSACTION .........................................................................11
    3.1    Representations and Warranties of Seller .............................11
    3.2    Representations and Warranties of Buyer Parties.................12

ARTICLE 4.  REPRESENTATIONS AND WARRANTIES CONCERNING THE
            COMPANY.................................................................................14
    4.1    Corporate Status.......................................................................14
    4.2    Power and Authority; Enforceability .....................................14
    4.3    No Violation..............................................................................14
    4.4    Brokers' Fees ............................................................................15
    4.5    Capitalization ...........................................................................15
    4.6    Company's Organizational Documents....................................15
    4.7    Company's Assets and Liabilities ...........................................15
    4.8    Purposely Deleted. ...................................................................15
    4.9    Purposely Deleted. ...................................................................15
    4.10    Legal Compliance. ...................................................................15
    4.11    Tax Matters...............................................................................16
    4.12    Title to Assets ..........................................................................16
    4.13    Title to Real Property...............................................................17
    4.14    Contracts ...................................................................................17
    4.15    Insurance ...................................................................................17
    4.16    Litigation...................................................................................18
    4.17    Labor; Employees ....................................................................18
    4.18    Employee Benefits....................................................................18
    4.19    Permits ......................................................................................18
    4.20    Limitations of Seller Parties' Representations and Warranties.................19
    4.21    Certain Assets Used by the Company......................................20
    4.22    Bank Accounts; Powers of Attorney.......................................20
    4.23    Scope of Business Activities....................................................20
    4.24    Records .....................................................................................20
    4.25    Oil and Gas Properties. ............................................................20
    4.26    Representations Complete .......................................................21

Wood 00004

ARTICLE 5.  PRE-CLOSING COVENANTS ............................................................21
    5.1    General ........................................................................................21
    5.2    Notices and Consents. ................................................................21
    5.3    Purposely Deleted. .....................................................................22
    5.4    Full Access ..................................................................................22
    5.5    Purposely Deleted. .....................................................................22
    5.6    Affiliated Transactions.................................................................22
    5.7    Access to Properties and Applicable Records. ..........................22

ARTICLE 6.  POST-CLOSING COVENANTS .........................................................23
    6.1    General ........................................................................................23
    6.2    Delivery and Retention of Records.............................................23
    6.3    Litigation Support .......................................................................24
    6.4    Purposely Deleted. .....................................................................25
    6.5    Taxes. ..........................................................................................25
    6.6    NORM..........................................................................................26
    6.7    Employees ...................................................................................26
    6.8    Undertaking to Plug and Abandon Wells. ..................................26
    6.9    Removal of Logos and Signs ......................................................27
    6.10   Tsar Case.....................................................................................27
    6.11   Assets of Seller After Closing.....................................................27

ARTICLE 7.  PURPOSELY DELETED ....................................................................27

ARTICLE 8.  PURPOSELY DELETED ....................................................................27

ARTICLE 9.  INDEMNIFICATION ..........................................................................27
    9.1    Survival of Representations and Warranties................................27
    9.2    Indemnification Provisions for Buyer's Benefit..........................27
    9.3    Indemnification Provisions for Seller's Benefit ..........................28
    9.4    Indemnification Provision For Seller's Benefit Regarding Specific Litigation .....28
    9.5    Notice of Claim ..........................................................................29
    9.6    Limitations on Indemnification Liability.....................................30
    9.7    Other Indemnification Provisions ...............................................30
    9.8    Purposely Deleted. .....................................................................30

ARTICLE 10. PURPOSELY DELETED....................................................................30

ARTICLE 11. MISCELLANEOUS ...........................................................................31
    11.1   Schedules ....................................................................................31
    11.2   Entire Agreement ........................................................................31
    11.3   Successors ...................................................................................31
    11.4   Assignments ................................................................................31
    11.5   Notices ........................................................................................31
    11.6   Binding Arbitration.....................................................................33
    11.7   Time ............................................................................................35
    11.8   Counterparts ................................................................................35

Wood 00005

11.9    Headings ................................................................................................35
11.10   Governing Law; Venue ........................................................................35
11.11   Amendments and Waivers ....................................................................35
11.12   Severability ..........................................................................................36
11.13   Expenses ..............................................................................................36
11.14   Construction .........................................................................................36
11.15   Incorporation of Exhibits and Schedules ............................................36
11.16   Remedies ..............................................................................................36
11.17   Electronic Signatures. ..........................................................................36
11.18   Press Releases ......................................................................................37
11.19   No Admission .......................................................................................37

**Wood 00006**

## ATTACHMENTS

### Exhibits

| | |
|---|---|
| Exhibit A | Purposely Deleted |
| Exhibit B | Form of Seller's Secretary's Certificate |
| Exhibit C | Purposely Deleted |
| Exhibit D | Form of Buyer's Secretary's Certificate |
| Exhibit E | Oil & Gas Leases, etc. |

### Schedules

| | |
|---|---|
| Schedule 1.1(a) | Business Employees |
| Schedule 3.1(c) | Required Seller Consents |
| Schedule 3.2(c) | Required Buyer Consents |
| Schedule 4.1 | Company's Officers and Directors |
| Schedule 4.10(a) | Legal Compliance |
| Schedule 4.11 | Tax Matters |
| Schedule 4.12 | Excluded Assets |
| Schedule 4.12(a) | Equipment & Vehicles |
| Schedule 4.12(b) | Wells and Facilities |
| Schedule 4.13 | Real Property Leases |
| Schedule 4.14 | Contracts |
| Schedule 4.15 | Insurance |
| Schedule 4.16 | Litigation |
| Schedule 4.17 | Labor, Employees |
| Schedule 4.18 | Employee Benefits |
| Schedule 4.19 | Permits |
| Schedule 4.22 | Bank Accounts; Powers of Attorney |
| Schedule 6.7 | Buyer's Severance Pay Plan |

Wood 00007

## Stock Purchase Agreement

THIS STOCK PURCHASE AGREEMENT (this "*Agreement*"), dated January 12, 2005, is by and among (i) PENNTEX RESOURCES, L.P., a Texas limited partnership ("*Buyer*") and PennTex Energy Inc., a Delaware corporation, ("*Penntex General Partner*") ("*Buyer Parties*"), (ii) ERG ILLINOIS HOLDINGS, INC. a Texas corporation ("*Seller*"), and (iii) ERG ILLINOIS, INC., a Delaware corporation and a wholly-owned subsidiary of Seller (the "*Company*" and, together with Seller, the "*Seller Parties*").

## RECITALS:

A.      Seller owns all of the outstanding capital stock of the Company.

B.      Buyer desires to purchase from Seller all of the outstanding capital stock of the Company, and Seller desires to sell to Buyer all of the outstanding capital stock of the Company, in accordance with this Agreement's terms and conditions.

C.      Buyer and the Seller Parties (the "*Parties*") intend for the purchase and sale of the Shares (as defined) to be treated as a taxable purchase for tax purposes.

