United States Bankruptcy Court
Southern District of Texas
FILED

SEP 1 2 2006

Michael N. Milby, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| SCOTT Y. WOOD, | § | |
| PLAINTIFF, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-06-2198 |
| | § | |
| PENNTEX RESOURCES, L.P. | § | |
| AND LANCE T. SHANER, | § | |
| | § | |
| DEFENDANTS. | § | |

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF
DEFENDANTS' MOTION TO COMPEL ARBITRATION
AND TO STAY THIS ACTION**

**FULBRIGHT & JAWORSKI L.L.P.**

J. Todd Shields
Federal I.D. No. 3582
State Bar No. 18260500
1301 McKinney Street, Suite 5100
Houston, Texas  77010-3095
713/651-3762 (telephone)
713/651-5246 (facsimile)

**ATTORNEY-IN-CHARGE FOR
DEFENDANTS AND  COUNTER-
CLAIMANTS, PENNTEX RESOURCES,
L.P. AND LANCE T. SHANER**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................1

I.  WOOD'S ARGUMENT THAT HE IS INSULATED FROM
    CORPORATE CONTRACTUAL OBLIGATIONS DOES NOT
    ADDRESS SUBSTANTIAL AUTHORITY SHOWING THAT HE
    CONSENTED TO BE BOUND TO INDIVIDUAL OBLIGATIONS IN
    THE 2005 STOCK PURCHASE AGREEMENT AND MUST
    THEREFORE ARBITRATE..................................................................................2

II. WOOD FAILS TO REFUTE THAT HE IS BOUND TO ARBITRATE
    UNDER THE 2005 STOCK PURCHASE AGREEMENT BECAUSE
    ORDINARY PRINCIPLES OF CONTRACT AND AGENCY LAW
    JUSTIFY BINDING WOOD TO THE ARBITRATION PROVISIONS
    OF THE 2005 STOCK PURCHASE AGREEMENT..........................................4

    A.  Introduction. ......................................................................................4

    B.  Wood's Argument That He Has Not Derived Substantial Direct
        Benefits Under The Agreement Is Insupportable, And The Direct
        Benefits Estoppel Doctrine Justifies Compelling Wood To
        Arbitrate.............................................................................................5

    C.  Wood Cannot Deny That He Is Bound To Arbitrate As A Third-
        Party Beneficiary Under The 2005 Stock Purchase Agreement..............13

    D.  Wood Is Bound To Arbitrate Under The 2005 Stock Purchase
        Agreement Because ERG Illinois Holdings, Inc. Bound Wood To
        That Agreement As His Agent, And Wood Fails To Address
        Defendants' Apparent Agency Argument. ...............................................15

    E.  Wood Does Not Deny That He Signed The 2005 Stock Purchase
        Agreement Without Any Intention Of Ever Performing The
        Personal Obligations Contained Therein, Which Were
        Consideration For Substantial Personal Benefits, And He Should
        Therefore Be Compelled To Arbitrate As The Alter Ego Of ERG
        Holdings.............................................................................................17

III. THE DISPUTE AT ISSUE IN DEFENDANTS' MOTION IS WITHIN
     THE SCOPE OF THE ARBITRATION PROVISION IN THE 2005
     STOCK PURCHASE AGREEMENT.................................................................18

CONCLUSION ...................................................................................................20

## TABLE OF AUTHORITIES

### FEDERAL CASES

*AT&T Technologies, Inc. v. Commc'ns Workers*, 106 S.Ct. 1415 ....................................13

*Air Liquide America Corporation v. U.S. Army Corps of Engineers*, 359 F.3d 358.........16

*Alpine Ocean Seismic Survey, Inc. v. F.W. Myers & Co.*, 23 F.3d 946....................14

*Howsam v. Dean Witter Reynolds, Inc.*, 123 S.Ct. 588 ....................................18

*Instone Travel Technology Marine & Offshore v. International Shipping
    Partners, Inc.*, 334 F.3d 423 ....................................................3

*John Wiley & Sons, Inc. v. Livingston*, 84 S.Ct. 909 ....................................18

*Municipal Energy Agency v. Big Rivers Electrical Corp.*, 804 F.2d 338....................13

*Snap-on Tools Corp. v. Mason*, 18 F.3d 1261 ....................................13

*Steelworkers v. American Mfg. Co.*, 80 S.Ct. 1343 ....................................13

*Wash. Mutual Finance Group, LLC v. Bailey*, 364 F.3d 260 ....................................5

### STATE CASES

*American Petrofina Company of Texas v. Bryan*, 519 S.W.2d 484 ....................................3

*Biggs v. United States Fire Insurance Co.*, 611 S.W.2d 624 ....................................16

*Castleberry v. Branscum*, 721 S.W.2d 270 ....................................17

*In re Rangel*, 45 S.W.3d 783 ....................................14

*In Re Weekley Homes*, 180 S.W.3d 127 ....................................5, 12

*Nationwide of Bryan, Inc. v. Dyer*, 969 S.W.2d 518 ....................................14

*Stonewall Insurance Co. v. Modern Exploration Inc.*, 757 S.W.2d 432 ....................................14

*Willis v. Donnelly*, _ S.W.3d _, 2006 WL 1506258 ....................................3

### RULES

Fed. R. Civ. P. 8(e) ....................................15

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| SCOTT Y. WOOD, | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-06-2198 |
| | § | |
| PENNTEX RESOURCES, L.P. | § | |
| AND LANCE T. SHANER, | § | |
| | § | |
| DEFENDANTS. | § | |

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF**
**DEFENDANTS' MOTION TO COMPEL ARBITRATION**
**AND TO STAY THIS ACTION**

PennTex Resources, L.P. ("PennTex") and Lance T. Shaner, defendants and counterclaimants herein ("Defendants"), file Defendants' Reply Memorandum In Support Of Defendants' Motion To Compel Arbitration And To Stay This Action ("Defendants' Reply Memorandum"), and for same would respectfully show the following:[1]

**INTRODUCTION**

The subject of this litigation is whether the plaintiff, Scott Y. Wood ("Wood"), is bound to arbitrate a dispute regarding whether he must comply with indemnity provisions in a stock purchase agreement that direct him, by name, to dismiss or release the individual claims he is now prosecuting in a pending state court action. Defendants' Memorandum In Support Of Defendants' Motion To Compel Arbitration And To Stay This Action ("Defendants' Memorandum") demonstrated that Wood is bound by relevant terms of the Stock Purchase

---

[1] Defendants file Defendants' Reply Memorandum both in support of Defendants' Motion To Compel Arbitration And To Stay This Action ("Defendants' Motion") and in opposition to the plaintiff's Response To Defendants' Motion To Compel Arbitration And To Stay This Action. Defendants' Appendix Of Supporting Materials Filed In Support Of Defendants' Motion To Compel Arbitration And To Stay This Action, also filed concurrently with Defendants' Motion, will be referred to herein as "Defendants' Appendix."

