**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| SCOTT Y. WOOD, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-06-2198 |
| | § | |
| PENNTEX RESOURCES, L.P., *et al.* | § | |

**MEMORANDUM AND ORDER**

In this suit, plaintiff Scott Y. Wood seeks a declaratory judgment that he is not required to participate in arbitration with PennTex Resources, L.P. and Lance T. Shaner. PennTex and Shaner began arbitration proceedings against Wood based on an arbitration provision in a contract that they allege binds Wood.  In the arbitration, PennTex and Shaner seek to prevent Wood from continuing to prosecute claims he has asserted against a third party in a Texas state court.  PennTex and Shaner assert that in the contract containing the arbitration clause, Wood agreed to dismiss or release the claims he is pursuing against the third party but has refused to do so.

In this suit, Wood asks this court to declare that he has no obligation to arbitrate with PennTex and Shaner; that he is entitled to continue to pursue the state-court claims against the third party; and, alternatively, that the arbitration is premature.  PennTex and Shaner have counterclaimed and moved to compel arbitration and to stay this action, asserting that Wood is contractually bound to arbitrate whether he is required to dismiss or release the claims he is pursuing in the state court.  (Docket Entry No. 8).  Wood has responded, (Docket Entry No. 11), and PennTex and Shaner have replied, (Docket Entry No. 15).  Diversity jurisdiction

1

is undisputed: Wood is a Texas citizen; PennTex is a limited partnership with no Texas partner; and Shaner is a Pennsylvania citizen.  (Docket Entry No. at 1, 2).  The parties stipulated that this court would determine arbitrability and an expedited briefing schedule was set.

Based on a careful review of the pleadings, the motion, response, and reply, the parties' submissions, and the applicable law, this court grants the motion to compel arbitration.[1]  Because this court has compelled arbitration as to all the claims at issue in this case, dismissal rather than stay may be appropriate. No later than October 30, 2006, the parties should advise whether, given the court's grant of the motion to compel arbitration, this case should be dismissed rather than stayed.

The reasons for these rulings are set out in detail below.

## I.    Background

On January 12, 2005, PennTex and Shaner acquired ERG Illinois, Inc. from ERG Illinois Holdings, Inc. through a Stock Purchase Agreement.  (Docket Entry No. 10, Ex. A). The Agreement identified PennTex Resources, L.P. and its general partner, PennTex Energy, Inc., as the "Buyer Parties" and identified PennTex Resources as the "Buyer."  Shaner is the president of PennTex Energy.  The Agreement identified ERG Holdings and ERG Illinois as the "Seller Parties" and ERG Illinois Holdings as the "Seller."  Wood is the president, sole

---

[1]The motion to seal Docket Entry No. 10, Exhibits B, C, and D is granted.  (Docket Entry No. 13).

director, and sole shareholder of ERG Holdings and the president of its wholly owned subsidiary, ERG Illinois, the company that PennTex bought.

Wood and Shaner both signed the Stock Purchase Agreement. The signature line for Wood stated that he signed on behalf of ERG Illinois as its president and on behalf of ERG Holdings as its president. The signature line for Shaner stated that he signed on behalf of PennTex Resources by signing for PennTex Energy, the general partner, as its president.

Before the Stock Purchase Agreement was executed, Wood and ERG Illinois had been in litigation in Texas state court with Tsar Energy II, L.L.C. and its principal member, Richard Cheatham, over a joint venture between ERG Illinois and Tsar involving oil-producing properties in Illinois and Indiana. (Docket Entry No. 1, Ex. A at 2-5). ERG Illinois prevailed on one part of the Texas case, relating to whether ERG Illinois was entitled as the operator to charge the joint account a fixed monthly overhead for certain producing wells. Final judgment has been entered as to that aspect of the case and it has been severed and is on appeal. The litigation as to the other part of the Texas case continues. This part of the case is the basis of PennTex's and Shaner's arbitration demand and this declaratory judgment suit.

In the other part of the state-court litigation, Wood and ERG Illinois claimed that Tsar and Cheatham tortiously interfered with a prospective contract Wood and ERG Illinois had with another entity. (Docket Entry No. 11, Ex. 2). Wood sought almost $2 million in damages against Tsar and Cheatham. Tsar and Cheatham counterclaimed against Wood

individually, asserting conspiracy with ERG Illinois to commit conversion and fraud. The Tsar litigation was pending when the 2005 Stock Purchase Agreement was executed.

Wood and ERG Illinois faced damages exposure in the Tsar state-court suit. The 2005 Stock Purchase Agreement addressed the Tsar case and any liability that might result. Section 9.4 of the Stock Purchase Agreement provided as follows:

> **9.4      Indemnification Provision For Seller's Benefit Regarding Specific Litigation**.
>
> Buyer acknowledges certain litigation is now pending in the 334th Judicial District Court of Harris County, Texas, bearing Cause No. 2004-39584, and styled "ERG Illinois, Inc. and Scott Y. Wood v. TSAR Energy II, L.L.C. and Richard Cheatham," and that future litigation may be brought or asserted regarding the subject matter of such Lawsuit in other forums or tribunals (all such pending or future litigation collectively referred to as the "Tsar case"). Buyer Parties and their successors and assigns will:
>
> (a) Pay any and all costs of the company, Scott Y. Wood, or any of the Buyer Indemnified Parties, which may be incurred in the Tsar Case after the Closing Date. Buyer Parties will pay directly to attorneys, court reporters, copy services, expert witnesses, and consultants and other providers or entities, all fees and expenses of the Buyer Indemnified Parties, or any of them, incurred after the Closing Date in connection with, arising out of or relating to the Tsar Case. Such payments by Buyer Parties, their successors or assigns, shall be made in accordance with the governing joint operating agreements within the time period stated on each invoice so that payment for such invoice shall not be past-due.
>
> (b) Promptly pay all judgments, awards, sanctions, damages, expenses, and/or costs of any of the Buyer Indemnified Parties. . . .

4

(c) Indemnify and hold the Buyer Indemnified Parties harmless from any and all harm, damage, loss, expense, liability, costs, awards, and judgment relating to or arising out of the Tsar Case . . .

(d) Provide . . . the amount of $1 million to secure the prompt payment and performance of all obligations of this Section 9.4.

(e) Provided that the Letter of Credit is in place and Buyer Parties have not breached this Section 9.4, Buyer will have full control of the representation of Seller Parties and Scott Y. Wood in the Tsar Case effective as of the Closing, with the right to cancel depositions and reschedule the hearing on Seller Parties' motion for summary judgment, and Scott Y. Wood and the other Buyer Indemnified Parties shall give their full cooperation to the Buyer in the Buyer's post-Closing prosecution and defense of the Tsar Case and Scott Y. Wood will, at Buyer's request and upon being furnished a full and complete release of all matters in the Tsar Case, either dismiss or release the claims that he has asserted individually in the Tsar Case.  Upon request, Seller Parties will deliver to the Buyer an executed form of motion for the substitution of counsel substituting Fulbright & Jaworski L.L.P, for the current attorney for Seller Parties and Scott Y. Wood in the Tsar Case.

(Docket Entry No. 10, Ex. A).