## AGREEMENT:

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties, and covenants contained herein, Buyer and each Seller Party agree as follows:

## ARTICLE 1.
## DEFINITIONS

"*Action*" means any action, appeal, petition, plea, charge, complaint, claim, suit, demand, litigation, arbitration, mediation, hearing, inquiry, or proceeding.

"*Affiliate*" or "*Affiliated*" with respect to any specified Person, means a Person that, directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, such specified Person.  For this definition, "control" (and its derivatives) means the possession, directly or indirectly, or as trustee or executor, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting Equity Interests, as trustee or executor, by contract or credit arrangements or otherwise.

"*Agreement*" is defined in the preamble to this Agreement.

"*Answer*" is defined in Section 11.6(a)(ii).

"*Business Employees*" means the employees identified on Schedule 1.1(a), as such schedule may be amended from time-to-time.

"*Buyer*" is defined in the preamble to this Agreement.

Wood 00008

"*Buyer Indemnified Parties*" means Seller and its officers, directors, managers, employees, agents, representatives, controlling Persons, shareholders, and their Affiliates.

"*Buyer Parties*" is defined in the preamble to this Agreement.

"*Claimant*" is defined in Section 11.6(a)(ii).

"*Claim Notice*" is defined in Section 9.5.

"*Closing*" is defined in Section 2.3.

"*Closing Date*" is defined in Section 2.3.

"*Closing Date Adjusted Purchase Price*" is defined in Section 2.2(c)(C).

"*Closing Date Adjustment Amount*" is defined in Section 2.2(c)(C).

"*Closing Statement*" is defined in Section 2.2(c)(C).

"*Code*" means the Internal Revenue Code of 1986.

"*Commercially Reasonable Efforts*" means efforts that are designed to enable a Party, directly or indirectly, to satisfy a condition to, or otherwise assist in the consummation of, the Transactions and that do not require the performing Party to expend any funds or assume liabilities other than expenditures and liabilities that are customary and reasonable in nature and amount in the context of the Transactions.

"*Commitment*" means (a) options, warrants, convertible securities, exchangeable securities, subscription rights, conversion rights, exchange rights, or other contracts that could require a Person to issue any of its Equity Interests or to sell any Equity Interests it owns in another Person; (b) any other securities convertible into, exchangeable or exercisable for, or representing the right to subscribe for any Equity Interest of a Person or owned by a Person; (c) statutory pre-emptive rights or pre-emptive rights granted under a Person's Organizational Documents; and (d) stock appreciation rights, phantom stock, profit participation, or other similar rights with respect to a Person.

"*Company*" is defined in the preamble to this Agreement.

"*Company Records*" means all books, records, data, drawings, plans, prints, reports correspondence files and papers, of any kind, in paper or electronic form, owned by the Company, including, but not limited to, corporate minute books, employee files, accounting, financial, banking and tax data, engineering reports, and Property Records.

"*Confidentiality Agreement*" means that certain confidentiality agreement between Buyer and Seller Parties executed December 20, 2004.

"*Consent*" means any consent, approval, notification, waiver, or other similar action that is necessary.

2

Wood 00009



*"Contracts"* is defined in <u>Section 4.14</u>.

*"Damages"* or *"Damaged"* means all damages, losses (including any diminution in value), liabilities, payments, amounts paid in settlement, obligations, fines, penalties, and other costs, (including reasonable and necessary fees and expenses of outside attorneys, accountants and other professional advisors and of expert witnesses and other costs of litigation in connection with any Action or threatened Action of any kind or nature whatsoever. IN NO EVENT, SHALL SELLER PARTIES OR BUYER PARTIES BE LIABLE HEREUNDER (ON THE BASIS OF BREACH OF CONTRACT, INDEMNITY, WARRANTY, TORT, OR OTHERWISE) FOR EXEMPLARY OR PUNITIVE DAMAGES RESULTING FROM OR ARISING OUT OF THIS AGREEMENT.

*"Defensible Title"* means with respect to any Property, such title, free and clear of all Encumbrances, other than Permitted Encumbrances, that (i) entitles the Company, throughout the duration of the estate, to receive not less than the Net Revenue Interest for such Property set forth in <u>Exhibit E</u> and (ii) obligates the Company, through the duration of the estate, to pay costs and expenses relating to such Property in an amount not greater than the Working Interest for such Property set forth in <u>Exhibit E</u>.

*"Demand"* is defined in <u>Section 11.6(a)(ii)</u>.

*"Deposit"* is defined in <u>Section 2.2(b)</u>.

*"Effective Date"* means 7:00 AM, at the location of the Properties, on January 1, 2005.

*"Encumbrance"* means any security interest, mortgage, pledge, lien, deed of trust, charge, contract, easement, covenant, equitable interest, right of first refusal, or restriction, including any restriction on use, voting, transfer, receipt of income, or exercise of any other attribute of ownership, except for Permitted Encumbrances.

*"Enforceable"* means the legal, valid, and binding obligation of the applicable Person enforceable against such Person in accordance with its terms, except as such enforceability may be subject to the effects of bankruptcy, insolvency, reorganization, moratorium, or other laws relating to or affecting the rights of creditors, and general principles of equity.

*"Environmental Condition"* means any past, present or future condition relating to the presence of a Hazardous Substance at, on, under, within, or migrating to or from the Properties, or having migrated to or from the Properties, in each case under, arising out of or related to or in violation of any Health, Safety and Environmental Law, as the same are in effect from time to time or requiring Remedial Action.

*"Environmental Laws and Regulations"* means any and all Laws, statutes, ordinances, rules, regulations, or Orders of any Governmental Body pertaining to the environment in effect as of the date hereof and applicable to Seller Parties or their assets, properties, or operations.

*"Equipment"* means all equipment, fixtures, physical facilities or interests therein (including gathering lines, pipelines, and gas plants) of every type and description to the extent

Wood 00010

that the same are used or held for use in connection with the owning or operating of the Company's operating assets, whether located on or off the Properties.

"*Equity Interest*" means (a) with respect to a corporation, any and all shares of capital stock, (b) with respect to a partnership, limited liability company, trust or similar Person, any and all units, interests or other partnership/limited liability company interests, and (c) any other direct equity ownership or participation in a Person.

"*ERISA*" means the Employee Retirement Income Security Act of 1974.

"*ERISA Affiliate*" means each business or entity which is a member of a "controlled group of corporations," under "common control" or an "affiliated service group" with the Company within the meaning of Sections 414(b), (c) or (m) of the Code, or required to be aggregated with the Company under Section 414(o) of the Code, or is under "common control" with the Company, within the meaning of Section 4001(a)(14) of ERISA.

"*Expenses*" means direct, out of pocket expenses or expenditures whether expensed or capitalizable under GAAP incurred in the ownership and operation of the Properties.

"*GAAP*" means United States generally accepted accounting principles as in effect from time to time as promulgated by the Financial Standards Accounting Board.