Agreement By And Among PennTex Resources, L.P., PennTex Energy Inc., ERG Illinois Holdings, Inc. And ERG Illinois, Inc. Dated:  January 12, 2005 (the "2005 Stock Purchase Agreement" or the "Agreement") because he signed the Agreement in an individual as well as a representative capacity, and, alternatively, because any one of a number of ordinary principles of contract and agency hold that he is so bound.  As will be demonstrated in the discussion that follows, Wood's Response To Defendants' Motion To Compel Arbitration And To Stay This Action ("Wood's Response") fails to demonstrate any reason why he should not be compelled to arbitrate under the 2005 Stock Purchase Agreement.

I.  **WOOD'S ARGUMENT THAT HE IS INSULATED FROM CORPORATE CONTRACTUAL OBLIGATIONS DOES NOT ADDRESS SUBSTANTIAL AUTHORITY SHOWING THAT HE CONSENTED TO BE BOUND TO INDIVIDUAL OBLIGATIONS IN THE 2005 STOCK PURCHASE AGREEMENT AND MUST THEREFORE ARBITRATE.**

Wood's argument that he created ERG Illinois Holdings, Inc. ("ERG Holdings") to insulate himself from personal liability for corporate contractual obligations, and then caused ERG Holdings rather than himself to be the "Seller" party under the 2005 Stock Purchase Agreement, fails to address Defendants' argument that the 2005 Stock Purchase Agreement should be construed as manifesting Wood's consent to be bound to that Agreement in both his individual and representative capacities.[2]  Indeed, this argument, on its own, is completely beside the point given that it is obvious that whatever Wood's purpose may have been in creating ERG Holdings, it certainly did not preclude him from thereafter undertaking individual obligations at the same time that he sought to bind his corporation to other, obviously corporate obligations.

Defendants' Memorandum made a compelling showing that Wood's signing of the 2005 Stock Purchase Agreement, which mandates that "*Scott Y. Wood* . . . shall give . . . full cooperation to the Buyer [PennTex] in the Buyer's post-Closing prosecution and defense of the

---

[2] *Compare* Wood's Response at pp. 2-3 *with* Defendants' Memorandum at pp. 7-11.

Tsar Case . . .," and that "*Scott Y. Wood* will, at Buyer's request . . . either dismiss or release the claims that he has asserted individually in the Tsar Case," caused Wood to be individually liable for performance of those obligations under the settled rule in Texas that an agent for a disclosed principal may become individually liable under a contract if the agent has substituted his own responsibility for that of his principle, or has pledged his own responsibility in addition to that of his principal.[3]  That Wood's Response does not even mention, much less discuss or attempt to distinguish, the *American Petrofina* and *Instone* decisions, speaks volumes about Wood's inability to refute the obvious conclusion that the 2005 Stock Purchase Agreement must be construed as manifesting his consent to be personally bound by his individual "cooperation" and "release" obligations that are set out in Section 9.4(e) of the 2005 Stock Purchase Agreement, and were obviously intended to be reciprocal to the Buyer's indemnity obligations relating to the Tsar Case that are described in the same section of the Agreement.

Wood's reliance on the rule that shareholders are shielded from personal liability for corporate contractual obligations also misses the point.[4]  Defendants have never sought to transform a corporate obligation into a personal obligation, but instead have argued, citing well-recognized principles of Texas contract law, that the *individual* nature of the Wood's "cooperation" and "release" obligations demonstrates unambiguously that Wood signed the Agreement in an *individual* as well as representative capacity.[5]  Under these circumstances, decisions such as *Willis v. Donnelly*, __ S.W.3d __, 2006 WL 1506258 (Tex. June 2, 2006), cited and relied on by Wood, are inapposite because they involve obviously corporate obligations. In *Willis*, Donnelly sought to hold the Willises liable for their companies' breach of a letter

---

[3] *See* Defendants' Memorandum at pp. 7-11, citing and discussing *American Petrofina Company of Texas v. Bryan*, 519 S.W.2d 484, 487 (Tex. App. – El Paso 1975, no writ), and *Instone Travel Tech Marine & Offshore v. Int'l Shipping Partners, Inc.*, 334 F.3d 423, 428, 430-31 (5th Cir. 2003).
[4] *See* Wood's Response at pp. 2-3.
[5] *See* Defendants' Memorandum at pp. 7-11.

agreement under which the companies, not the Willises, were to transfer to him certain amounts of stock. *Id.* at *5-6. The text of the letter agreement "obligated [the corporations] *only* to issue shares to Donnelly." *Id.* at *6 (emphasis added). Here, by contrast, the Defendants seek only to hold Wood personally responsible for his own individual obligations that, by their own terms, are personal to him and can only be performed by him.[6]

II.    **WOOD FAILS TO REFUTE THAT HE IS BOUND TO ARBITRATE UNDER THE 2005 STOCK PURCHASE AGREEMENT BECAUSE ORDINARY PRINCIPLES OF CONTRACT AND AGENCY LAW JUSTIFY BINDING WOOD TO THE ARBITRATION PROVISIONS OF THE 2005 STOCK PURCHASE AGREEMENT.**

   A.    **Introduction.**

   Although the individual capacity in which Wood signed the 2005 Stock Purchase Agreement provides a sufficient basis to compel arbitration, Defendants' Memorandum presented as alternative arguments a number of contract and agency law theories that each independently show that Wood is personally bound and must arbitrate the dispute arising out of Wood's failure to comply with his "cooperation" and "release" obligations set out in the 2005 Stock Purchase Agreement.[7]  Wood's Response does not overcome Defendants' arguments.