PennTex and Shaner assert that they negotiated Section 9.4 with Wood to avoid damages exposure from the Tsar litigation as a result of acquiring ERG Illinois and agreeing to indemnify Wood and the ERG entities.  PennTex and Shaner argue that they negotiated the right to control the Tsar litigation after the Stock Purchase Agreement was executed.  The Stock Purchase Agreement provided that PennTex would be responsible for damages, fees, costs, and expenses incurred by Wood and the other "Buyer Indemnified Parties" in the prosecution and defense of the Tsar litigation and required PennTex to post a $1 million letter

of credit to secure this obligation.  The Agreement defined "Buyer Indemnified Parties" as "Seller and its officers, directors, managers, employees, agents, representatives, controlling Persons, shareholders, and their Affiliates."  *Id.*  Wood was a "Buyer Indemnified Party." If PennTex met its Section 9.4 obligations, it would have "full control of the representation of Seller Parties and Scott Y. Wood in the Tsar Case effective as of the Closing . . . and Scott Y. Wood and the other Buyer Indemnified Parties shall give their full cooperation to the Buyer in the Buyer's post-Closing prosecution and defense of the Tsar Case and Scott Y. Wood will, at Buyer's request and upon being furnished a full and complete release of all matters in the Tsar Case, either dismiss or release the claims that he has asserted individually in the Tsar Case."  (Docket Entry No. 10, Ex. A).

After the Stock Purchase Agreement was executed, PennTex posted the $1 million letter of credit.  (Docket Entry No. 11, Ex. A at 2).   PennTex also paid the attorneys' fees ERG Illinois and Wood demanded.  (Docket Entry No. 10, Ex. I at 3).  Wood asserts that PennTex paid the attorneys' fees to ERG Holdings, which paid Wood because of an indemnity obligation owed him as a director and officer under ERG Holdings's articles of incorporation and by-laws.  PennTex asserts that it paid ERG Holdings not only the corporate entities' fees but also Wood's attorneys' fees because he was an indemnified party under the Stock Purchase Agreement.  (Docket Entry No. 10, Ex. E at 4).

In January 2006, Tsar and Cheatham nonsuited the counterclaims they had asserted against Wood, without prejudice.  (Docket Entry No. 10, Ex. F at 2–3).  In May 2006, PennTex provided Wood a full and complete release executed by Tsar and Cheatham.  The

6

release applied to "all matters in the Tsar Case" and other claims that they could have asserted against Wood.  Wood asserts that the release was not necessary because Tsar and Cheatham had already nonsuited their claims against him.  Wood asserts that he did not request the release because he did not want to relinquish his individual claims against Tsar and Cheatham in the state-court case.  (Docket Entry No. 11 at 5–6; Ex. A at 2–3).  Wood further asserts that he did not need the release because he was indemnified by ERG Holdings under its bylaws.  (Docket Entry No. 11 at 5).  PennTex responds that the release it obtained on Wood's behalf dismissed the Tsar parties' claims against him with prejudice, while the prior nonsuit was without prejudice.  PennTex also asserts that the release it obtained of the Tsar parties' claims against Wood provided "absolute and unlimited contractual protection," more valuable than the limited indemnification Wood might have from ERG Holdings. (Docket Entry No. 9 at 14; Docket Entry No. 15 at 6).

In the May 2006 letter that delivered the executed release to Wood, PennTex and Shaner demanded that Wood dismiss or release the claims he had asserted against Tsar and Cheatham in the state-court case.  (Docket Entry No. 10, Ex. H at 8).  Wood refused by letter dated May 3, 2006.  (Docket Entry No. 15, Ex. B).  In June 2006, PennTex and Shaner began an arbitration proceeding against ERG Holdings and Wood, seeking specific performance of Wood's alleged obligation under the Stock Purchase Agreement to release or dismiss his claims against Tsar and Cheatham.  (Docket Entry No. 10, Ex. I).  The arbitration demand was based on the following provision in the Stock Purchase Agreement:

### 11.6  Binding Arbitration

(a)  All disputes arising under this Agreement, ("Disputes") will be resolved as follows: first senior management of Buyer and Seller will meet to attempt to resolve such Dispute.  If the Dispute cannot be resolved by agreement of the Parties, any Party may, after 30 days following the first meeting of Senior Management of Buyer and Seller, make a written demand for binding arbitration of the Dispute in accordance with this Section 11.6; provided that the foregoing shall not preclude equitable or other judicial relief to enforce the provisions hereof or to preserve the status quo pending resolution of Disputes; and provided further and subject to Section 9.4 that resolution of Disputes with respect to claims by Third Persons will be deferred until any judicial proceeding with respect thereto are concluded.

(Docket Entry No. 10, Ex. A).  The Stock Purchase Agreement provided that Texas law would apply.  "This Agreement and the performance of the Transactions and obligations of the Parties hereunder will be governed by and construed in the State of Texas, without giving any effect to any choice of law principles."  (*Id*. at 35).

In June 2006, Wood filed this suit seeking a declaratory judgment that he is not obligated to arbitrate the claim that he must release or dismiss his claims against the Tsar parties and that he would not be bound by any such arbitration.  Wood asserts that he is not a party to the Stock Purchase Agreement and is not bound by the arbitration provision.  In this complaint, Wood seeks "declaratory relief to protect his right to proceed to trial against Tsar and Cheatham and . . . a recovery of $1,869,365.00. . . .Wood requests the Court to construe the [Stock Purchase Agreement] and to declare that:  a.  he is not a party to the arbitration found in the [Stock Purchase Agreement]; b. Wood is not bound by any award made in the arbitration proceeding; and c. to the extent the Court finds that Wood is a party

8

to the arbitration provision, the arbitration is premature for failure to satisfy conditions precedent to the requested arbitration." (Docket Entry No. 1 at 5). PennTex and Shaner counterclaimed, seeking to compel Wood to arbitrate the issue of whether the Stock Purchase Agreement requires him to dismiss or release his claims against the Tsar parties in the state court. PennTex and Shaner assert that Wood is a party to the Stock Purchase Agreement and bound by its arbitration clause. They also argue that, even if Wood is not a party, he can be compelled to arbitrate under agency and contract principles recognized by state and federal courts. The parties have agreed to stay the arbitration until this court determines whether the dispute is arbitrable. The state-court trial of the claims Wood asserted against the Tsar parties is also stayed pending the decision on arbitrability.

## II.   The Legal Standards

The parties agree that this dispute falls under the Federal Arbitration Act. The Act provides in relevant part:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement.

9 U.S.C. § 3.

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28, in a

9

civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement.

9 U.S.C. § 4.

This court must first decide "whether the parties agreed to arbitrate the dispute in question.  This determination involves two considerations:  (1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement." *Tittle v. Enron Corp.*, No. 05-20380, 2006 WL 2522444, at *6 (5th Cir. Sep. 1, 2006) (quoting *Webb v. Investacorp*, 89 F.3d 252, 258 (5th Cir. 1996)).  "Generally under the FAA, state law governs whether a litigant agreed to arbitrate, and federal law determines the scope of the arbitration clause." *In re Weekley Homes*, 180 S.W.3d 127 (Tex. 2005); *Fleetwood Enters., Inc. v. Gaskamp*, 280 F.3d 1069, 1077–78 (5th Cir. 2002), *opinion supplemented on denial of rehearing*, 303 F.3d 570 (5th Cir. 2002) (same).  The courts have recognized, however, that while state law determines whether contracting parties agreed to arbitrate under their contract, it is "not entirely clear what substantive law governs whether a nonparty must arbitrate." *Weekley Homes*, 180 S.W.3d at 130.