"*Governmental Body*" or "*Governmental Bodies*" means any legislature, agency, bureau, branch, department, division, commission, court, tribunal, magistrate, justice, multi-national organization, quasi-governmental body, or other similar recognized organization or body of any federal, state, county, municipal, local, or foreign government or other similar recognized organization or body exercising similar powers or authority.

"*Hazardous Substance*" means at any time (i) any material, substance, waste, pollutant, chemical, or contaminant regulated, designated or defined as hazardous, extremely or imminently hazardous, dangerous or toxic (or similar term or terms) under any Health Safety and Environmental Law; (ii) petroleum products including crude oil and any fractions or derivatives thereof; (iii) asbestos; (iv) natural gas, synthetic gas and any mixtures thereof; (v) noise or radiation; or (vi) any substance with respect to which a Governmental Body otherwise requires Remedial Action.

"*Indemnified Parties*" means, individually and as a group, the Buyer Indemnified Parties and the Seller Indemnified Parties.

"*Indemnitor*" means any Party having any liability to any Indemnified Party under this Agreement.

"*Knowledge*" means, with respect to:

(a) the Seller Parties, the actual knowledge of the following individuals and such matters or facts as an operator following procedures customarily followed in the oil and gas industry would be expected to discover or otherwise become aware of in the course of conducting the operations of the Company:

4

Wood 00011

Scott Y. Wood
Doug Lacey
Carl Pomeroy
Jack Shawver

; and

(b) the Buyer Parties, the actual knowledge of the following individuals:

Lance Shanor
Tom Taylor

"*Laws*" means all applicable laws, rules, regulations, ordinances, orders, interpretations and other requirements promulgated by any Governmental Body or any agency, authority, body, board, commission, court, instrumentality, legislature or office having jurisdiction over the Company and its operations, other than Environmental Laws and Regulations.

"*Leases*" means the oil, gas and/or mineral leases, overriding royalties, production payments and net profits interests, fee mineral interests, fee royalty interests and all other interests in such oil, gas and other minerals owned by the Company or in which the Company has any interest including, without limitation, those that are described in Exhibit E.

"*Letter of Credit*" is defined in Section 9.4.

"*Material Adverse Change (or Effect)*" means any individual event, circumstance, condition, development or occurrence causing, resulting in or having (or with the passage of time likely to cause, result in or have) an adverse effect on the financial condition, business, assets, properties, prospects or results of operations of Company, which are reasonably likely to result in losses, costs, or expenses to the Company or the owner of the Shares of more than US $100,000, provided that in no event shall any of the following be deemed to constitute or be taken into account in determining a Material Adverse Effect: any event, circumstance, change or effect that results from (i) changes affecting the economy generally, (ii) changes in the market price of oil or natural gas, or (iii) compliance with the terms of this Agreement.

"*Net Revenue Interest*" means that percentage of the proceeds of production from a well or unit to which the Company is entitled to receive as a result of its rights in and to a Lease which pertain to such well or unit.

"*NORM*" is defined in Section 6.6.

"*Order*" means any order, ruling, decision, verdict, decree, writ, subpoena, mandate, precept, command, directive, consent, approval, award, judgment, injunction, or other similar determination or finding by, before, or under the supervision of any Governmental Body or arbitrator.

"*Ordinary Course of Business*" means the ordinary course of business consistent with past custom and practice (including with respect to quantity, quality and frequency) of the relevant Person and its Subsidiaries.

5

Wood 00012



"*Organizational Documents*" means the articles of incorporation, certificate of incorporation, charter, bylaws, articles of formation, regulations, operating agreement, certificate of limited partnership, partnership agreement, and all other similar documents, instruments or certificates executed, adopted, or filed in connection with the creation, formation, or organization of a Person, including any amendments thereto.

"*Parties*" is defined in the preamble to this Agreement.

"*Permit*" means any permit, license, certificate, approval, consent, notice, waiver, franchise, registration, filing, accreditation, or other similar authorization required by any law, Governmental Body, or contract.

"*Permitted Encumbrance*" means (a) the matters reflected on Exhibit E as a part of the description of the Properties described thereon; (b) contracts for the sale of Substances from the Properties which do not cause the representations set forth in Section 4.14 to be untrue; (c) liens for Taxes, assessments, governmental charges, or claims that are being contested in good faith by appropriate actions promptly instituted and diligently conducted and liens securing the payment of Taxes for which the final date for payment without penalty or interest has not passed; (d) preferential rights to purchase and required third party consents that are disclosed on Exhibit E or that are routinely obtained from Governmental Bodies after transfer of property; (e) statutory and conventional liens securing payments to operators, mechanics and materialmen or others, payments of taxes or other claims or payment obligations that are, in each case, not yet delinquent or, if delinquent, are being contested in good faith in the normal course of business; (f) any obligations or duties to any municipality or public authority with respect to any franchise, grant, certificate, license or permit; (g) any easements, rights-of-way, servitudes, permits and other rights in respect of surface operations, pipelines or the like, and easements for pipelines, power lines and other similar rights-of-way, and encroachments, on, over or in respect of any of the Properties that do not, individually or in the aggregate, unreasonably or materially interfere with the operation of the Leases or any Wells thereon for exploration and production of hydrocarbons or related operations; (h) all royalties, overriding royalties, net profits interests, production payments, carried interests, reversionary interests, calls on production and other burdens on or deductions from the proceeds of production that do not operate to (x) reduce the NRI below that set forth in Exhibit E for the applicable Property, or (y) increase the Working Interest above that set forth in the asset schedule of the applicable Seller for the applicable Property without a proportionate increase in the NRI for such Property; (i) contractual rights of reassignment prior to abandonment; (j) any consent, if applicable, from working interest owners under the Leases; and (k) any other liens, charges, encumbrances, contracts, agreements, instruments, obligations, defects or irregularities of any kind whatsoever that, individually, or in the aggregate, that do not have a Material Adverse Effect on the Company.

"*Person*" means any individual, partnership, limited liability company, corporation, association, joint stock company, trust, entity, joint venture, labor organization, unincorporated organization, or Governmental Body.

"*Plains*" is defined in Section 3.1.

"*Plans*" is defined in Section 4.18.

6

Wood 00013



"*Properties*" means, collectively, the Leases, the wells and associated equipment located thereon, and all related right-of-ways, properties, rights, and interests, including surface properties, rights and interests of all types.

"*Property Records*" means, collectively, (i) Seller's lease files, title opinions, production records, well files, maps, surveys, electric logs, seismic records, geological and geophysical data, together with all other files, third party contracts, documents, manuals and records, related to the Properties, and (ii) copies of Seller's accounting and tax records pertaining to the Properties, including computer stored data and records.

"*Purchase Price*" is defined in <u>Section 2.2(a)</u>.

"*Remedial Action*" shall include any environmental response, study, investigation, monitoring, testing, sampling, removal (including, without limitation, the removal of underground storage tanks), containment, clean-up, remediation, restoration, payment or compensation for natural resource damages, or corrective action with respect to any Hazardous Substance contamination or pollution, required or ordered by any Governmental Body in accordance with or made necessary or advisable by any applicable Environmental Law.