---

[6] In addition, Wood's supposed evidence that the 2005 Stock Purchase Agreement reflects that he was to be insulated from personal liability crumbles under even the briefest examination. Defendants had Wood sign the side-letter agreement guaranteeing that ERG Holdings would retain part of the sales consideration for one year precisely because that obligation was a corporate obligation. Quite unlike Wood's "cooperation" and "release" obligations in Section 9.4(e) of the Agreement, ERG Holdings's retention of sales consideration could in no way be construed as Wood's personal obligation without the separate side-letter agreement. Wood again apparently misconceives that Defendants are trying to hold him personally liable for corporate obligations when all Defendants seek to do is compel Wood to arbitrate a dispute arising out of his failure to comply with his own individual obligations under the 2005 Stock Purchase Agreement that are inherently personal in nature.

[7] *See* Defendants' Memorandum at pp. 12-24.

**B.**   **Wood's Argument That He Has Not Derived Substantial Direct Benefits Under The Agreement Is Insupportable, And The Direct Benefits Estoppel Doctrine Justifies Compelling Wood To Arbitrate.**

Wood prefaces his argument on direct benefits estoppel by suggesting that "[b]ased on the Fifth Circuit's application of the doctrine, the theory fails in this case."[8]  However, Wood has not, and indeed cannot, contest Defendants' assertion that Texas law, and not federal common law, controls this Court's application of the direct benefits estoppel doctrine.[9]  More importantly, Wood's Response makes no attempt to refute the strong showing that was made in Defendants' Memorandum demonstrating that the applicable Texas law supports a finding that, irrespective of Wood's status as a plaintiff or defendant in the underlying arbitration proceeding, he is bound to arbitrate under the 2005 Stock Purchase Agreement because he has sought or obtained direct benefits from a contract "by means other than a lawsuit."  *In Re Weekley Homes*, 180 S.W.3d 127, 133-135 (Tex. 2005).[10]

Wood's principal argument regarding direct benefits estoppel is, incredibly, that "Wood has never claimed a benefit under the SPA [2005 Stock Purchase Agreement] and has never received a direct benefit from it."[11]  Wood's argument is filled with straw men, irrelevant and misleading observations and specious reasoning.  Notably absent from Wood's argument is any analysis that undercuts or refutes the compelling showing that was made in Defendants'

---

[8] *See* Wood's Response at p. 4.

[9] *See* Defendants' Memorandum at p. 3 and n. 2.  *See also Wash. Mut. Fin. Group, LLC v. Bailey*, 364 F.3d 260, 264 (5th Cir. 2004) ("In determining whether the parties agreed to arbitrate a certain matter, courts apply the contract law of the particular state that governs the agreement.").

[10] Similarly, Wood's Response fails to address Defendants' argument that consideration of the underlying rationale of decisions applying the doctrine of direct benefits estoppel under the federal common law does not support a formulaic approach that would make a non-party's status as a plaintiff asserting a claim premised in part on a contract containing an arbitration provision a *necessary* as opposed to merely a *sufficient* condition for applying direct benefits estoppel.  *See* Defendants' Memorandum at pp. 16-18.  Under the compelling facts of this case, it could not be clearer that, irrespective of Wood's status as a plaintiff or defendant in the underlying arbitration proceeding, he is bound to arbitrate the dispute at issue in the arbitration proceeding because it arises out of his failure to comply with personal indemnity obligations that are contained in, and are reciprocal to, contractual provisions that he has repeatedly invoked to his direct and substantial benefit.

[11] *See* Wood's Response at pp. 4-7.

-5-

Memorandum that Wood has reaped substantial direct benefits from the 2005 Stock Purchase

Agreement that make it entirely appropriate that he be bound to arbitrate thereunder.[12]

As was discussed at length in Defendants' Memorandum, one of the most important

benefits that was conferred on Wood by the 2005 Stock Purchase Agreement was the contractual

indemnity protection contained therein that explicitly named Wood, and protected him from the

moment of execution of the Agreement from the substantial risks and costs associated with the

claims that had been asserted against him in the Tsar Case.[13]   Despite Wood's attempt to avoid

the obvious implications of his receipt of this contractual indemnity protection by suggesting that

it was negotiated for ERG Holdings' benefit by ERG Holdings' counsel, by its explicit terms this

contractual indemnity protection conferred on Wood a substantial economic benefit by making

an unaffiliated third party responsible for indemnity protection for all of the risks and costs

associated with the Tsar Case.[14]   This indemnity was of a much greater economic value to Wood

than was the boilerplate indemnity protection contained in the bylaws of ERG Holdings, which is

a company that Wood wholly owns, and whose performance of its own indemnity obligations

---

[12] *See* Defendants' Memorandum at pp. 12-18.

[13] *See* Defendants' Memorandum at pp. 13-14.