If there is a binding agreement to arbitrate, the court must then decide whether the dispute is within the scope of that agreement. *Tittle*, 2006 WL 2522444, at *6 (5th Cir. Sep. 1, 2006).  "The Federal Arbitration Act (FAA) expresses a strong national policy favoring arbitration of disputes, and all doubts concerning the arbitrability of claims should be

resolved in favor of arbitration." *Wash. Mut. Fin. Group, L.L.C. v.* Bailey, 364 F.3d 260, 263 (5th Cir. 2004) (quotations omitted); *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002). The duty to arbitrate remains one of contract; a court cannot compel parties to arbitrate issues they have not agreed to submit. *Tittle*, 2006 WL 2522444 at \*5 (citing *Neal v. Hardee's Food Sys., Inc.*, 918 F.2d 34, 37 (5th Cir. 1990) ("A party cannot be compelled to submit a dispute to arbitration unless there has been a contractual agreement to do so.")).

Finally, the court must determine whether "legal constraints external to the parties' agreement foreclosed the arbitration of those claims." *Tittle*, 2006 WL 252244, at \*6 (citing *Mitsubishi Motors Corp. v. Soler Chrsyler-Plymouth*, 473 U.S. 614, 628 (1985)). The parties have not alleged such constraints in this case.

Wood first claims that he did not sign the Stock Purchase Agreement in his individual capacity and cannot be required to arbitrate under that Agreement. (Docket Entry No. 11 at 1–3, 9–11). PennTex and Shaner respond that Wood is individually bound to the terms of the Stock Purchase Agreement. PennTex and Shaner also argue that even if Wood is a nonparty to that Agreement, he can nonetheless be required to arbitrate under estoppel and agency principles; Wood disputes that those principles allow a nonsignatory in his position to be compelled to arbitrate with a signatory. Wood argues that even if he is bound by the Stock Purchase Agreement, his dispute with PennTex and Shaner does not fall within the scope of the arbitration clause because certain prerequisites to arbitration have not been met; PennTex and Shaner assert that the arbitration is not premature and should be compelled. Each argument and response is examined below.

11

**III.    Is Wood a Party to the Stock Purchase Agreement?**

The first issue is whether Wood can be compelled to arbitrate because he is a party to the Stock Purchase Agreement.  "A federal court decides challenges to the making of an agreement to arbitrate." *Brown v. Pac. Life Ins. Co.,* 2006 WL 242749, at *6 (5th Cir. Aug. 23, 2006) (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-04 (1967)).  "[W]here a party contends that it has not signed any agreement to arbitrate, the court must first determine if there is an agreement to arbitrate before any additional dispute can be sent to arbitration." *Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 218 (5th Cir. 2003).  As noted, under the Federal Arbitration Act, the issue of whether a litigant agreed to arbitrate is generally decided under state law.  Whether a signatory to an agreement is a party to that agreement is determined by state-law contract principles.

Wood argues that he did not sign the Stock Purchase Agreement in his individual capacity and that he cannot be compelled to arbitrate as a party to that Agreement.  PennTex and Shaner argue that Wood can be required to arbitrate as a party to the Stock Purchase Agreement because he manifested his intent to be individually bound by its terms, despite the fact that he is not a "Seller Party" as defined in the Agreement and despite the fact that he signed the Agreement as president of ERG Illinois and ERG Holdings.  PennTex and Shaner argue that Wood manifested his consent to assume individual obligations under the Agreement in addition to obligations imposed on the corporate parties on whose behalf he signed.

12

Under Texas law, an agent who signs a contract for a disclosed principal is generally not liable for the obligations imposed under that contract.  Texas law recognizes that "parties to a contract may alter this general rule so that the agent *will* be liable on the contract." *Instone Travel Tech. Marine & Offshore v. Int'l Shipping Partners*, 334 F.3d 423, 428 (5th Cir 2003) (emphasis in original); *Am. Petrofina v. Bryan*, 519 S.W.2d 484 (Tex. App. – El Paso 1975, no writ).  "The fact that a person is under an agency relation to another which is disclosed does not prevent him from becoming personally liable where the terms of the contract clearly establish personal obligation."  *Am. Petrofina*, 519 S.W.2d at 487.

In *American Petrofina*, an agreement guaranteeing a corporate debt was signed by two brothers who designated their corporate capacities after their signatures.  The court held the obligations after the signatures to be *descriptio personae.  Id.* at 487.  Texas law defines "*descriptio personae*" as the use of a word or phrase to identify or point out the person intended, not to indicate that the person is signing only in the "technical character" that might appear indicated by that word or phrase.  *Neeley v. Intercity Mgmt. Corp.*, 623 S.W.2d 942, 948 (Tex. App.— Houston 1981, no writ).  According to the *American Petrofina* court, there was no ambiguity in the guaranty agreement, which clearly set forth the obligations the brothers undertook as individuals.  The court emphasized that the guaranty was a collateral undertaking to secure the debt of the corporation.  If the court were to hold that the undertaking did not impose obligations on the brothers individually, the guaranty would become meaningless.  The court cited the basic contract law principle that the entire document must be interpreted to give effect to every provision.  *Id.*  The court concluded that

13

reading the contract to give effect to all its terms and recognizing that under Texas law, "designations after the signatures do not destroy the effect of the undertaking and defeat the terms," the brothers themselves were parties to the contract, notwithstanding their signatures in their corporate capacities. *Id*. at 487. Similarly, in *Dann v. Team Bank*, 788 S.W.2d 182 (Tex. App.–Dallas 1990, no writ), a corporation, Cetcon, signed a deed of trust, and the plaintiff signed a guaranty in her corporate capacity as president of Cetcon. The designation of her corporate capacity was found to be *descriptio personae*, because to hold that the guarantor could only be liable in a representative capacity would make the guaranty meaningless. "To treat Cetcon as the guarantor as well as the borrower would negate the purpose of the guaranty," while holding that the guarantor signed in her individual capacity gave the guaranty its intended effect. *Id*. at 184–85 (citing *Am. Petrofina*, 519 S.W.2d at 487).

The courts have rejected the application of *descriptio personae* when it would impose corporate obligations on an individual who signed only in a corporate capacity, as opposed to enforcing obligations that the individual agreed to assume in addition to, or in place of, corporate obligations. In *Block v. Aube,* 718 S.W.2d 914 (Tex. App.–Beaumont 1986, no writ), the court considered an employment contract between a corporation and an individual. The issue was whether the individual who signed the contract on behalf of the corporation as the "owner" and "president" of the corporation had individually guaranteed the employment agreement. The *Block* court held that there was no personal obligation on the

part of the signatory-owner, emphasizing that the only obligations imposed in the contract were corporate, not individual, obligations.  *Id*. at 915.

Under Texas law, a corporate designation does not relieve an individual signatory of liability if the contract imposes such personal liability:

> [T]here is no clear mode of signature that will absolutely fix or avoid personal liability. A signature followed by corporate office will result in personal liability where the individual is clearly designated within the instrument as personal surety for the principal. In such case, the corporate office may be construed a descriptio personae of the signator rather than indication of the capacity in which he signs.