"*Reply*" is defined in <u>Section 11.6(a)(ii)</u>

"*Respondent*" is defined in <u>Section 11.6(a)(ii)</u>

"*Schedules*" means the Schedules to this Agreement.

"*Securities Act*" means the Securities Act of 1933.

"*Seller*" is defined in the preamble to this Agreement.

"*Seller Indemnified Parties*" means Buyer, its officers, directors, managers, employees, agents, representatives, controlling Persons, and after the Closing the Company and its shareholders.

"*Seller Parties*" is defined in the preamble to this Agreement.

"*Share*" means any issued and outstanding share of the common stock, par value $0.01 per share, of the Company.

"*Specified Properties*" means, collectively, the Leases, the wells, and units, each as listed on <u>Exhibit E</u>.

"*Substances*" means all severed crude oil, natural gas, casinghead gas, drip gasoline, natural gasoline, petroleum, natural gas liquids, condensate, products, liquids and other hydrocarbons and other minerals or materials of every kind and description.

"*Tax*" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Code Section 59A), customs, ad valorem, duties, capital stock, franchise,

Wood 00014

profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

"*Tax Returns*" means all tax returns filed by the Company and all associated work papers.

"*Transaction Documents*" means this Agreement and any agreement or document executed in connection herewith.

"*Transactions*" means all of the transactions contemplated by this Agreement, including: (a) the sale of the Shares by Seller to Buyer and Buyer's delivery of the Purchase Price therefor; (b) the execution, delivery, and performance of all of the documents, instruments and agreements to be executed, delivered, and performed in connection herewith; and (c) the performance by Buyer and Seller Parties of their respective covenants and obligations (pre- and post-Closing) under this Agreement.

"*Tsar Case*" is defined in Section 9.4.

"*Working Interest*" means the ownership of an interest, whether expressed as a percentage or a decimal, in an oil and gas lease or other mineral right, which percentage or decimal interest also expresses the share of the costs of operation, development, or production, the owner of such interest bears.

## ARTICLE 2.
## PURCHASE AND SALE OF SHARES

2.1     **Purchase and Sale of Shares.**  On and subject to the terms and conditions of this Agreement, Buyer agrees to purchase from Seller, and Seller agrees to sell to Buyer, all of the Shares for the consideration specified in Section 2.2

2.2     **Purchase Price.**

(a)     The purchase price for the Shares is $5,000,000 (the "*Purchase Price*") plus and minus the amounts referred to in Section 2.2(c) below.

(b)     Purposely Deleted

(c)     Purchase Price Adjustments.  The Purchase Price will be subject to the following adjustments (collectively, the "*Purchase Price Adjustments*"):

(A)     The Purchase Price will be increased by:

(1) Revenues from the sale of production produced from Properties prior to the Effective Date but not yet received by Company;

8

Wood 00015

(2) All joint interest billings prepared by the Company prior to Closing for which the Company is owed reimbursement by third parties;

(3) All other expenses that have not been included in any joint interest billing less the Company's share of such expenses;

(4) The Company's share of all pre-paid expenses; and

(5) The amount of all accounts receivable as of December 31, 2004.

(B)     The Purchase Price will be decreased by:

(1) 26% of all invoices for actual expenses which were incurred by the Working Interest owners of the Properties prior to the Effective Date but neither booked nor paid as of the Effective Date; and

(2) The amount of all accounts payable as of the Closing Date.

(C)     *Initial Purchase Price Adjustment*.  Prior to the expected Closing Date, Seller will deliver to Buyer a written statement (the *"Closing Statement"*) setting forth Seller's good faith estimate of the Purchase Price Adjustment as of the Closing Date (the *"Closing Date Adjustment Amount"*).  The Purchase Price as adjusted by the Closing Date Adjustment Amount is the *"Closing Date Adjusted Purchase Price."*

(D)     *Definitive Purchase Price Adjustment*.  As promptly as practicable after the Closing Date, but not later than ninety (90) calendar days thereafter, Buyer will deliver to Seller a schedule setting forth in reasonable detail Buyer's calculation of the Purchase Price Adjustments under Section 2.2(a) as of the Closing Date based on actual results (the *"Post-Closing Estimated Adjustment Amount"*).  The Post-Closing Estimated Adjustment Amount will be subject to Seller's review.  In reviewing the Post-Closing Estimated Adjustment Amount, Seller will have the right to communicate with Buyer, and to review the work papers, schedules, memoranda and all other documents Buyer prepared or reviewed in determining the Post-Closing Estimated Adjustment Amount and thereafter will have access to all relevant books and records, all to the extent Seller reasonably requires to complete its review of Buyer's calculation of the Post-Closing Estimated Adjustment Amount.  Within 30 calendar days after its receipt of Buyer's calculation of the Post-Closing Estimated Adjustment Amount, Seller will advise Buyer whether, based on such review, it has any exceptions to such calculation.  Unless Seller delivers to Buyer within such 30 calendar day period a letter describing its exceptions to Buyer's calculation of the Post-Closing Estimated

9

Wood 00016

Adjustment Amount as set forth in the schedule delivered by Buyer described in this Section 2.2(c) (or a letter describing the failure of Seller to comply with its obligations under this Section 2.2(c) which has resulted in Seller's inability to determine the exceptions to the schedule Seller delivers), the Post-Closing Estimated Adjustment Amount will be conclusive and binding on Seller and Buyer. If Seller submits a letter detailing any exceptions to the calculation of the Post-Closing Estimated Adjustment Amount, then (1) for 20 days after the date Buyer receives such letter, Buyer and Seller will use their Commercially Reasonable Efforts to agree on the calculation of the Post-Closing Estimated Adjustment Amount and (2) lacking such agreement, Buyer or Seller may refer such matter for resolution under the arbitration provisions of Section 11.6 hereof. Such amount determined in accordance with this Section 2.2(c) is the "*Conclusive Adjustment Amount.*"

   2.3   **The Closing.** The closing of the purchase and sale of the Shares (the "*Closing*") will take place at the offices of Seller, 1100 Louisiana, Suite 2650, Houston, Texas, commencing at 11:00 a.m., local time, on the earlier of (i) January 12, 2005, or (ii) such other date as Buyer and the Seller may mutually determine (the "*Closing Date*"), provided, however, that if a Party is continuing to cure a breach of a representation, warranty or covenant through the exercise of its Commercially Reasonable Efforts, the Closing Date may be extended by mutual agreement.

   2.4   **Deliveries at the Closing.**

At the Closing:

   (a)   Seller will deliver to Buyer:

         (i)   Certificates representing the Shares, duly endorsed (or accompanied by duly executed stock powers).

         (ii)   A secretary's certificate, substantially in the form of Exhibit B, duly executed on Seller's behalf.

         (iii)   The resignation, effective as of the Closing, of the Company's directors and officers.

         (iv)   The Property Records.