[14] Wood's argument that he "did not negotiate the terms of the indemnity provision" of the 2005 Stock Purchase Agreement, Wood's Response at 5, is a semantical ploy. Defendants have never asserted that Wood negotiated "the terms" of Section 9.4 of the 2005 Stock Purchase Agreement in the sense that he came up with the actual language that ended up in the executed Agreement. That language was undoubtedly drafted by the lawyers involved in the transaction. However, those lawyers were undoubtedly acting on the instructions of the real parties in interest, and Defendants' affidavit proof clearly establishes that Wood was an "active participant in the negotiation process relating to the terms and conditions of the 2005 Stock Purchase Agreement," including the indemnity provisions of Section 9.4 that he was "insistent from the outset of negotiations that the proposed transaction be structured so that he would have unlimited indemnity protection against his own potential individual liability in the Tsar Case;" and that he was "personally involved in the negotiations relating to Section 9.4 of the 2005 Stock Purchase Agreement, including the portion of that section requiring him to release or dismiss his individual claims asserted in the Tsar Case." *See* Affidavit Of Thomas C. Stabley at ¶¶ 5-7; Defendants' Appendix, Exhibit E at ¶¶ 5-7. Wood denies none of these facts. *Compare* Affidavit Of Scott Y. Wood attached to Wood's Response *with* Affidavit Of Thomas C. Stabley at ¶¶ 5-7; Defendants' Appendix, Exhibit E at ¶¶ 5-7. In addition, the suggestion that ERG Holdings' counsel negotiated the indemnity provisions for ERG Holdings' sole benefit is further contradicted by the fact that the indemnity provisions do not apply only to ERG Holdings. The indemnity provisions extend also to "Scott Y. Wood" and to ERG Holdings' "officers, directors, managers, employees, agents, representatives, controlling Persons, shareholders, and their Affiliates." *See* 2005 Stock Purchase Agreement at Article I and Sections 9.4(a), (b) and (c); Defendants' Appendix, Exhibit A at pp. 2 and 28-29.

would, unlike the performance by PennTex of its indemnity obligations, reduce Wood's own net worth dollar-for-dollar.

Wood received a substantial direct benefit by reason of the provision in Section 9.4(d) of the 2005 Stock Purchase Agreement that required the Buyer Parties to post a $1,000,000.00 letter of credit that would secure the indemnity obligations set out in subsections (a), (b) and (c) of Section 9.4 of the Agreement that ran in favor of "Scott Y. Wood" and the other Buyer Indemnified Parties.  Wood's implied assertion that this letter of credit proved to be of no direct benefit to him because his wholly-owned company, ERG Holdings, was subsequently named as the beneficiary under the letter of credit is entirely specious.  As the sole shareholder of ERG Holdings, Wood could obviously cause ERG Holdings to draw on the letter of credit for his own individual benefit.  More importantly, under the terms of Section 9.4(d) of the 2005 Stock Purchase Agreement, the Buyer Indemnified Parties, which included Wood, were given the power to approve the form of the letter of credit.  As the most influential of the Buyer Indemnified Parties, Wood presumably preferred to designate his wholly-owned company as the sole beneficiary under the letter of credit so that it could act as the agent for all of the Buyer Indemnified Parties.  This not only made sense from an administrative convenience standpoint given that it would have been impractical to name all of the Buyer Indemnified Parties as beneficiaries, but it also was particularly advantageous to Wood personally since only in this manner could Wood be assured that some officer or director of ERG Holdings who also qualified as a Buyer Indemnified Party would not be able to draw on the letter of credit without his knowledge or consent.

Wood has also sought a direct benefit under the 2005 Stock Purchase Agreement of a very substantial nature that Defendants inadvertently failed to mention in Defendants'

Memorandum. Specifically, in the correspondence that was exchanged after the Defendants made formal demand that Wood comply with his "release obligation" under Section 9.4(e) of the 2005 Stock Purchase Agreement, Wood's counsel made a formal written demand that PennTex "indemnify" him pursuant to the indemnity provisions of that Agreement for the almost $2,000,000.00 value of the claims that Wood is asserting individually as a plaintiff in the Tsar Case.[15] Wood's demand was stated as follows:

> PennTex is currently in breach of that [indemnity] Section [of the 2005 Stock Purchase Agreement] by its failure to indemnify and hold Mr. Wood harmless from his damages relating and arising out of the Tsar Case. PennTex is fully aware of the nature of those damages as a result of its involvement in the Tsar Case and its previous receipt of pleadings in that matter. Demand is made in the amount of $1,869,350.00 plus interest for the obligated indemnification.

Letter dated May 25, 2006, from John M. Zukowski to J. Todd Shields at ¶ 3; Exhibit O in Defendants' Supplemental Appendix at ¶ 3.[16]

Wood's assertion of a demand for "indemnity" for almost $2,000,000.00 pursuant to the indemnity provisions of Section 9.4 of the 2005 Stock Purchase Agreement, coupled as it is with his simultaneous attempt to reject any obligation to arbitrate Defendants' claim arising out of Wood's refusal to comply with his own individual "release obligation" set out in the same indemnity provision, illustrates as perhaps nothing else could the appropriateness of compelling Wood to arbitrate under the Agreement.

As was discussed in Defendants' Memorandum, after execution of the 2005 Stock Purchase Agreement, Wood repeatedly invoked the rights that were explicitly conferred upon him by name in Section 9.4(a) of the Agreement by seeking and obtaining reimbursement of

---

[15] *See* letter dated May 25, 2006, from John M. Zukowski to J. Todd Shields at ¶ 3; Exhibit O in Defendants' Supplemental Appendix at ¶ 3; Second Affidavit Of J. Todd Shields at ¶¶ 4-7; Exhibit M in Defendants' Supplemental Appendix at ¶¶ 4-7. *See also* letter dated May 3, 2006, from John M. Zukowski to J. Todd Shields at ¶ 2; Exhibit N in Defendants' Supplemental Appendix at ¶ 2.

[16] *See also* letter dated May 3, 2006, from John M. Zukowski to J. Todd Shields at ¶ 2; Exhibit N in Defendants' Supplemental Appendix at ¶ 2.

-8-

$79,144.70 in attorneys' fees and expenses that were incurred by his personal counsel in the defense of the claims that had been asserted against him in the Tsar Case.[17]  Wood's attempt to avoid the obvious implications of this reimbursement by mischaracterizing it as reimbursement that was requested by ERG Holdings for its own benefit is both factually insupportable and logically irrelevant to a determination whether the reimbursement conferred an economic benefit on Wood personally.