*Material P'ships., Inc. v. Ventura*, 102 S.W.3d 252, 259 (Tex. App. – Houston 2003, no writ) (citation omitted).  In *Ventura*, the contract stated, "I . . . want to certify you [sic] that I, personally, guaranty all outstandings [sic] and liabilities of Sacos Tubulares with Material Partnerships as well as future shipments," signed "JORGE LOPEZ VENTURA, GENERAL MANAGER."  *Id.* at 256.  The court found that the contract clearly intended to bind Ventura as an individual, despite the corporate designation accompanying his signature.  *Id.*

The Fifth Circuit has applied the *American Petrofina* rule.  In *Instone Travel Tech. Marine & Offshore v. Int'l Shipping Partners*, 334 F.3d 423, a corporation providing passenger-ship management services for vessel owners contracted to purchase airline tickets from the plaintiff but did not pay for the tickets.  The purchaser asserted that it had no liability for the tickets' cost because it signed the contract in its capacity as a third party's agent.  The court held that under Texas law, the contract imposed liability on the purchaser to pay for the tickets purchased.  That obligation was not overcome by the statement in the

15

contract that the signing party was an agent.  "[S]tatus as an agent, alone, is insufficient to override the indicia of liability that pervade the Agreement."  *Instone*, 334 F.3d at 430–31.

 In this case, Wood signed the Stock Purchase Agreement above a signature line that indicated his corporate capacity.  Section 9.4 of the Stock Purchase Agreement, however, clearly imposed obligations on Scott Y. Wood as an individual separately from, and in addition to, the obligations imposed on the Seller Parties, ERG Illinois and ERG Holdings. Section 9.4 stated that if the Buyer met its obligations of posting the letter of credit, paying the costs and fees relating to the Tsar litigation, and providing releases to Wood and the ERG entities relating to that litigation, then "*Scott Y. Wood* and the other Buyer Indemnified Parties shall give their full cooperation to the Buyer," and "*Scott Y. Wood* will, at Buyer's request and upon being furnished a full and complete release of all matters in the Tsar Case, either dismiss or release the claims that he has asserted individually in the Tsar Case." (Docket Entry No. 1, Ex. A, Section 9.4(e)(emphasis added)).  Section 9.4 of the Stock Purchase Agreement imposed duties on Wood individually, not merely on the ERG corporate entities.  Under *American Petrofina* and *Instone*, the fact that Wood signed in his corporate capacity does not determine his status as a party because, read as a whole, the Agreement makes it clear that Wood agreed to assume certain personal obligations in addition to the obligations imposed on the corporations.

 Wood claims that he insulated himself from personal liability arising from his ownership and sale of ERG Illinois stock by creating a separate corporation, ERG Holdings, to hold that stock before he signed the Stock Purchase Agreement.  Wood testified that

before signing the 2005 Stock Purchase  Agreement, he had transferred the stock he owned in ERG Illinois to ERG Illinois Holdings to try to "separate the company out from—from myself." (Docket Entry No. 8, Ex. G at 38; Docket Entry No. 11 at 3).  This corporate structure is not inconsistent with, and does not defeat, holding Wood individually responsible for his individual—not corporate—obligations under the Stock Purchase Agreement.  The Agreement requires Wood himself to perform specific acts.   In signing the Stock Purchase Agreement, Wood manifested his intent to assume these individual obligations, in addition to the obligations assumed by the disclosed principal.  To read the Stock Purchase Agreement as Wood urges would do what Texas law forbids: allow a corporate designation in a signature line to overcome expressly assumed personal duties, making specific contract provisions meaningless.  To read the Stock Purchase Agreement to allow Wood to avoid his obligations would negate the purpose of Section 9.4; holding that Wood has the specifically identified personal obligations set out in Section 9.4 gives the Agreement its intended effect.

This court finds that under Texas law, Wood's signature under the designation of "President" in the Stock Purchase Agreement does not preclude his personal liability for the individual obligations he agreed to assume in Section 9.4 of the Agreement.  Because Wood is a party to the Agreement, he can be compelled to arbitrate if the dispute is within the scope of the arbitration clause.

## IV.   Can Wood Be Compelled to Arbitrate Under Contract or Agency Principles?

Alternatively, PennTex and Shaner urge that, even if Wood is not a party to the Stock Purchase Agreement, he can be compelled to arbitrate this dispute arising under the

Agreement under recognized contract or agency principles.  This court has found that Wood is a party to the Agreement and can be compelled to arbitrate on that basis.  The issue is whether Wood can be compelled to arbitrate if, despite the individual obligations Wood assumed and the individual benefits he received in the Agreement, he is considered a nonsignatory.  This circuit has not analyzed a case involving similar facts.

The courts are properly cautious in binding individuals who have not signed contracts containing arbitration clauses to arbitrate under those contracts.  Arbitration is a matter of contract.  *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000).  An arbitration agreement can be enforced as to a nonsignatory only if the nonsignatory is bound by that agreement under recognized contract or agency law principles.  *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347 (5th Cir. 2003); *Weekley Homes*, 180 S.W.2d 127.  Courts have compelled arbitration involving nonsignatories under the following contract and agency principles: (a) incorporation by reference; (b) assumption; (c) agency; (d) veil-piercing/alter ego; (e) estoppel; and (f) third-party beneficiary.  *See, e.g., Bridas*, 345 F.3d at 356; *In re First-Merit Bank, N.A.*, 52 S.W.3d 749 (Tex. 2001).

Cases addressing whether to compel arbitration involving a nonparty to an arbitration agreement can be divided into two categories.  One category involves nonparties seeking to enforce an arbitration agreement against a party to that agreement.  *See, e.g., Westmoreland v. Sadoux*, 299 F.3d 462, 467 (5th Cir. 2002).  That category of cases does not apply here.  In this case, the issue is whether a party to a contract containing an arbitration clause may enforce that clause against a nonparty.  Courts have carefully distinguished between these

two categories of cases, holding that principles allowing a nonsignatory to enforce an arbitration clause against a signatory may not allow a signatory to enforce arbitration against a nonsignatory. *See, e.g., MAG Portfolio Consult, Gmbh v. Merlin Biomed Group*, LLC, 268 F.3d 58, 62 (2d Cir. 2001); *Bridas*, 346 F.3d at 361. As the court explained in *Bridas*, "It is more foreseeable, and thus more reasonable, that a party who has actually agreed in writing to arbitrate claims with someone might be compelled to broaden the scope of his agreement to include others." 346 F.3d at 361.

PennTex argues that even if Wood is not a party to the Stock Purchase Agreement, he is still bound to arbitrate under direct-benefits estoppel. (Docket Entry No. 9 at 12–18). Wood argues that because he has not sued PennTex under the contract containing the arbitration clause, the doctrine does not apply to him. PennTex and Shaner respond that under Texas law, direct-benefits estoppel can be applied to require a nonparty to an agreement containing an arbitration clause to arbitrate, even if the nonparty is not suing the party under the agreement.

The Texas Supreme Court has recently recognized direct-benefits estoppel as a basis to enforce an arbitration contract against someone who was not a party to that contract. In *Weekley Homes*, 180 S.W.2d 127, the Texas court began by noting that under both Texas and federal law, a nonparty to an arbitration contract may be compelled to arbitrate if it asserts a claim that is based on the contract. *Id*. at 131 (citing *In re First-Merit Bank*, 52 S.W.3d at 755; *Bridas*, 345 F.3d at 362). The court held that even if the nonparty had not asserted a claim under the contract containing the arbitration clause, arbitration could be compelled if

19

that nonparty "deliberately seeks and obtains substantial benefits from the contract itself" in other ways. *Id.* at 132. PennTex relies on *Weekley Homes* to argue that under direct-benefits estoppel, Wood may be compelled to arbitrate even though he is not a party to the Stock Purchase Agreement and even though he did not file a lawsuit or claim against PennTex under that Agreement.