         (v)   Counterpart originals of Assignment of Overriding Royalty Interests from CTS Properties, Ltd. to the Company reconveying all interests conveyed by that certain Assignment of Overriding Royalty Interests dated September 22, 2004, from the Company to Scott Y. Wood, a counterpart of which is recorded in Volume 622, Page 77, Public Records, Lawrence County, Illinois.

Wood 00017

(b)     Buyer will deliver to Seller:

(i)     Closing Date Adjusted Purchase Price, less the Deposit, in cash, via Fedwire.

(ii)     A secretary's certificate, substantially in the form of <u>Exhibit D</u>, duly executed on Buyer's behalf.

(iii)     Letter of Credit.

(iv)     An Amendment to the Company's Articles of Incorporation, together with directors' and shareholders' consents authorizing such Amendment, dated effective the day following the Closing Date, changing the Company's name to PennTex Resources Illinois, Inc., said form to be filed in Delaware and each state in which the Company is qualified to transact business.

## ARTICLE 3.
## REPRESENTATIONS AND WARRANTIES CONCERNING THE TRANSACTION

3.1     **Representations and Warranties of Seller.**  Seller Parties, jointly and severally, represent and warrant to Buyer that for the period of time commencing on March 13, 2004 and ending on the date of this Agreement or the Closing Date, as applicable, the statements contained in this <u>Section 3.1</u> are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this <u>Section 3.1</u>); it being expressly understood and agreed that Seller Parties make no representations or warranties for the period of time prior to March 13, 2004 and that Buyer's recourse for events, conditions or circumstances that existed on or before March 12, 2004, and which would cause a breach of a representation or warranty had the time period not be limited, shall not be against either Seller Party but shall be solely from Plains Exploration and Production Company ("Plains") under that certain Stock Purchase Agreement dated January 5, 2004 between Plains and the Company (a copy of which has been delivered to Buyer).

(a)     <u>Status of Seller</u>.  Seller is corporation duly created, formed or organized, validly existing, and in good standing under the laws of the State of Delaware.

(b)     <u>Power and Authority; Enforceability</u>.  Seller has the corporate power and authority to execute and deliver each Transaction Document to which Seller is a party, and to perform and consummate the Transactions.  Seller has taken all corporate actions necessary to authorize the execution and delivery of each Transaction Document to which it is party, the performance of Seller's obligations thereunder, and the consummation of the Transactions.  Each Transaction Document to which Seller is a party has been duly authorized, executed, and delivered by, and is Enforceable against, Seller.

(c)     <u>No Violation</u>.  Except as set forth in <u>Schedule 3.1(c)</u>, the execution and the delivery by Seller of the Transaction Documents to which Seller is a party and the performance and consummation of the Transactions by Seller will not (i) breach any Law or Order to which Seller is subject, (ii) violate, breach, impair or terminate any material

Wood 00018

Contract, Order, or Permit to which Seller is a party or by which Seller is bound or to which any of Seller's assets is subject, or (iii) require any Consent except as may be required from working interest owners under the Leases or except any notifications or filings to the Illinois Department of Natural Resources and the Indiana Department of Natural Resources.

(d) <u>Brokers' Fees</u>. Seller has no liability to pay any compensation to any broker, finder, or agent with respect to the Transactions for which Buyer or the Company would become directly or indirectly liable.

(e) <u>Shares; Seller Information</u>. Seller holds of record and owns beneficially all of the Shares, free and clear of any Encumbrances (other than any restrictions under the Securities Act and state securities laws). Seller is not a party to any contract that requires Seller to sell, transfer, or otherwise dispose of any of the Shares (other than this Agreement). Seller is not a party to any other contract with respect to the Shares.

**3.2 Representations and Warranties of Buyer Parties.** Each Buyer Party, jointly and severally, represents and warrants to Seller that the statements contained in this Section 3.2 are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date (as though made then and, except as expressly provided in a representation or warranty, as though the Closing Date were substituted for the date of this Agreement throughout this <u>Section 3.2</u>).

(a) <u>Entity Status</u>. Buyer is an entity duly created, formed or organized, validly existing and in good standing under the laws of the jurisdiction of its creation, formation or organization.

(b) <u>Power and Authority; Enforceability</u>. Buyer Parties have the relevant entity power and authority to execute and deliver each Transaction Document to which it is party, and to perform and consummate the Transactions. Buyer has taken all entity action necessary to authorize the execution and delivery of each Transaction Document to which it is party, the performance of its obligations thereunder, and the consummation of the Transactions. Each Transaction Document to which Buyer is a party has been duly authorized, executed and delivered by, and is Enforceable against, Buyer.

(c) <u>No Violation</u>. Except as set forth on <u>Schedule 3.2(c)</u> and except as would not cause a Material Adverse Change, the execution and delivery by Buyer of the Transaction Documents to which Buyer is party and the performance and consummation of the Transactions by Buyer will not (i) breach any law or Order to which Buyer is subject or any provision of its Organizational Documents; (ii) violate, breach, impair or terminate any material contract, Order, or Permit to which Buyer is a party or by which it is bound or to which any of its assets is subject; or (iii) require any Consent, except any notifications or filings to the Illinois Department of Natural Resources and the Indiana Department of Natural Resources.

Wood 00019

(d) <u>Brokers' Fees</u>. Buyer has no liability to pay any compensation to any broker, finder, or agent with respect to the Transactions for which either Seller Party would become liable.

(e) <u>Acquired Company Review</u>.

Buyer:

(i) Has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of its investment in the Shares contemplated hereby.

(ii) Is acquiring the Shares for investment purposes only, is able to bear the economic risk of such investment and has no intention of selling or distributing the Shares in any manner that would violate Laws governing the sale and distribution of securities.

(iii) Has made its own independent examination, investigation, analysis and evaluation of the Shares, including its own estimate of the value of the Shares.

(iv) Buyer Parties acknowledge that (i) they have, and pursuant to this Agreement will have, before the Closing Date access to the Seller, the Properties, the Company Records, and the officers and employees of the Company and (ii) in making the decision to enter into this Agreement and consummate the transactions contemplated under this Agreement, they have relied solely on their own independent investigation and upon the express representations, warranties, covenants, and agreements set forth in this Agreement. Without limiting the above, the Buyer Parties acknowledge that they have, prior to the execution and delivery of this Agreement, (w) conducted due diligence to their satisfaction including environmental due diligence, (x) reviewed the environmental site assessments relating to the Properties, (y) had full opportunity to conduct to their satisfaction inspections of the Properties and the Company Records, and (z) fully completed and approved the results of all such inspections.

(v) THE BUYER PARTIES ACKNOWLEDGE THAT, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NEITHER THE SELLER NOR THE COMPANY HAS MADE, AND NEITHER THE SELLER NOR THE COMPANY MAKES ANY REPRESENTATION OR WARRANTY AND DISCLAIMS ANY REPRESENTATION OR WARRANTY, WHETHER EXPRESS OR IMPLIED, AND WHETHER BY COMMON LAW, STATUTE, OR OTHERWISE, REGARDING THE ASSETS, PROPERTIES, BUSINESS OR THE FACILITIES, INCLUDING, WITHOUT ANY LIMITATION, (i) THE QUALITY, CONDITION, OR OPERABILITY OF ANY ASSET OR PROPERTY, (ii) THEIR MERCHANTABILITY, (iii) THEIR FITNESS FOR ANY PARTICULAR PURPOSE, (iv) THEIR ENVIRONMENTAL

13

Wood 00020



CONDITION, OR (v) THEIR CONFORMITY TO MODELS, SAMPLES OF MATERIALS OR MANUFACTURER DESIGN.