The requests for reimbursement that were made pursuant to the 2005 Stock Purchase Agreement came at a time when the only "ERG" person or company that was a party to the Tsar Case was ERG Illinois, Inc.[18]  The new owners of ERG Illinois, Inc. promptly substituted the undersigned as its counsel in the Tsar Case in place of John M. Zukowski, who continued only as counsel for Scott Y. Wood in the litigation.[19]  As a consequence, neither ERG Holdings nor the companies affiliated with Scott Wood that actually made the requests for reimbursement were ever parties to the Tsar Case, and the requests for reimbursement therefore were necessarily related solely to the fees and expenses that the Zukowski firm had incurred in its representation of its only client in the Tsar Case, Scott Y. Wood.[20]  This reimbursement necessarily redounded

---

[17] See Defendants' Memorandum at pp. 15-17; and Affidavit Of Thomas C. Stabley at ¶¶ 8-9, Defendants' Appendix, Exhibit E at ¶¶ 8-9.

[18] See Second Affidavit Of J. Todd Shields at ¶ 10; Defendants' Supplemental Appendix, Exhibit M at ¶ 10.

[19] Id.

[20] Wood has asserted that the Court's examination of the documentation relating to the requests for reimbursement of the Zukowski firm's fees and expenses will demonstrate that "[i]n each instance . . . ERG [Holdings] had paid Wood's legal expense, that ERG [Holdings] requested payment from PennTex and that PennTex paid ERG [Holdings]."  Wood's Response at p. 5.  However, the documentation referred to, which is filed as Exhibits B, C and D in Defendants' Appendix, not only does not support this assertion, it affirmatively reveals the after-the-fact, concocted nature of Wood's assertion that the reimbursement requests were made by ERG Holdings for its own benefit.  For example, for several months after ERG Illinois, Inc. had been acquired by Lance T. Shaner and had obtained new counsel in the Tsar Case, the Zukowski firm continued to send bills to Wood's offices in Houston addressed to "ERG Illinois, Inc."  See enclosures to letter dated October 18, 2005, from Energy Reserves Group, L.L.C. to PennTex Resources, L.P. filed as Exhibit B in Defendants' Appendix.  In addition, the requests for reimbursement were not made by ERG Holdings, as Wood has asserted, but by two other entities that he obviously controlled and caused to act as his agent in accomplishing the reimbursement:  Energy Reserves Group, L.L.C. and ERG Resources, L.L.C.  See letter dated October 18, 2005, from Energy Reserves Group, L.L.C. to PennTex Resources, LP, Exhibit B in Defendants' Appendix; letter dated January 31, 2006, from Energy Reserves Group, L.L.C. to PennTex Resources Illinois, Inc., Exhibit C in Defendants' Appendix; and letter dated June 23, 2006, from

-9-

to Wood's personal benefit, coming as it did from an unaffiliated third party whose indemnity of his defense costs in the Tsar Case would not reduce his own net worth on a dollar-for-dollar basis as would the alleged indemnity from ERG Holdings that Wood has concocted in an effort to avoid the obvious conclusion that he has derived substantial direct benefits under the 2005 Stock Purchase Agreement by repeatedly causing the entities under his control to invoke his rights to obtain reimbursement of attorneys' fees and expenses pursuant to Section 9.4(a) of the Agreement.

Wood's assertion that he "did not request and did not receive any direct benefit from PennTex's obtaining a release from defendants in the Tsar Case" is demonstrably false, and is certainly unsupported by his irrelevant observation that the claims against him in the Tsar Case had already been nonsuited when the release was delivered to him.[21]

Wood's desire to obtain a release from the claims that had been asserted against him individually in the Tsar Case is obviously implicit in almost every aspect of Section 9.4 of the 2005 Stock Purchase Agreement in which the indemnity duties owed to Wood can be fully performed by the delivery of a release, like the one at issue, that fully extinguishes the claims against Wood that exposed him to risks and costs in the Tsar Case.[22] More importantly, Wood's request for such a release is made explicit in Section 6.10 of the Agreement, which states:

> From and after the Closing Date, the Buyer shall use Commercially Reasonable Efforts to have Scott Y. Wood released and discharged from the Tsar Case and to settle or otherwise discharge the Tsar Case. This Section 6.10 shall in no way be deemed to limit or reduce the Buyer's obligations and assumption of liabilities as set forth in Section 9.4.

---

ERG Resources, L.L.C. to PennTex Resources Illinois, Inc., Exhibit D in Defendants' Appendix. Finally, and in apparent recognition of Scott Wood's willy-nilly usage of the companies he controls, PennTex made its reimbursement checks payable simply to "ERG." *See, e.g.,* check dated October 20, 2005, filed as the last page of Exhibit B in Defendants' Appendix; and check dated February 13, 2006, filed as the last page of Exhibit C in Defendants' Appendix.

[21] *See* Wood's Response at pp. 5-6.

[22] *See* subsections (a), (b) and (c) of Section 9.4 of the 2005 Stock Purchase Agreement; Exhibit A in Defendants' Appendix at pp. 28-29.

-10-

Section 6.10 of the 2005 Stock Purchase Agreement; Exhibit A in Defendants' Appendix at p. 27.

Against this background, Wood's assertion that he "did not *request* . . . any direct benefit from PennTex's obtaining a release from defendants in the Tsar Case" is simply false.[23]  As will be shown below, Wood's assertion that he "did not *receive* any direct benefit from PennTex's obtaining a release from defendants in the Tsar Case" is equally lacking in credibility.[24]

Wood's observation that the Full And Complete Release was delivered to him only after the claims that had been asserted against him in the Tsar Case had been nonsuited does not undercut the value of Wood's receipt of a release of those claims.[25]  These claims had been nonsuited pursuant to papers that explicitly provided that the nonsuit was "without prejudice to refiling," and thus at the time that the Defendants obtained the Full And Complete Release from Tsar and Richard M. Cheatham, the nonsuited claims remained viable claims that could have been refiled and prosecuted without being barred by issue preclusion or limitations.[26]  In addition, given the pendency of litigation in which a fraud in the inducement claim was being litigated against Wood's former company, ERG Illinois, Inc., based on representations that Wood had allegedly made to representatives of Tsar during the transaction in which Tsar had acquired from ERG Illinois, Inc. a forty-nine percent working interest in the Illinois And Indiana Properties, the Full And Complete Release, which covered this and all other potential claims arising out of Wood's past dealings with Tsar and Cheatham, was of substantial benefit to Wood

---

[23] *See* Wood's Response at p. 5 (emphasis added).