In *Weekley Homes*, an individual signed a contract with Weekley Homes to construct a home that he would purchase. The contract contained a broad arbitration clause that extended to claims "between Purchaser and Seller . . . whether sounding in contract, tort, or otherwise. . . . [to] include . . .those arising out of or relating to . . . the design, construction, preparation, maintenance or repair of the Property." *Id.* at 129. The individual who signed the contract intended to have his daughter and her family live with him in the home. The daughter and her husband negotiated with Weekley Homes on most of the issues relating to the construction. The daughter also handled subsequent problems with the house and Weekley Homes's efforts to repair it. Both the father and the daughter—who was not party to the contract—later sued Weekley Homes over the condition of the house and the repair work. The father asserted contract and tort claims. The daughter sued only for personal injuries, alleging that Weekley Homes's negligent repairs caused her to develop asthma. *Id.* Weekley Homes moved to compel arbitration of all the claims under the FAA. The trial court granted the motion as to the father's claims but refused to compel arbitration as to the daughter's claims because she was not a party to the contract. The Texas Supreme Court

granted mandamus and compelled arbitration as to the daughter's claims on the basis of direct-benefits estoppel.

The Texas Supreme Court found that although the daughter had sued Weekley Homes in state court, she had made "no claim on the Weekley contract" and her claims did not arise from that contract. Instead, her tort claims were "what any bystander might assert." 180 F.3d at 132. The Texas court declined to limit direct-benefits estoppel to cases in which the nonsignatory had asserted claims against the signatory under the contract containing an arbitration clause. Even though the daughter's tort claims against Weekley Homes did not arise from the contract containing the arbitration clause, the Texas Supreme Court ordered arbitration because she had sought and obtained direct and substantial benefits from that contract. The Court looked to the "nonparty's conduct during the performance of the contract" and determined that direct-benefits estoppel applied. *Id.* at 133. The Texas Supreme Court concluded that the daughter's direct and substantial benefits under the contract between her father and Weekley Homes went beyond merely living in the home. "Claiming the authority of the Purchase Agreement, she directed how Weekley should construct many of its features, repeatedly demanded extensive repairs to 'our home,' personally requested and received financial reimbursement for expenses 'I incurred' while those repairs were made, and conducted settlement negotiations with Weekley (apparently never consummated) about moving the family to a new home." 180 S.W.3d at 133. "Having obtained these substantial actions from Weekley by demanding compliance with provisions

of the contract, [the daughter] cannot equitably object to the arbitration clause attached to them." *Id*.

The Texas Supreme Court cited its prior decision in *In re First-Merit Bank*, 52 S.W.3d 749 (Tex. 2001). In that case, the nonparty had asserted claims against the party under the contract containing the arbitration clause. In *Weekley Homes*, the Court extended direct-benefits estoppel to compel arbitration against a nonparty who "deliberately sought substantial and direct benefits from the contract" but had not asserted claims under that contract. 180 S.W.3d at 134. In so doing, the Texas Supreme Court noted that the limits of direct-benefits estoppel were necessarily unclear and its application fact-specific, requiring courts to exercise discretion based on the equities of each case. *Id*. at 135. The court articulated the basis of the doctrine as follows: "'when a nonparty consistently and knowingly insists that others treat it as a party, it cannot later turn [] its back on the portions of the contract, such as an arbitration clause, that it finds distasteful.' A nonparty cannot both have his contract and defeat it too." *Id*.[2]

In *Weekley Homes*, the Texas Supreme Court recognized uncertainty as to whether Texas or federal law governed this analysis. The court applied Texas law, "while endeavoring to keep it as consistent as possible with federal law." 180 F.3d at 131. Other

---

[2] In *In re Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lockey Investment Group, L.L.C.*, 195 S.W.3d 807 (Tex. App.–Dallas 2006), the court declined to compel arbitration. The case was filed against the new employer of individuals who had worked for Merrill Lynch. At Merrill Lynch, the employees had signed a contract (a securities professional's registration form) with an arbitration clause. When these employees went to work for a competitor, the new employer sued Merrill Lynch for business disparagement and other claims. Merrill Lynch moved to compel arbitration against the new employer. The court refused. The new employer had not asserted a claim under the contract signed by the former employees and had not otherwise sought to invoke benefits under that contract. The result is consistent with *Weekley Homes*.

courts have found that when it is undisputed that there is a valid contract containing an arbitration clause, the issue of whether that agreement applies to a nonsignatory is determined under federal law. *See, e.g., R.J. Griffin & Co. v. Beach Club Homeowners Ass'n, Inc*., 384 F.3d 157, 160 n.1) (4th Cir. 2004). The federal courts have also recognized direct-benefits estoppel. In *Bridas*, 345 F.3d 347, the court was asked to confirm an arbitration award in favor of Bridas against the Government of Turkmenistan arising out of a joint venture agreement. The Government of Turkmenistan was not a signatory to the agreement containing the arbitration clause. The court had to decide whether the arbitration award bound the Government of Turkmenistan under principles of agency and estoppel. Direct-benefits estoppel was one of the grounds offered as a basis for binding the Government to the arbitration contract. The court acknowledged that direct-benefits estoppel could be the basis for compelling a nonsignatory to arbitrate with a signatory to an agreement when the nonsignatory "knowingly exploits the agreement containing the arbitration clause." 345 F.3d at 362 (quoting *E.I. DuPont de Nemours & Co. v. Rhone Poulenc*, 269 F.3d 187, 199 (3d Cir. 2001)); *see, e.g., Gersten v. Intrinsic Techs., L.L.P.*, 442 F. Supp. 2d 573, 579 (N.D. Ill. 2006) (compelling arbitration using direct-benefits estoppel where nonsignatory plaintiff's claims were "fundamentally rooted in the terms of [the contract]").

In *Bridas*, however, the court declined to apply direct-benefits estoppel. The nonsignatory had not sued the signatory under the agreement containing the arbitration clause and therefore had not "exploited" the joint-venture agreement to "the degree that the cases that consider applying this version of estoppel require." 345 F.3d at 362. The opinion does

23

not reveal any indication that the Government of Turkmenistan had otherwise demanded or accepted benefits under the contract. The court did not consider whether such conduct during the contract's life could have supported direct-benefits estoppel.

*Bridas* cited *DuPont*, 269 F.3d 187, with approval. That case involved a joint-venture agreement between DuPont China and Rhodia Fiber, subsidiaries of DuPont and Rhodia respectively. DuPont, the parent company of DuPont China, sued Rhodia Fiber and Rhodia for breach of an oral agreement, not for breach of the joint-venture agreement. The joint-venture agreement contained an arbitration clause. The Third Circuit affirmed the district court's refusal to compel DuPont to arbitrate its claim against the signatories to the joint-venture agreement. The court acknowledged that direct-benefits estoppel could apply to "prevent a non-signatory from embracing a contract and then turning its back on the portions of the contract, such as an arbitration clause, that it finds distasteful." 269 F.3d at 200. Direct-benefits estoppel did not apply because there was no evidence that DuPont had "embraced the Agreement itself during the lifetime of the Agreement, or that it received any direct benefit under the Agreement." *Id*. The *DuPont* court did not limit direct-benefits estoppel to cases in which the nonsignatory had sued the signatory under the agreement containing the arbitration clause.