(vi)     Buyer has sufficient immediately available funds to enable it to make payment of the Closing Date Adjusted Purchase Price and the Conclusive Adjustment Amount at such times as such amounts are to be paid without encumbrance or delay and without causing the Buyer to become insolvent or to declare insolvency.

## ARTICLE 4.
## REPRESENTATIONS AND WARRANTIES
## CONCERNING THE COMPANY

Seller Parties, jointly and severally, represent and warrant to Buyer that for the period of time commencing on March 13, 2004 and ending on the date of this Agreement or the Closing Date, as applicable, the statements contained in this Article 4 are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this Article 4); it being expressly understood and agreed that Seller Parties make no representations or warranties for the period of time prior to March 13, 2004 and that Buyer's recourse for events, conditions or circumstances that existed on or before March 12, 2004, and which would cause a breach of a representation or warranty had the time period not been limited, shall not be against either Seller Party but shall be solely from Plains under that certain Stock Purchase Agreement dated January 5, 2004 between Plains and the Company (a copy of which has been delivered to Buyer).

4.1     **Corporate Status.**  The Company is an entity duly created, formed or organized, validly existing, and in good standing under the Laws of the jurisdiction of its creation, formation, or organization.  The Company is duly authorized to conduct its business and is in good standing under the Laws of each jurisdiction where such qualification is required except where failure to so qualify would not cause a Material Adverse Effect.  The Company has the requisite entity power and authority necessary to own or lease its properties and to carry on its businesses as currently conducted.  Schedule 4.1 lists the Company's directors and officers. Seller has delivered to Buyer correct and complete copies of the Company's Organizational Documents, as amended to date.  The Company is not in breach of any provision of its Organizational Documents.

4.2     **Power and Authority; Enforceability.**  The Company has the relevant entity power and authority necessary to execute and deliver each Transaction Document to which it is a party and to perform and consummate the Transactions.  The Company has taken all corporate action necessary to authorize the execution and delivery of each Transaction Document to which it is a party, the performance of its obligations thereunder, and the consummation of the Transactions.  Each Transaction Document to which the Company is party has been duly authorized, executed, and delivered by, and is Enforceable against, the Company.

4.3     **No Violation.**  Except as listed on Schedule 4.3, the execution and the delivery of the applicable Transaction Documents by the Company and the performance of its obligations

14

Wood 00021

hereunder and thereunder, and consummation of the Transactions by the Company will not (a) breach any Law or Order to which the Company is subject or any provision of the Organizational Documents of the Company; (b) violate, breach, impair or terminate any Contract, Order, or Permit to which the Company is a party; or (c) require any Consent, except any notifications or filings to the State of Illinois Department of Natural Resources and the State of Indiana Department of Natural Resources.

4.4 **Brokers' Fees.** The Company has no liability to pay any compensation to any broker, finder, or agent with respect to the Transactions for which Buyer or the Company would become directly or indirectly liable.

4.5 **Capitalization.** The Company's authorized Equity Interests consist of (a) 1,000 shares of common stock, $.01 par value, of which 1000 shares are issued and outstanding and none are held in treasury. All of the Company's issued and outstanding shares: (a) have been duly authorized and are validly issued, fully paid, and nonassessable, (b) were issued in compliance with all applicable state, and federal securities laws, (c) were not issued in breach of any Commitments, and (d) are held of record and owned beneficially by Seller. The Company has no Commitments outstanding and has no obligation to issue any Commitments. There are no contracts with respect to the voting or transfer of the Company's Equity Interests. The Company is not obligated to redeem or otherwise acquire any of its outstanding Equity Interests. The Company does not own an Equity Interest in any Person.

4.6 **Company's Organizational Documents.** The copies of the Company's Organizational Documents that were provided to Buyer are accurate and complete and reflect all amendments made through the date hereof.

4.7 **Company's Assets and Liabilities.** The Company has provided to Buyer a list of the assets and liabilities of the Company prepared in the ordinary course of its business. There are no outstanding third party notes or loans.

4.8 **Purposely Deleted.**

4.9 **Purposely Deleted.**

4.10 **Legal Compliance.**

(a) To the Knowledge of Seller, and except as would not cause a Material Adverse Effect, and except as set forth on Schedule 4.10(a) and except with regard to Environmental Laws and Regulations (exclusively covered in Section 4.20), (i) the Company has complied with all applicable Laws except for such failures to comply as would not cause a Material Adverse Effect, and (ii) no Action is pending or, to the Knowledge of Seller, threatened against the Company alleging any failure to so comply.

(b) To the Knowledge of Seller, and except as would not cause a Material Adverse Effect, all oil and gas wells comprising a part of such Properties have been drilled and completed within the boundaries of the applicable Leases or within limits otherwise permitted by a valid and enforceable pooling, unit, or other contract or by Law, and no well comprising a part of such Properties is or was subject to any penalty on

15

Wood 00022

allowables after the Effective Date because of any overproduction (or any other Orders) which would (or did) prevent such well from being entitled to its full legal and regular allowable share of production, as prescribed by any Governmental Body, from and after the Effective Date. During its ownership of the Properties, Seller Parties have not drilled any wells on the Properties.

4.11 **Tax Matters.** Except as set forth on Schedule 4.11 or as would not cause a Material Adverse Effect:

(a) <u>Tax Liabilities</u>. All Taxes for which the Company is liable in respect of periods (or portions thereof) have been timely paid or have been specifically and fully reserved for (but excluding any reserve for deferred Taxes established to reflect a timing difference between book and Tax income or for Taxes for the current period for which no Taxes are due and payable) or are being contested in good faith.

(b) <u>Payroll Taxes</u>. All payroll Taxes required to be withheld by Company have been withheld and have been remitted as required by applicable Law.

(c) <u>Tax Audits</u>. The Company has not received written notification of an issue raised or adjustment proposed (and, to the Knowledge of Seller, none is pending) by any Governmental Body in connection with any of the Tax Returns of the Company that have been filed prior to the date hereof except as set forth on Schedule 4.11. The Company has not received written notice of any deficiencies for any Taxes asserted or assessed against it that remain unpaid except as set forth on Schedule 4.11. Seller has not received any written notice that Tax Returns of Company are currently being audited or examined by any Governmental Body except as set forth on Schedule 4.11. To the Knowledge of Seller, no examinations, actions, suits or proceedings with respect to Taxes are pending or threatened against Company except as set forth on Schedule 4.11.

(d) <u>Waivers and Extensions</u>. No waiver or extension of any statute of limitations as to any Tax matter has been given by Company, and no such waiver or extension has been requested from Company.