[24] *See* Wood's Response at p. 5 (emphasis added).

[25] *See* Wood's Response at pp. 5-6.

[26] *See* Defendant Tsar Energy II, LLC's Notice Of Partial Nonsuit (Conspiracy Claim Against Scott Y. Wood) filed January 13, 2006, a true and correct copy of which is filed as Exhibit P in Defendants' Supplemental Appendix; Order On Defendant Tsar Energy II, L.L.C.'s Notices Of Partial Nonsuit signed January 23, 2006, a true and correct copy of which is filed as Exhibit Q in Defendants' Supplemental Appendix; and Second Affidavit Of J. Todd Shields at ¶¶ 8-9, Exhibit M in Defendants' Supplemental Appendix at ¶¶ 8-9.

in giving him the peace of mind of knowing that he was free of defending potential claims that might be brought against him by either Tsar or Cheatham.[27]

Wood devotes the final portion of his response relating to the direct benefits estoppel doctrine to an irrelevant "straw man" argument leveled at Defendants' assertion that they reasonably relied on Wood's explicit promise to comply with his "release obligation" spelled out in Section 9.4(e) of the 2005 Stock Purchase Agreement.[28]   Wood's arguments in this regard are irrelevant and erroneous, and, in any event, are inappropriate for consideration by this Court because they focus on merits rather than arbitrability issues.

As should be apparent from the discussion of the direct benefits estoppel doctrine in Defendants' Memorandum, binding Wood to arbitrate under the 2005 Stock Purchase Agreement is not dependent upon defendants' proof that it relied, or reasonably relied, on those aspects of the Agreement in which Wood undertook to perform duties, like the "release obligation," that were reciprocal to the Defendants' performance of the indemnity obligations in the same portion of the Agreement that directly benefited Wood.   The focus of the direct benefits estoppel doctrine is on the conduct of the non-party who is alleged to be bound to arbitrate.  *See In re Weekley Homes,* 180 S.W.3d at 132-33.  In any event, Wood's arguments in this regard rely on his strained interpretations of the provisions of Section 9.4(e) of the Agreement,[29] and those

---

[27] *See* Second Affidavit Of J. Todd Shields at ¶ 9; Exhibit M in Defendants' Supplemental Appendix at ¶ 9.  Wood's receipt of the Full And Complete Release also provided a direct benefit to Wood because it freed Wood from having to report the Tsar Case as a contingent liability on his personal financial statements, and because it freed Wood from the burden of complying with certain aspects of the portion of his "cooperation" obligation that are spelled out in Section 9.4(e) of the 2005 Stock Purchase Agreement, which explicitly required that Wood must give his "full cooperation to the Buyer in the Buyer's post-Closing prosecution and defense of the Tsar Case . . ."   Under these circumstances, it comes as no surprise that Wood has retained the Full And Complete Release despite his self-serving attempts in this litigation to downplay its significance.

[28] *Compare* Wood's Response at pp. 6-7 *with* Defendants' Memorandum at p. 18.

[29] The emptiness of Wood's arguments opposing application of the direct benefits estoppel doctrine is plainly obvious in his strained interpretation of the "release obligation" set out in Section 9.4(e) of the 2005 Stock Purchase Agreement.  Wood's argument, in effect, is that he would release his claims pursuant to the Agreement if the Defendants provided Wood a release of all claims including his own, to which he would have had to previously agree.  *See* Wood's Response at p. 6.  In other words, according to Wood, the "dismiss or release" requirement

arguments implicate the merits of the underlying dispute, and, as such, under the relevant case law, they are inappropriate for consideration in the context of a court's determination of arbitrability issues.[30]

### C.   Wood Cannot Deny That He Is Bound To Arbitrate As A Third-Party Beneficiary Under The 2005 Stock Purchase Agreement.

Defendants' Memorandum argued that the indemnity provisions of Section 9.4 of the 2005 Stock Purchase Agreement manifested beyond any doubt an intent to make Scott Wood a third party beneficiary under the Agreement.[31]  Wood does nothing but reinforce that conclusion with his quotation of Section 11.12 of the Agreement, which recognizes that there are no third party beneficiaries under the 2005 Stock Purchase Agreement "*[e]xcept as expressly contemplated by Article 9.*"[32]  But Wood persists, asserting "there is no clear intent shown to make Wood a third party beneficiary . . . the intent shown is just the opposite."[33]  Defendants submit that if the intent really were to make certain that Scott Wood was not a third party beneficiary, the parties to the 2005 Stock Purchase Agreement could have done a far better job of manifesting such intent than by naming Wood in the indemnity provisions of Section 9.4 and providing for the payment of his costs, attorney's fees and any adverse judgments or awards that might be entered against him in the Tsar Case.

---

means that Wood would release his claims if Wood releases his claims.  This absurd, circular interpretation, if adopted, would render the "release obligation" a virtual nullity, nothing more than a superfluous charade.
[30] Under Section 4 of the Federal Arbitration Act, a court should consider only whether the arbitration clause covers the dispute that is to be arbitrated.  "If the dispute is within the scope of the arbitration clause, the court may not delve further into the merits of the dispute." *Snap-on Tools Corp. v. Mason*, 18 F.3d 1261, 1267-68 (5th Cir. 1994) (quoting *Mun. Energy Agency v. Big Rivers Elec. Corp.*, 804 F.2d 338, 342 (5th Cir. 1986).  *See also AT&T Techs., Inc. v. Commc'ns Workers*, 106 S.Ct. 1415, 1419 (1986) ("[I]n deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims . . . 'The courts . . . have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim.'") (quoting *Steelworkers v. American Mfg. Co.*, 80 S.Ct. 1343, 1346 (1960)).
[31] *See* Defendants' Memorandum at pp. 19-20.
[32] *See* Wood's Response at p. 7 (underscore original; italics added).
[33] *See* Wood's Response at p. 7.