Other cases have not focused on whether the nonsignatory filed a suit or claim against the signatory based on the agreement containing the arbitration clause but, as in *DuPont*, focused instead on whether the evidence showed that the nonsignatory received direct and substantial benefits from that agreement. In *Hellenic Inv. Fund, Inc. v. Det Nortske Veritas*,

24

No. 05-20862, 2006 WL 2567462, at *3 (5th Cir. Sep. 7, 2006), the court enforced a forum-selection clause against a nonsignatory to the contract because the evidence showed that the nonsignatory received direct and substantial benefits from the signatory's contract performance. The nonsignatory had purchased a ship classed by a classification society. The classification society had contracted with the ship's seller to provide classification services. The ship's purchaser later sued the classification society, alleging negligent misrepresentation; the suit did not allege breach of the contract between the ship's seller and the classification society. That contract contained an arbitration clause. The court found that the ship's purchaser had benefitted from the contract between the society and the ship's seller because the classification benefits included that the ship could be "flagged and operate in commerce." *Id*. at *4. The basis for direct-benefits estoppel was not that the nonsignatory had sued the signatory under the contract containing the arbitration clause. The *Hellenic* court did note, however, that as in *Bridas*, the nonsignatory had sued the signatory and the claims in the suit stemmed from—but were not based on—the subject matter of the contract. *Id.*

Similarly, in *American Bureau of Shipping*, 170 F.3d 349 (2d Cir. 1999), the court enforced a forum-selection clause against nonsignatory vessel owners who sued the classification society alleging that deficient inspection, approval, and classification of the vessel resulted in poor design and construction. The court relied on direct-benefits estoppel, finding that the ship owners had benefitted from the contract (containing the forum-selection clause) between the classification society and the shipyard. Again, the basis for enforcing

the clause was the benefits the nonsignatory obtained under the contract, not the fact that the nonsignatory had sued the signatory under that contract. *See also Zurich Am. Ins. Co. v. Watts Indus., Inc.,* 417 F.3d 682, 687-88 (7th Cir. 2005) (declining to enforce arbitration agreement against a nonsignatory based on direct-benefits estoppel because the nonsignatory had not sought to enforce any rights under the agreements containing the arbitration clause and any benefits available under those agreements were too attenuated and indirect to force arbitration under an estoppel theory); *Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060, 1064 (2d Cir. 1993) (a nonsignatory local affiliate sued for a declaratory judgment that it had a right to use a trade name; the authority to use the trade name was provided under an agreement containing an arbitration clause, which the court enforced against the nonsignatory because it had benefitted from the use of the trade name); *Amkor Technology, Inc. v. Alcatel Business Systems*, 278 F. Supp. 2d 591 (E.D. Pa. 2003) (when a nonsignatory asserted tort claims against a signatory over allegedly defective mobile telephone components obtained from a contract between the signatory and the nonsignatory's sister company, the court enforced an arbitration clause in that contract because the nonsignatory had received direct benefits from the contract).

Both federal and Texas state law are clear that a court may compel arbitration against a nonsignatory under direct-benefits estoppel if the nonsignatory has sued the signatory under a contract containing arbitration clause and the other requirements for direct-benefit estoppel and arbitrability are met. *Weekley Homes*, *DuPont*, and other cases make it clear that a court may compel arbitration against a nonsignatory who has sued the signatory, even if the suit

is not based on the contract containing the arbitration clause, if the other requirements are met. Wood argues that this case would go one step further, enforcing arbitration against a nonparty who has not sued the party to the contract containing the arbitration clause at all. PennTex and Shaner ask this court to clarify when this application of direct-benefits estoppel may be appropriate.

In at least one case, the court used direct-benefits estoppel to compel arbitration against a nonsignatory that had not sued the signatory. In *Legacy Wireless Servs. v. Human Capital, L.L.C.*, 314 F. Supp. 2d 1045 (D. Or. 2004), a signatory to an agreement containing an arbitration clause sued a nonsignatory to compel arbitration. As in the present case, the underlying arbitration in *Legacy* involved a contract dispute between the signatory seeking to compel arbitration and another signatory to the contract. The signatory asserted that the nonsignatory should also be compelled to participate in the arbitration because it had allegedly breached the contract containing the arbitration clause—to which it was not a party—by failing to register with a state contracting board under state law, which cost the signatory a major construction job. The court refused to dismiss the motion to compel arbitration on the ground that the nonsignatory did not sue the signatory under the agreement containing the arbitration clause. The court held that direct-benefits estoppel applied because the nonsignatory had allegedly received direct and substantial benefits – fees – from the agreement and because it allegedly "played an important role in the consummation of the agreement and in assisting [a signatory's] fulfilling its contractual obligations." *Id.* at 1056–57. The court found that although the nonsignatory had not sued the signatory to the

contract containing the arbitration clause, the nonsignatory could be compelled to participate in the arbitration with the signatory.  The "dispositive point was that on the actual facts the nonsignatories received direct benefits from the contract." *Id.* at 1057 (quotations omitted).

In *Phoenix Cos. v. Abrahamsen*, 05 Civ. 4894, 2006 WL 2847812 (S.D.N.Y. Sep. 28, 2006), the court declined to apply direct-benefits estoppel to a nonsignatory that had not sued a signatory, for reasons unrelated to the fact that the nonsignatory was not a plaintiff in the underlying dispute.  Instead, the court emphasized that the benefits the nonsignatory had allegedly received from the agreement containing the arbitration clause were indirect.  The court also emphasized that the nonsignatory was not mentioned in the agreement and did not have any involvement in executing or performing the agreement.  *Id.* at *7.

Wood first argues that he has not accepted any direct benefits from the agreement (Docket Entry No. 11 at 4).  Wood claims that the indemnity extended to him as a "Buyer Indemnified Party" under the Stock Purchase Agreement, the receipt of attorneys' fees paid by PennTex, and the release obtained on his behalf by PennTex, are not direct or substantial benefits under the Agreement.  The record does not support this argument.  Unlike the facts described in *Phoenix Companies,* Wood participated in negotiating the 2005 Stock Purchase Agreement, was named in the Agreement, and has been involved in its execution and performance.  The Agreement imposed obligations on him and provided benefits for him.  The Agreement provided him protection against the individual exposure he faced from the Tsar parties' counterclaims against him for actual and punitive damages for conspiring to commit conversion and theft.  At the execution of the Stock Purchase Agreement, Wood

28

received indemnification from PennTex for claims Tsar and Cheatham might assert against him.  The Agreement named Wood as an Indemnified Party in Article 9—"Scott Y. Wood and the other Buyer Indemnified Parties"—and defines him as a "Buyer Indemnified Party" in Article 1—"Seller and its officers, directors, managers, employees, agents, representatives, controlling Persons, shareholders, and their Affiliates."   (Docket Entry No. 10, Ex. A at 2, 28).   When the Stock Purchase Agreement was executed, PennTex complied with its contractual obligation to post a $1 million letter of credit to secure the indemnity obligation. (Docket Entry No. 11, Ex. A at 2).  On May 2, 2006, PennTex complied with its contractual obligation to deliver Wood a broad and complete release from Tsar and Cheatham for all claims against him, including future related claims and claims that had earlier been dismissed but without prejudice.   (Docket Entry No. 10, Ex. F).  Wood has received $79,144.70 in attorneys' fees paid by PennTex.  (Docket Entry No. 9 at 15; Docket Entry No. 10, Ex. E at 4–6; Docket Entry No. 11 at 2; Docket Entry No. 10, Exs. B–D).