(e) <u>Tax Rulings</u>. To the Knowledge of Seller, there are no Tax rulings, requests for rulings or closing agreements with any Governmental Body concerning Taxes with respect to Company.

(f) <u>Tax Indemnities</u>. The Company has no contractual obligation to indemnify any other person with respect to Taxes.

4.12 **Title to Assets.** Except as set forth on Schedule 4.12, the Company has indefeasible title to, or a valid leasehold interest in the following, in each case free and clear of all Encumbrances:

(a) <u>Equipment and Vehicles</u>. Except for omissions which do not have a Material Adverse Effect, Schedule 4.12(a) contains a true and correct list of substantially all equipment, machinery, and motor vehicles currently in use in the operation of the oil and gas interests of Company.

16

Wood 00023

(b)     <u>Wells and Facilities</u>.  Except for omissions which do not have a Material Adverse Effect, <u>Schedule 4.12(b)</u> contains a list of substantially all (a) wells owned by Company, and (b) pipelines, plants, generation facilities and other facilities owned and used by Company in the area.

(c)     <u>No Removal of Assets</u>.  Seller shall not remove any assets that are owned and used in the operation of the Company as of the Effective Date.

**4.13    Title to Real Property.**

(a)     Except for the Properties, the Company does not own or lease any real property other than the leases listed in <u>Schedule 4.13</u>.

(b)     Except as would not cause a Material Adverse Effect in the aggregate, the Company has Defensible Title to the Properties.

**4.14    Contracts.**  <u>Schedules 4.13</u>, <u>4.14</u>, <u>4.15</u> and <u>4.18</u> list the following contracts to which the Company is a party ("***Contracts***"):

(a)     Any contract for the sale, exchange or other disposition of Substances produced from the Properties that is not cancelable without penalty on not more than 30 days prior written notice.

(b)     Any contract to sell, lease, farmout or otherwise dispose of any of its interests in any of the Properties other than conventional rights of reassignment.

(c)     Any option to purchase or call on the Substances produced from the Properties, other than those terminable on 30 days notice or less.

(d)     Any contract (or group of related contracts) under which it has created, incurred, assumed, or guaranteed any liability for borrowed money or any capitalized lease in excess of $100,000, or under which it has imposed or suffered to exist an Encumbrance on any of its assets.

(e)     Any contract with Seller or any Affiliates of Seller other than the Company.

(f)     Any contract for the employment of any officer or employee of Company obligating the Company in excess of $150,000 per year for such individual Contract.

Seller has delivered to Buyer a correct and complete copy of each Contract (as amended to date).  The total value of all contracts or commitments not listed on <u>Schedules 4.13, 4.14, 4.15 and 4.18</u> do not in the aggregate exceed $100,000.

**4.15    Insurance.**  <u>Schedule 4.15</u> contains accurate and complete lists of all insurance policies currently carried by the Seller insuring the Company or its assets.  Such insurance policies are currently in full force and effect .  The Company has not received (i) any written or electronic notice of cancellation of any policy described in <u>Schedule 4.15</u> or refusal of coverage

17

Wood 00024


thereunder, (ii) any written or electronic notice that any issuer of such policy has filed for protection under applicable bankruptcy or other insolvency laws or is otherwise in the process of liquidating or has been liquidated, or (iii) any other written or electronic indication that such policies are no longer in full force or effect or that the issuer of any such policy is no longer willing or able to perform its obligations thereunder.

4.16   **Litigation.**  Schedule 4.16 sets forth each instance in which the Company (a) is subject to any outstanding Order or (b) is a party to, the subject of, or, to Seller's Knowledge, is threatened to be made a party to or the subject of any Action.  Except for the Tsar Case, no Action required to be set forth in Schedule 4.16 questions the Enforceability of this Agreement or the Transactions, or would reasonably be expected to result in any Material Adverse Change with respect to the Company, and to Seller's Knowledge, no such Action has been threatened against the Company.

4.17   **Labor; Employees.**  Except as set forth on Schedule 4.17, the Company is not a party to or bound by any collective bargaining contract, nor has it experienced any strikes, grievances, claims of unfair labor practices, or other collective bargaining disputes.  Seller has no Knowledge of any organizational effort currently being made or threatened by or on behalf of any labor union with respect to the Company's employees.  Schedule 4.17 contains a true and complete list of all of the Company's employees as of the Effective Date.

4.18   **Employee Benefits.**  Schedule 4.18 lists each non-qualified deferred compensation plan, qualified defined contribution retirement plan, qualified defined benefit retirement plan or other material fringe benefit plan or program that the Company maintains or to which the Company contributes ("*Plans*").  With respect to any Plan, within the meaning of Section 3(3) of ERISA, which is subject to ERISA and which is sponsored, maintained or contributed to, or has been sponsored, maintained or contributed to, within six years prior to the Closing Date, by the Company or any ERISA Affiliate, (a) no withdrawal liability, within the meaning of Section 4201 of ERISA, has been incurred, which withdrawal liability has not been satisfied, (b) no liability to the PBGC has been incurred by the Company or any ERISA Affiliate, which liability has not been satisfied, (c) no accumulated funding deficiency, whether or not waived, within the meaning of Section 302 of ERISA or Section 412 of the Code has been incurred, and (d) all contributions (including installments) to such plan required by Section 302 of ERISA and Section 412 of the Code have been timely made.

4.19   **Permits.**  To the Knowledge of Seller, the Company possesses all Permits required to be obtained for its business and operations, except (i) as disclosed in Schedule 4.19 and (ii) which the failure to obtain would not cause a Material Adverse Effect.  To the Knowledge of Seller, except as set forth in Schedule 4.19 or as would not cause a Material Adverse Effect, with respect to each such Permit:

    (a)     it is valid, subsisting and in full force and effect;

    (b)     there are no violations of such Permit that would result in a termination of such Permit;

Wood 00025

(c)     the Company has not received written notice that such Permit will not be renewed; and

(d)     the Transactions will not adversely affect the validity of such Permit or cause a cancellation of or otherwise adversely affect such Permit.

4.20    **Limitations of Seller Parties' Representations and Warranties.** The following limitations apply with regard to all representations and warranties by the Seller Parties:

(a)     The Seller Parties hereby make no and disclaim any representation or warranty, whether express or implied, and whether by common law, statute, or otherwise, regarding any and all Environmental Laws and Regulations.