-13-

Wood again relies on federal common law to suggest that because he has allegedly not filed a claim premised on the Agreement or otherwise sought to enforce its terms, he is immunized from arbitrating the dispute over his failure to comply with his "release obligation" spelled out in Section 9.4(e) of the Agreement.[34]   As discussed above and in Defendants' Memorandum, however, Wood has actually, and repeatedly, enforced and accepted benefits under the 2005 Stock Purchase Agreement, and there has been no need for a lawsuit only because PennTex has complied with every demand for reimbursement other than Wood's recent demand to be reimbursed for the value of the claims that he has asserted as a plaintiff in the Tsar Case.  Wood has not disclaimed his third party status but has rather embraced it.  Under Texas law, which applies in this case, Wood must accept the burdens of the agreement, including the arbitration provision, along with the benefits.[35]

**D.      Wood Is Bound To Arbitrate Under The 2005 Stock Purchase Agreement Because ERG Illinois Holdings, Inc. Bound Wood To That Agreement As His Agent, And Wood Fails To Address Defendants' Apparent Agency Argument.**

Wood's Response to Defendants' agency arguments suggests that Defendants allege a factual situation that is "actually totally different" from what they allege elsewhere in their Memorandum.[36]  This is not necessarily true.  A corporation must always act through agents, and in this case, it is undisputed that Wood was acting as ERG Holdings' agent with respect to certain aspects of the transaction contemplated by the 2005 Stock Purchase Agreement.

---

[34] *See* Wood's Response at pp. 7-8.

[35] *See In re Rangel*, 45 S.W.3d 783, 787 (Tex. App.—Waco 2001, no pet.) (holding that as a third party beneficiary, nonsignatory was bound by the terms of the contract, including the arbitration provision); *Nationwide of Bryan, Inc. v. Dyer*, 969 S.W.2d 518, 520 (Tex. App—Austin 1998, no pet.) (holding that nonsignatory was bound by the terms of the contract, including the arbitration provision, because absence of signature had "no legal significance" due to party's status as third party beneficiary).  *See also Stonewall Ins. Co. v. Modern Exploration Inc.*, 757 S.W.2d 432, 434-35 (Tex. App.—Dallas 1998, no pet.) (stating that third party beneficiary "steps into shoes" of contracting party and is thus bound by conditions precedent in contract); *Alpine Ocean Seismic Survey, Inc. v. F.W. Myers & Co.*, 23 F.3d 946, 948 (5th Cir. 1994) (third party beneficiary takes no greater rights than original contracting party).

[36] *See* Wood's Response at p. 8.

-14-

However, that fact does not mean that ERG Holdings could not itself act as agent for another person with respect to other aspects of the same transaction (just as it does not preclude the agent himself from pledging his own responsibility in addition to that of his principal, as Defendants have earlier argued).  Defendants' agency argument is that ERG Holdings, acting through Wood, acted with apparent authority to bind Wood to the individual obligations that appear in the indemnity provisions of Section 9.4(e) of the 2005 Stock Purchase Agreement.

Here and elsewhere, Wood implies there is something remarkable or self-defeating in Defendants' assertion of alternative arguments.  However, the Federal Rules of Civil Procedure explicitly authorize alternative argumentation.  *See* FED. R. CIV. P. 8(e)(2) ("A party may . . . state as many separate claims or defenses as the party has regardless of consistency and whether based on legal, equitable, or maritime grounds.").  Each of the ordinary principles of contract and agency law discussed in Defendants' Memorandum, as well as Wood's actual consent, supply a separate, distinct and independent basis for binding Wood to arbitrate under the 2005 Stock Purchase Agreement.  Each of these alternative arguments must be considered on their own terms, and they should not be construed as somehow denigrating or casting doubt on each other.

Wood misconstrues Defendants' agency argument by focusing on actual authority or control rather than apparent authority.[37]  Defendants have not argued that an actual agency relationship exists between ERG Holdings and Wood – though it is exceedingly difficult to believe that Wood's solely-owned company, for which he serves as president and on whose behalf he ostensibly signed the 2005 Stock Purchase Agreement, was not under his actual and complete control – but have instead focused on Wood's conduct in the 2005 Stock Purchase Agreement transaction, which establishes conclusively that ERG Holdings had *apparent*

---

[37] *See* Wood's Response at p. 8.

-15-

authority to bind Wood.[38] *See Biggs v. United States Fire Ins. Co.*, 611 S.W.2d 624, 629 (Tex. 1981) ("Apparent authority is based on the doctrine of estoppel, and one seeking to charge the principal through apparent authority of an agent must establish conduct by the principal that would lead a reasonably prudent person to believe that the agent has the authority that he purports to exercise."). The decision cited by Wood, *Air Liquide America Corporation v. U.S. Army Corps of Engineers*, 359 F.3d 358, 363 (5th Cir. 2004), does not involve allegations that conduct by the alleged principal clothed the purported agent with apparent authority, and it is, therefore, inapposite. *See id.* at 362-63.

Wood's conduct during the negotiation and execution of the 2005 Stock Purchase Agreement gave PennTex every reason to reasonably believe that ERG Holdings had authority to contract for Wood as his agent. As sole owner with complete control, Wood could easily authorize ERG Holdings to be his agent or just as easily prevent it from purporting to bind him as agent. Accordingly, when Wood signed the 2005 Stock Purchase Agreement and caused his company to enter into an agreement containing as key consideration promises to the effect that "Scott Y. Wood will" take certain actions, ERG Holdings was, if that consideration has any value, purporting to bind Wood. Wood's signing of the 2005 Stock Purchase Agreement (as well as his earlier participation in negotiations with specific attention to the indemnity concepts) was affirmative conduct that led PennTex to believe, reasonably, that ERG Holdings had authority to bind Wood. Wood had every opportunity, until the moment he put pen to paper, to disclose to PennTex that ERG Holdings was not under his control and had no authority to purport to bind him by making promises that "Scott Y. Wood" will take actions that he had no intention of honoring, but Wood remained silent. Under these circumstances, Wood should not now be heard, for the first time, to complain that ERG Holdings had no authority to bind him.