Wood asserts that PennTex paid these fees to ERG Holdings, which in turn paid them to Wood under the indemnity required by the bylaws.  (Docket Entry No. 11 at 5).  The record, however, reveals that PennTex paid fees not only for ERG Illinois's attorneys' representation in the Tsar case, but also for fees that were incurred by Wood personally in that litigation.  (Docket Entry No. 11, Ex. A at 2; Docket Entry No. 10, Exs. B–D).  The record reveals that Wood demanded that PennTex pay the attorneys' fees for the "Buyer Indemnified Parties," which is what the Stock Purchase Agreement required.  (Docket Entry

29

No. 10, Ex. E at 4–6; Docket Entry No. 11 at 2).  Wood has knowingly received significant and direct benefits under the Stock Purchase Agreement.

Wood also argues that because he has not sued PennTex under the Stock Purchase Agreement, he cannot be compelled to arbitrate under that Agreement.  Wood is correct that in *Weekley Homes*, on which PennTex primarily relies, the nonsignatory had sued the signatory, although not under the contract containing the arbitration clause.  This court noted this fact in *Int'l Demographics*, 2006 WL 1897042, at *7, a suit that did not involve arbitration.  In that case, a party to a contract sued a nonparty, alleging breach of contract.  The plaintiff asked this court to bind the nonsignatory to the contract under direct-benefits estoppel.  This court declined to do so, noting that direct-benefits estoppel is not generally applied to hold a defendant who is not a party to a contract liable to a plaintiff suing under that contract.  *Id.* at *7.  This is consistent with the cautious statement in *Weekley Homes* that direct-benefits estoppel cannot create liability for noncontracting parties that does not otherwise exist.  In cases like *Weekley Homes*, *DuPont*,  and *American Bureau of Shipping*, it is the combination of the nonsignatory seeking "substantial and direct benefits from the contract" containing the arbitration clause other than through suing the signatory, the signatory providing those benefits, and the fact that the dispute to be arbitrated was so closely related to the contract containing the arbitration clause as to be within the scope of that clause, which triggered the equitable basis for precluding the nonsignatory from "avoiding the arbitration clause that was part of that agreement."  *Weekley Homes*, 180 S.W.3d at 134.  The keys are whether the nonsignatory demanded and received substantial and direct benefits

under the contract containing the arbitration clause, by suing the signatory under that contract or otherwise; the relationship between the claims to be arbitrated and the contract; and whether equity prevents the nonsignatory from avoiding the arbitration clause that was part of that contract.

No Fifth Circuit case has applied direct-benefits estoppel to a nonsignatory who has not sued the signatory. In *Bridas*, the court only examined whether the nonsignatory had sued the signatory under the contract and did not discuss the circumstances under which a nonsignatory might otherwise directly benefit from the contract containing the arbitration clause so as to trigger direct-benefits estoppel. 345 F.3d at 362. In *Hellenic*, the court noted that it was sufficient that the nonsignatory had sued the signatory asserting claims "premised in part" upon the agreement, while acknowledging that the claims asserted were for misrepresentation and not based on the contract and that the benefits derived from the contract were separate from those sought in the suit the nonsignatory had filed. 2006 WL 2567462 at *4. No Fifth Circuit case, however, has examined the application of direct-benefits estoppel in a case that involves facts similar to the present case.

As noted, in this case, the nonsignatory – Wood – received direct and substantial benefits from the Stock Purchase Agreement. Wood did not sue PennTex under the Stock Purchase Agreement. But Wood did claim, and receive, direct and substantial benefits from the Agreement. Wood also participated in negotiating the Stock Purchase Agreement and is specifically referred to in the Agreement. These facts are similar to those involved in *Weekley Homes, Hellenic,* and *Legacy*.

The subject matter of the underlying dispute in this case is premised on the Stock Purchase Agreement.  PennTex alleges that Wood is violating the Agreement by continuing to pursue his individual claims against the Tsar parties in the state court.  The claims in the underlying dispute are premised on the Stock Purchase Agreement  The courts emphasized the relationship between the claims the nonsignatories asserted in *Weekley Homes* and *Hellenic* and the agreements containing the arbitration provisions in those cases.

Wood claims that because he is not a plaintiff in the underlying dispute, he cannot be compelled to arbitration.  Wood is right that courts must be extraordinarily cautious in allowing a contracting party to reach out to enforce an arbitration clause in that contract against a nonparty, particularly if the nonparty has not himself sued the party.  What is unusual about this case is that although Wood did not sue PennTex in the underlying dispute that PennTex is seeking to arbitrate, his actions as a *plaintiff* pursuing litigation allegedly prohibited by the PennTex Agreement led to the underlying dispute.  Although Wood has not sued PennTex and has not sued under the Agreement containing the arbitration clause, he is the plaintiff in a case that by its continued existence allegedly violates the Agreement, from which he has directly and substantially benefitted.  It is Wood's refusal to release or dismiss his claims he has filed as a plaintiff against the parties in the state court that allegedly violates the Agreement containing the arbitration clause.  The disputed issue is whether the Stock Purchase Agreement precludes Wood from pursuing those claims.  The unique fact of this case is that although Wood did not sue PennTex, he is the plaintiff in the suit that is the

subject of the dispute between them.  To say that he cannot be compelled to arbitrate with PennTex because he is not the plaintiff would ignore this unusual aspect of the suit.

This usual set of facts presents a stronger basis to compel arbitration than was present in *Legacy*.  In *Legacy*, the nonsignatory to the contract containing the arbitration clause had not filed a suit against the signatory.  It was sufficient that the nonsignatory had allegedly obtained direct and substantial benefits from the contract containing the arbitration clause and participated in negotiating and performing that contract.  In the present case, Wood has also obtained direct and substantial benefits from the Agreement containing the arbitration clause and participated in negotiating and performing that Agreement.  In addition, the dispute to be arbitrated is whether his actions as a plaintiff in the state-court  case violates the Agreement.  The unusual combination of these facts leads this court to reject Wood's argument that his procedural status precludes the application of direct-benefits estoppel. Because Wood has deliberately sought and obtained substantial and direct benefits from the Stock Purchase Agreement, yet continued as a plaintiff pressing a lawsuit against a third party so as to allegedly breach that Agreement, he is bound to arbitrate the allegation of the breach under direct-benefits estoppel.[3]

---

[3] PennTex has argued for the application of other forms of estoppel and agency to compel Wood to arbitrate.  Some of the other forms of estoppel or agency are not applicable.  For example, equitable estoppel for "intertwined claims" does not apply. *See Grigson*, 210 F.3d at 527–28.  Third-party beneficiary estoppel does not apply because the doctrine applies to allow a nonparty to enforce the contract under certain circumstances, but not to impose obligations against a party that has not sought to enforce its terms.  Under Texas law, "a third-party beneficiary [is] not a promisor," *In re Palm Harbor Homes*, 195 S.W.3d 672 (Tex. 2006) (citing *Stine v. Stewart*, 80 S.W.3d 586, 589 (Tex. 2002)).  PennTex asserts that Wood has obligations under the contract, that PennTex seeks to enforce in arbitration.  In *Bridas*, the court made it clear that third-party beneficiary estoppel could not serve as a basis to compel a nonparty to arbitrate if the nonparty had not sued on the contract.  345 F.3d at 363.  Moreover, the relationship between Wood and the ERG corporate

**IV.    Is This Dispute Within the Scope of the Arbitration Clause?**

The parties agree that federal law applies to the question of whether PennTex's claims against Wood under the Stock Purchase Agreement are within the scope of the arbitration provision.  (Docket Entry No. 6 at 1).