(b)     The Buyer acknowledges that: (i) it has had and pursuant to this Agreement will have before the Closing Date access to the Company, the Seller Parties, the Company Records, the Properties, the Property Records and all of the Seller Parties' assets, properties, and operations, and the officers and employees of the Seller Parties, and (ii) in making the decision to enter into this Agreement and consummate the Transactions, the Buyer has relied solely on its own independent investigation and upon the express representations, warranties, covenants, and agreements set forth in this Agreement.  Without limiting the above, the Buyer has, prior to the execution and delivery of this Agreement, (i) conducted all due diligence to its satisfaction including environmental due diligence of the Company, the Properties, the Property Records and all of the Seller Parties' assets, properties, and operations, (ii) fully reviewed the Company Records and Property Records to its satisfaction, (iii) had full opportunity to conduct to its satisfaction inspections of the Company Records, the Properties, the Property Records and all of the Company's assets, properties, and operations, and (iv) fully completed and approved the results of all such inspections.  The Buyer acknowledges, upon Closing, that no Company Records, Properties, Property Records, any of the Company's assets, properties, and operations, nor any further investigation is necessary for the purpose of acquiring the Shares or for the Buyer's intended operation of the Company's business after Closing.

UPON CLOSING, THE BUYER HEREBY WAIVES ANY AND ALL OBJECTIONS TO OR CLAIMS WITH RESPECT TO ALL PHYSICAL CHARACTERISTICS AND EXISTING OR HISTORICAL CONDITIONS AT OR RELATED TO THE COMPANY, THE PROPERTIES, THE PROPERTY RECORDS AND ANY OF THE COMPANY'S ASSETS, PROPERTIES, AND OPERATIONS INCLUDING WITHOUT LIMITATION EXISTING OR HISTORICAL ENVIRONMENTAL CONDITIONS AND THE PRESENCE OF ANY HAZARDOUS SUBSTANCES AT OR RELATING TO THE COMPANY, THE PROPERTIES, THE PROPERTY RECORDS AND ANY OF THE COMPANY'S ASSETS, PROPERTIES, AND OPERATIONS.

WITHOUT LIMITING THE ABOVE, ALL ASSETS OWNED BY THE COMPANY'S TO BE DELIVERED AS AN AUTOMATIC RESULT OF THE SALE OF THE SHARES HEREUNDER ARE DELIVERED "AS IS, WHERE IS," "WITH

19                                      Wood 00026

ALL FAULTS," IN THE CONDITION IN WHICH THE SAME EXIST AS OF THE CLOSING DATE. THE BUYER ACKNOWLEDGES THAT, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, THE SELLER PARTIES HAVE NOT MADE, AND THE SELLER PARTIES MAKE NO REPRESENTATION OR WARRANTY AND DISCLAIM ANY REPRESENTATION OR WARRANTY, WHETHER EXPRESS OR IMPLIED, AND WHETHER BY COMMON LAW, STATUTE, OR OTHERWISE, REGARDING THE COMPANY, THE PROPERTIES, THE PROPERTY RECORDS, THE COMPANY RECORDS AND ANY OF THE COMPANY'S ASSETS, PROPERTIES, AND OPERATIONS, INCLUDING, WITHOUT ANY LIMITATION, (i) THE QUALITY, CONDITION, OR OPERABILITY OF ANY ASSETS, (ii) THEIR MERCHANTABILITY, (iii) THEIR FITNESS FOR ANY PARTICULAR PURPOSE, (iv) THEIR ENVIRONMENTAL CONDITION, OR (v) THEIR CONFORMITY TO MODELS, SAMPLES OF MATERIALS OR MANUFACTURER DESIGN.

**4.21    Certain Assets Used by the Company.**  Except as set forth on <u>Schedule 4.12</u>, neither Seller nor Seller's Affiliates (other than the Company) own any asset that is required to operate in the Company's business or is used in the Company's business as such is being conducted on the date of this Agreement.

**4.22    Bank Accounts; Powers of Attorney.**  <u>Schedule 4.22</u> sets forth: (a) the name of each bank, savings and loan, credit union or other financial institution in which Company has any account, certificate of deposit or other investment or safe deposit box, the style and number of each such account or safe deposit box and the names of all persons authorized to draw thereon or have access thereto other than the account identified in <u>Schedule 4.12</u> indicating that it is excluded from this Agreement, and (b) the name of each person holding a general or special power of attorney from the Company and a summary of the terms thereof.

**4.23    Scope of Business Activities.**  Company has not conducted any business activities other than activities relating to the ownership of the Properties and the performance of petroleum exploration, development and production.

**4.24    Records.**  The Company Records which have been previously made available to Buyer have been maintained in the Ordinary Course of Business.

**4.25    Oil and Gas Properties.**

(a)    Except with regard to the matters alleged in the Tsar Case, which neither Seller Party admits constitutes a breach or default of any obligation of the Company, to Seller's Knowledge, the Company is not in breach or default nor has the Company received written notice from another party to any Lease or material contract, agreement, license, permit, easement, right of way or other right of surface use, or any other Contract that the Company is in breach or default.

(b)    The Company is not obligated, by virtue of a prepayment arrangement, a "take or pay" arrangement, production payment or any other arrangement to deliver oil,

20

**Wood 00027**

gas or other hydrocarbons produced from the Properties at some future time without then receiving full payment therefore.

(c) To Seller's Knowledge, the Company has not received written notification that proceeds from the sale of oil, condensate or gas from the Properties attributable to mineral or royalty interests are not being properly paid and received in all respects by such mineral and/or royalty interest owners in a timely manner and are not being unreasonably held in suspense.

**4.26 Representations Complete. Except as and to the extent expressly and specifically set forth in this Agreement, neither Seller Party makes any representations or warranties whatsoever (INCLUDING ANY IMPLIED OR EXPRESS WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR CONFORMITY TO MODELS OR SAMPLES OF MATERIALS) to Buyer and each of them hereby disclaims all liability and responsibility for any representation, warranty, statement, or information not included herein that was made, communicated, or furnished (orally or in writing) to Buyer or its representatives (including any opinion, information, projection, or advice that may have been or may be provided to Buyer by any director, officer, employee, agent, consultant, or representative of either Seller Party). Any disclosure made on any schedule shall operate as a disclosure on any other schedule to which such disclosure may apply, so long as it is sufficiently identified.**

### ARTICLE 5.
### PRE-CLOSING COVENANTS

The Parties agree as follows with respect to the period prior to the Closing Date:

**5.1 General.** Each Party will use its Commercially Reasonable Efforts to take all actions and to do all things necessary, proper, or advisable to consummate, make effective, and comply with all of the terms of this Agreement and the Transactions applicable to it (including satisfaction, but not waiver, of the Closing conditions for which it is responsible or otherwise in control.

**5.2 Notices and Consents.**

(a) Each Seller Party will give any notices to third parties, and will use its Commercially Reasonable Efforts to obtain any third party Consents that Buyer reasonably may request, but Closing shall not be dependent on the obtaining of any Consents. Each Seller Party will give any notices to, make any filings with, and use its Commercially Reasonable Efforts to obtain any Consents of Governmental Authorities, if any, required or reasonably deemed advisable by Buyer pursuant to any applicable law in connection with the Transactions including in connection with the matters referred to in Section 3.1(c).

(b) Buyer will give any notices to third parties, and will use its Commercially Reasonable Efforts to obtain any third party Consents that Seller reasonably may otherwise request. Buyer will give any notices to, make any filings with, and use its Commercially Reasonable Efforts to obtain any Consents of Governmental Bodies, if

21

Wood 00028