---

[38] *See* Defendants' Memorandum at pp. 21-22.

**E.**   **Wood Does Not Deny That He Signed The 2005 Stock Purchase Agreement Without Any Intention Of Ever Performing The Personal Obligations Contained Therein, Which Were Consideration For Substantial Personal Benefits, And He Should Therefore Be Compelled To Arbitrate As The Alter Ego Of ERG Holdings.**

Scott Y. Wood abused the corporate form and committed actual fraud for his own personal benefit when he caused his company to enter into an agreement containing as key consideration personal obligations only he could perform but which, unbeknownst to PennTex, he had no intention of ever performing.  Wood engaged in an obvious scheme to obtain cost-free benefits – namely, indemnity protection, reimbursement for costs and attorney's fees, and the "Full And Complete" release – by skillfully allowing his wholly-owned company to use individual promises ("Scott Y. Wood will . . .") as bargaining chips to win those benefits, all the while figuring he could later hide behind the corporate form and refuse to make good on those promises (after first collecting the benefits, of course).  It is quite telling that even in his response papers, Wood never denies that he signed the 2005 Stock Purchase Agreement without any intention he would ever comply with the personal obligations contained in the indemnity provisions.[39]

Wood's conduct constitutes "dishonesty of purpose" and "intent to deceive." *Castleberry v. Branscum*, 721 S.W.2d 270, 273 (Tex. 1986) (stating that actual fraud involves dishonesty of purpose or intent to deceive).  Under these circumstances, the Court should disregard the corporate fiction and make no distinction between ERG Holdings, a designated party, and Wood.  To permit Wood to hide behind the corporate form so as to evade the personal obligations imposed on him by the indemnity provisions of the 2005 Stock Purchase Agreement would permit Wood to perpetuate an iniquity.

---

[39] *See* Wood's Response at p. 9.

III.    **THE DISPUTE AT ISSUE IN DEFENDANTS' MOTION IS WITHIN THE
SCOPE OF THE ARBITRATION PROVISION IN THE 2005 STOCK
PURCHASE AGREEMENT.**

Wood's claim that the dispute arising out of his failure to comply with his release
obligation spelled out in Section 9.4(e) of the 2005 Stock Purchase Agreement is somehow
outside the scope of the Agreement's arbitration provision is utterly without merit. The dispute
undoubtedly falls within the scope of Section 11.6 of the Agreement, which prescribes a dispute
resolution process culminating in binding arbitration for all disputes "arising under" the
Agreement.[40]   Wood's argument that Section 11.6 makes arbitration of the dispute premature
until "Wood and the Tsar Case defendants' pending claims are resolved in the Tsar Case's
judicial proceedings"[41] is an argument that, according to clear guidance from the Supreme Court,
should be presented exclusively to the arbitration panel. *See John Wiley & Sons, Inc. v.
Livingston*, 84 S.Ct. 909, 917-19 (1964) (holding that arbitrator, not court, should decide whether
party fulfilled procedural prerequisites to arbitration where subject matter of dispute was one the
parties agreed to arbitrate); *Howsam v. Dean Witter Reynolds, Inc.*, 123 S.Ct. 588, 592 (2002)
(following precedent recognizing that gateway procedural matters such as whether time limits,
notice, laches, estoppel and other conditions precedent to an obligation to arbitrate have been met
are for the arbitrators to decide). Because Wood's argument contests only the timing of the
arbitration – *i.e.,* whether procedural prerequisites have been fulfilled – and not whether the
subject matter of the dispute is of the type required to be submitted to arbitration – it does not
relate to the choice between an arbitral and judicial forum. As such, it is irrelevant to
arbitrability and need not and should not be decided by this Court.[42]

---

[40] *See* 2005 Stock Purchase Agreement at Section 11.6(a); Defendants' Appendix, Exhibit A at p. 33.
[41] *See* Wood's Response at pp. 9-10.
[42] Notwithstanding that this issue is actually one for the arbitration panel, Defendants here note the fallaciousness of
Wood's premise. The provision Wood quotes calling for deferral of "Disputes with respect to claims by third

-18-

## CONCLUSION

For the foregoing reasons, Defendants pray that the Court sign forthwith the proposed order granting Defendants' Motion To Compel Arbitration And To Stay This Action, and that Defendants have such other and further relief to which they may be justly entitled.

Respectfully submitted,

**FULBRIGHT & JAWORSKI L.L.P.**

By: _____

J. Todd Shields
Federal I.D. No. 3582
State Bar No. 18260500
1301 McKinney Street, Suite 5100
Houston, Texas  77010-3095
713/651-3762 (telephone)
713/651-5246 (facsimile)

**ATTORNEY-IN-CHARGE FOR
DEFENDANTS AND  COUNTER-
CLAIMANTS, PENNTEX RESOURCES,
L.P. AND LANCE T. SHANER**

---

Persons" is expressly "subject to Section 9.4," which in turn contains the indemnity benefits and obligations at issue between Wood and the Defendants. *See* 2005 Stock Purchase Agreement at Section 11.6(a); Defendants' Appendix, Exhibit A at p. 33.  The purpose in making that provision "subject to" Section 9.4 was obviously to permit immediate, interim resolution of a dispute such as the present one.  Ordinarily in situations in which the parties dispute whether one must indemnify the other for claims that have been asserted by a third person, economy and efficiency call for delaying arbitration of that dispute until the third person has fully prosecuted his claims.  That is not the situation here.  Delaying arbitration of the dispute concerning whether Wood must dismiss or release his claims against Tsar until after he fully prosecutes those claims serves no purpose other than to risk the unnecessary waste of party and judicial resources.  It is patently unreasonable to interpret the 2005 Stock Purchase Agreement as calling for such a delay in this case.

-19-

## CERTIFICATE OF SERVICE

I hereby certify that on September 12, 2006, I complied with Rule 5 of the Federal Rules Of Civil Procedure by serving a true and correct copy of the above and foregoing instrument, together with this certificate of service, on the attorney-in-charge for plaintiff by facsimile.

J. Todd Shields