The arbitration clause applies to "all disputes arising under this Agreement." (Docket Entry No. 10, Ex. A).  "[C]ourts distinguish 'narrow' arbitration clauses that only require arbitration of disputes 'arising out of' the contract from broad arbitration clauses governing disputes that 'relate to' or 'are connected with' the contract." *Pennzoil Exploration & Prod. Co. v. Ramco Energy Ltd*., 139 F.3d 1061, 1067 (5th Cir. 1998) (citing *Tracer Research Corp. v. Nat'l Envtl. Servs. Co.*, 42 F.3d 1292, 1295 (9th Cir. 1994) (comparing "relating to" language with "arising out of" language)).  "Broad arbitration clauses . . . are not limited to claims that literally 'arise under the contract,' but rather embrace all disputes between the parties having a significant relationship to the contract regardless of the label attached to the dispute." *Id*.  An "arbitration clause that cover[s] disputes 'arising under' an agreement, but omitt[ing] reference to claims 'relating to' an agreement, cover[s] only those disputes 'relating to the interpretation and performance of the contract itself.'" *Tracer Research Corp.*, 42 F.3d at 1295 (quoting *Mediterranean Enter., Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1464 (9th Cir. 1983)).

---

entities does not "demonstrate[] a virtual abandonment of separateness," *Bridas*, 345 F.3d at 359, and is not a sufficient basis to compel arbitration.

The dispute at issue is an alleged breach of Section 9.4(e) of the Stock Purchase Agreement, Wood's alleged refusal to dismiss or release his claims against the Tsar parties in the state court litigation.  This dispute concerns the interpretation and performance of the Agreement itself and "arises  under" the Agreement.

The arbitration provision requires the "Buyer" and "Seller" senior management to attempt to resolve disputes before a written demand for arbitration.  (Docket Entry No. 1, Ex. B at 33).  The parties do not dispute that PennTex, a defined "Party," filed the arbitration demand after the requisite attempts at resolution failed.

Wood argues that because the arbitration provision requires that "subject to Section 9.4. . . resolution of Disputes with respect to claims by third Persons will be deferred until any judicial proceeding with respect thereto are concluded," the arbitration that PennTex and Shaner seek cannot proceed until the Tsar case is concluded.  Wood argues that because the arbitration seeks to compel him to dismiss or release his claims against "third Persons"—the Tsar parties—the dispute cannot be arbitrated until the "judicial proceeding with respect" to the claims against the "third Persons" is concluded.  (Docket Entry No. 11 at 9–11).

There are two flaws with Wood's argument.  First, the dispute to be arbitrated is PennTex's claim that Wood breached the Stock Purchase Agreement obligation requiring him to dismiss or release his claims against the Tsar parties, not the merits of Wood's claims against those parties.  Second, the claims involving the Tsar parties are claims by Wood against third parties, not "by third Persons."  Wood is not a "third Person" because, as discussed above, he signed the Agreement not only as a corporate agent, but also assumed

35

the individual obligations of Section 9.4, and because he is defined as a "Buyer Indemnified Party" under Section 9.4 of the Agreement.  The Agreement states, "*subject to Section 9.4* that resolution of Disputes with respect to claims by third Persons will be deferred." (Docket Entry No. 10, Ex. A at 11.6) (emphasis added).   The dispute at issue does not involve any claim "by third Persons" that requires deferring arbitration until judicial proceedings were concluded.

The Agreement does not state that deferring arbitration is a "condition precedent" to arbitration.  The Agreement states that certain kinds of "Disputes" "with respect to claims by third Persons" will not be arbitrated until judicial proceedings with respect to those claims are concluded.  Wood disputes whether PennTex has complied with this provision.  This court has concluded that PennTex has complied.[4]  Further procedural questions go to the

---

[4] This issue is not one of "procedural arbitrability" for an arbitrator to determine.  See *John Wiley & Sons v. Livingston*, 376 U.S. 543, 555 (1964).  In *John Wiley,* a labor union brought a motion to compel arbitration under a collective bargaining agreement ("CBA") that required compliance with a multistep grievance procedure before arbitration.  The CBA required the employer and the union to engage in discussions aimed at resolving a grievance before it was submitted to arbitration.  John Wiley, the corporate employer, had merged with the employer that had originally entered into the CBA.  A number of issues arose as to the effect of the merger on the rights of employees covered by the CBA.  John Wiley did not believe that it was bound by the CBA, refused to acknowledge the union representatives, and had refused to discuss the employees' grievances with those representatives.  John Wiley then argued that it had no duty to arbitrate because the prearbitration grievance procedure required in the CBA were not followed.  The union responded that John Wiley's refusal to discuss the employee's grievances with the union representatives made compliance with that procedure futile.  John Wiley argued that the court, not an arbitrator, should decide whether noncompliance with the grievance procedure precluded arbitration.  The Supreme Court disagreed, holding that the issue was arbitrable.  "Once it is determined . . . that the parties are obligated to submit the subject matter of a dispute to arbitration, 'procedural' questions which grow out of the dispute and bear on its final disposition should be left to the arbitrator."  *Id.* at 557.  The Court stated that "doubt whether grievance procedures or some part of them apply to a particular dispute, whether such procedures have been followed or excused, or whether the unexcused failure to follow them avoids the duty to arbitrate cannot ordinarily be answered without consideration of the merits of the dispute which is presented for arbitration."  *Id.*  A court's task of determining "substantive arbitrability" does not raise the same concerns.  "Refusal to order arbitration of subjects which the parties have not agreed to arbitrate does not entail the fractioning of disputes about subjects which the parties do wish to have submitted."  *Id* at 558-59.  The issue in *John Wiley*

"*kind of arbitration proceeding* the parties agreed to."  *Green Tree Fin. Corp. v. Bazzle*, 539

U.S. 444, 445 (2003) (emphasis in original).  "[A]rbitrators are well situated to answer that

question."  *Id.*

## IV.    Conclusion

PennTex and Shaner's motion to compel arbitration, (Docket Entry No. 8), is granted.

Because this court has compelled arbitration as to all the claims at issue in this case,

dismissal rather than stay may be appropriate.  *CitiFinancial Corp. v. Harrison*, 453 F.3d

245, 249 (5th Cir. 2006).  No later than October 30, 2006, the parties should advise whether,

given the court's grant of the motion to compel arbitration, this case should be dismissed

rather than stayed.

SIGNED on October 23, 2006, at Houston, Texas.

_____

Lee H. Rosenthal
United States District Judge

---

was whether the court or arbitrator decides if the parties to an arbitration agreement have complied with the
arbitration prerequisites.   The Court declined to decide whether the parties had complied with the CBA's
prerequisites to arbitration because that question could not be answered without considering the effect of the
merger on the parties' rights under the CBA,  which went to the merits of the very dispute presented for
arbitration.   In the present case, deciding whether the parties complied with the Agreement's provisions on
the timing of arbitration does not require this court to decide any issue relating to the merits of the claims that
are presented for arbitration.