American Arbitration Association

| | | |
|---|---|---|
| PennTex Resources, L.P. and Lance T. Shaner | § § § § § | |
| Claimants, | § | |
| | § | |
| vs. | § | AAA No.  70 180 Y 00437 06 |
| | § | |
| ERG Illinois Holdings, Inc. and Scott Y. Wood | § § | |
| Respondent, | | |

## COMMERCIAL AWARD OF ARBITRATOR

WE, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with the arbitration agreement entered into between the above-named parties and dated January 12, 2005, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, do hereby, FIND and AWARD, as follows:

### A.    Procedural Background

1.    Claimants commenced this arbitration against Respondents under the AAA Commercial Rules pursuant to the terms of a Stock Purchase Agreement by and among PennTex Resources, L.P., PennTex Energy, Inc., ERG Illinois Holdings, Inc. and ERG Illinois, Inc. ("SPA") of January 12, 2005. On December 22, 2006, Claimants filed their Second Amended Demand for Arbitration seeking performance by Respondent Wood of an alleged contractually-required release obligation; the payment by Respondents of the cost of renewal of a letter of credit issued pursuant to the SPA; the return to Claimants of the letter of credit, with it not to be drawn upon; the payment by Respondents of certain contractually-allowed pre-closing and post-closing price adjustments; and the payment to Claimants of their reasonable attorneys' fees and expenses incurred in pursuing these claims. On January 22, 2007, Respondents filed their Response to Claimants' Second Amended Demand for Arbitration in which Respondents disputed the standing of the Claimants to participate in this arbitration; denied the existence of any obligation by Respondent Wood to provide a release of his counterclaims in a case pending

**EXHIBIT C**

in the 334th Judicial District Court of Harris County, Texas, styled *"ERG Illinois, Inc. and Scott Y. Wood vs. Tsar Energy II, LLC and Richard M. Cheatham"* ("Tsar Case"); denied the existence of any obligation by Respondents to reimburse Claimants the cost of the letter of credit renewal; denied the existence of any obligation by Respondents to return the letter of credit to Claimants; and counterclaimed against Claimants for an additional amount alleged to be due to Respondents in the form of an additional contractually-required pre-closing price adjustment.

2.    Claimants subsequently filed three motions for summary judgment entitled, Claimants' Motion for Summary Judgment on Claimant's Claim Requesting Relief with Respect to Issues Relating to the Letter of Credit Posted in Compliance with Section 9.4(d) of the 2005 Stock Purchase Agreement, Claimant's Motion for Summary Judgment on Claimant's Claim Requesting Specific Performance of Release Obligation Set out in Section 9.4(e) of the 2005 Stock Purchase Agreement, and Claimants' Motion for Partial Summary Judgment on Claimants' Claims for and Award of Attorney's Fees.

3.    Respondents filed a single comprehensive Motion for Dispositive Relief generally covering the same issues set forth in Claimant's motions for summary judgment except for Respondents' assertion regarding the "standing" issue as it relates to Lance T. Shaner or PennTex Resources L.P.

4.    Both sides filed responses and rejoinders to the various motions for summary judgment and dispositive relief.

5.    A hearing was held on Claimants' various Motions for Summary Judgment and on Respondents' Motion for Dispositive Relief on June 19, 2007. At the hearing, the Tribunal asked counsel for both parties if the parties wanted the Tribunal to decide the issues that are the subject of the respective motions for summary judgment and dispositive relief on the cross motions for summary judgment, and counsel for both parties answered "yes". The Tribunal then inquired if it had all the evidence before it relevant to the subjects of those motions, and counsel for both parties again answered "yes." In this context, the Tribunal considered those issues to be submitted for decision on the documents and affidavits provided, along with written briefs and oral arguments. Both parties asked the Tribunal to rule on the various motions by June 22, and to provide the reasons for the rulings later in the Final Award.

2

6.    Two issues were not submitted on the papers. Those were Claimants' claims with respect to pre-closing/post-closing purchase price adjustments  and Claimant's requested attorneys' fees and expenses. At the final hearing on the merits on June 25-26, 2007, Claimants withdrew their claim with respect to a Pre-Closing Price Adjustment. Evidence was taken at that hearing on the Post-Closing Purchase Price adjustment issue, including the testimony of Chris Hulbert, Tom Stabley and Howard Blunk, appearing for Claimants, and Frank Kinkead and Doug Lacey for Respondents. At the hearing, the Tribunal accepted all documents tendered by the parties and counsel for the Claimants testified regarding the recovery of Claimants' attorneys' fees and expenses, submitting various supporting exhibits which were accepted as part of the hearing record.

**B.    Respondents' Challenge to the Standing of Claimants**

7.    In its Motion for Dispositive Relief, Respondents challenged the standing of PennTex to maintain its claims because of a prior assignment it made to Lance T. Shaner. In response, Claimants explained that the only thing assigned to Mr. Shaner was a stock power and that PennTex is a proper party in this case on all claims and counterclaims.

8.    On June 22, 2007, the Tribunal denied Respondents' challenge to standing, but noted that it would consider the proper role of each Claimant in deciding the claims in the case.

9.    At the merits hearing, Claimants again explained that Mr. Shaner was only assigned a stock power and nothing else, and that PennTex is the proper party to the case. Claimants then announced that Mr. Shaner was being dismissed as a party to this arbitration.

10.    Since there was no dispute among the parties that Mr. Shaner is not a proper party and Claimants having announced the dismissal of Mr. Shaner as a Claimant, Mr. Shaner was dismissed as a Claimant and the case continued with PennTex as the sole Claimant.

**C.    Letter of Credit**

11.    Both sides moved for summary judgment or dispositive relief on the issue of whether Claimant is required to maintain the Letter of Credit ("LC") in force and whether Claimant was required to renew it in January 2007.

12.    Article 9.4(d) of the SPA provides as follows:

"Provide at Closing to the Buyer Indemnified Parties an Irrevocable Letter of Credit ("*Letter of Credit*") from a financial institution acceptable to the

Buyer Indemnified Parties, in their sole discretion, in the amount of $1 million to secure the prompt payment and performance of all obligations of this Section 9.4. Such Letter of Credit shall be maintained in full force and effect, or replaced, renewed or extended, as the case may be until all claims against the Buyer Indemnified Parties in the last of the suits included in the definition of Tsar Case have been resolved either by a final, non-appealable judgment dismissing those claims with prejudice with no liability imposed against the Buyer Indemnified Parties, by the satisfaction of any judgment that might award relief with respect to such claims, or by mutual agreement of all parties to the Tsar Case. The conditions for drawing upon such Letter of Credit by the Buyer Indemnified Parties shall be the presentation by the Buyer Indemnified Parties to the bank that has issued the Letter of Credit of the following: (i) a copy of an invoice for costs or expenses, or a copy of a judgment, sanction, order or award in the Tsar Case awarding a money judgment against one or more of the Buyer Indemnified Parties; and (ii) an affidavit executed by the President of Seller that the Buyer Parties have failed to perform obligations required under this Section 9.4, and that the amount of the draw request that is being filed by the Buyer Indemnified Parties against the Letter of Credit does not exceed the amount of the money judgment, order or award of the amount of any outstanding invoice against one or more of the Buyer Indemnified Parties as referred to in the preceding subparagraph (i) of this Section 9.4(d). The Letter of Credit shall permit multiple drawings until such time as the $1 million amount has been exhausted. Such draws may be in any increments and shall require no minimum draw amount."

13.     At the request of the parties, the Tribunal announced its ruling in principle on this issue on June 22, 2007, prior to the commencement of the hearing on the merits. That ruling was as follows: "1. Claimants' indemnity obligations concluded when they provided a release and/or judgment to Respondents. 2. Therefore, Claimants no longer need to renew the Letter of Credit."

14.     Art. 9.4(d) provides that the LC "shall be maintained in full force and effect . . . *until* all claims against the Buyer Indemnified Parties . . . have been resolved either by a final, non-appealable judgment dismissing those claims with prejudice with no liability imposed against the Buyer Indemnified Parties . . . or by mutual agreement of all parties to the Tsar case."

15.     It is undisputed that Claimants delivered a release to Respondent Wood on May 2, 2006, and a final judgment dismissing the Tsar Party claims against Respondent Wood was entered on June 4, 2007.

16.     Respondents point out persuasively that, although Claimants provided a release on May 2, 2006, Claimants nevertheless refused to provide the full settlement documents to Respondents until June 19, 2007, upon order of the Tribunal. Thus, Respondents did not know until then whether there were conditions to the release, such as the dismissal of Mr. Wood's claims against Tsar and Cheatham.

17.     Since the language of Art. 9.4(d) requires either a dismissal by mutual agreement of all parties, or a final judgment, the Tribunal decides that Claimant's obligations to maintain the LC in full force and effect ended when the final judgment was entered in the Tsar Case on June 4, 2007, in favor of Respondent Wood. Since they had not received the settlement documents, it was only then that Respondents could be assured that they were fully protected against any further claims in that case. The later event served to give literal effect to Art. 9.4(e) of the SPA without doing injustice to Article 9.4(d)'s requirements.

18.     Claimant's claim for damages for renewal of the LC in January 2007 is therefore denied, but Claimant's Claim for Specific Performance by Respondents regarding the LC is granted. Respondents shall therefore promptly deliver to Claimants the original and all copies of the LC, and Respondents shall not draw upon, or attempt to draw upon, the LC, provided that Claimants have paid all attorneys' fees of Wood as ordered hereafter. Respondents' obligation to surrender the original and all copies of the LC and not to draw upon the LC are expressly conditioned upon Claimant's payment of all of Wood's attorneys' fees as ordered herein. At the same time as Respondents deliver to Claimant the aforesaid LC documentation, in order to comply with the LC cancellation requirements of an irrevocable letter of credit, as set forth in the Uniform Customs and Practice for Documentary Letters of Credit 1993 Revision, International Chamber of Commerce Publication No. 500 (which governs the LC in this instance) Respondents shall provide Claimant with any letter necessary to fully comply with these requirements.

**C.     Wood's Claim that Claimant is required to pay any unsatisfied judgment against Tsar Parties**

19.     Respondent Wood claims that, pursuant to Art. 9.4(c), Claimant is required to pay any unsatisfied judgment that he may obtain against the Tsar Parties on his counterclaims against the Tsar Parties.

20.     Art. 9.4(c) reads as follows:

> "[Buyer Parties shall]Indemnify and hold the Buyer Indemnified Parties harmless from any and all harm, damage, loss, expense, liability, costs, awards and judgments relating to or arising out of the Tsar Case after the Closing Date and relating to or arising out of the obligations of this Section 9.4."

21.     On June 22, 2007, the Tribunal ruled on this claim as follows: "3.  Claimants' indemnity obligations do not extend to paying any unpaid judgment that Wood may obtain against Tsar and/or Cheatham."

22.     The Tribunal rejects Wood's claim in this respect.  Art. 9.4 is entitled, "Indemnification Provision for Seller's Benefit Regarding Specific Litigation."  The purpose of indemnification is to protect a party against claims or judgments against it.  Thus, Art. 9.4(c) was designed so that Claimant would indemnify and hold harmless Respondents *from* any and all harm, damage, loss, expense, liability, costs, awards and judgments."  If the Tsar Parties had obtained a judgment against Respondents after the SPA Closing Date, Claimant would have been required to indemnify Respondents against the effects of that judgment.  Art. 9.4(c) cannot legitimately be read to require Claimant to pay any judgment that Respondent Wood might obtain against the Tsar Parties that goes unsatisfied.  That is not in the nature of an indemnity and was clearly not the intended scope of Art. 9.4(c).  The terms "indemnify," "hold harmless" and "from" clearly indicate that the scope of the clause does not require payment to the Respondents of any affirmative judgment that they may obtain.  Moreover, an unsatisfied judgment in favor of Respondents cannot be considered to be "harm, damage, loss, expense, liability, costs, awards and judgments" within the meaning of the indemnity requirement of Art. 9.4(c).  Thus, this claim is denied.

**E.     Wood's Attorneys' Fees in Prosecuting His Claims Against Tsar Parties**

23.     Based on Art. 9.4(a) of the SPA, Wood claims that Claimant is required to reimburse him for his attorneys' fees in prosecuting his claim against Tsar and Cheatham.

24.     Art. 9.4(a) reads as follows:

> "Pay any and all costs of the Company, Scott Y. Wood, or any of the Buyer Indemnified Parties, which may be incurred in the Tsar Case after the Closing Date.  Buyer Parties will pay directly to attorneys, court reporters, copy services, expert witnesses, consultants and other providers or entities, all fees and expenses of the Buyer Indemnified Parties, or any of them, incurred after the Closing Date in connection with, arising out of or relating of the Tsar Case.  Such payment by Buyer Parties, their

6

successors or assigns, shall be made in accordance with the governing joint operating agreements within the time period stated on each invoice so that payment for such invoice shall not be past-due."

25.   On June 22, 2007, the Tribunal ruled as follows: "4.   Claimants' indemnity obligations require them to pay all attorneys' fees of Wood, including Wood's attorneys' fees incurred in prosecuting his claims, until Claimants submitted to Wood a release and/or judgment resolving all claims against Wood.   Claimants have no obligation to indemnify or pay Wood's attorneys' fees for prosecuting his affirmative claims after that date."

26.   Claimant argues that Art. 9.4(a) must be read in light of Art. 9.4 generally —"Indemnification Provision"— and claims that subsection (a) only applies to Wood's attorneys' fees for defending the claims brought against him by the Tsar Parties.   Respondents, on the other hand, point to the precise language of Art. 9.4(a) —Claimants "will" "(a) Pay any and all costs of . . . Wood . . . which may be incurred in the Tsar Case after the Closing Date," including "all fees and expenses . . . incurred after the Closing Date in connection with, arising out of or relating to the Tsar Case."   Respondents suggest that the language is unlimited and is broad enough in scope to cover all attorneys' fees of Wood both in prosecuting and defending the Tsar case.

27.   The Tribunal views Art. 9.4(a), taken literally, as being broad enough to cover all attorneys' fees of Wood, whether in defending the Tsar claims against him or in prosecuting his own claims.   But the Tribunal cannot ignore the context and purpose of the provision.   Art. 9.4(a) is part of the larger provision of Art. 9.4 generally, which as Claimants note, is an indemnity provision.   An indemnity generally protects one from claims brought against it.   Subsection (a) must also be read in light of the other provisions of Art. 9.4(d).

28.   Art. 9.4(d) provides that the LC is intended "to secure the prompt payment and performance of *all* obligations of this Section 9.4."   It also requires that the LC be maintained in full force and effect "until all claims against" Wood are resolved either by a final, non-appealable judgment or by mutual agreement of the parties.

29.   Interpreting these provisions together harmoniously, as required by applicable law and as both parties agree should be done, the broad language of Art. 9.4(a) must be read at a minimum to cover all attorneys' fees of Wood incurred in defending the Tsar Case claims against him until the final judgment was signed on June 4, 2007, as discussed above.   But a

7

literal reading of Art. 9.4(a) does not limit Wood to recovery of defense fees, and it is clearly broad enough to cover the fees for prosecuting his counterclaims as well.

30.    The Tribunal notes that the existence and prosecution of Wood's claim against Tsar and Cheatham could have been considered, and likely was considered, an important part of the strategy of defending Wood against the claims of Tsar and Cheatham. The prosecution of a good faith counterclaim is a well-known and oft-used defense strategy. This likely explains the broad language used in subsection (a). It was intended that Claimant pay all attorneys' fees of Wood both in defending the claims against him and in prosecuting his own claims. But the parties did provide a limit on this broad language by evidencing their intent in Art. 9.4(d) that the LC be maintained only until a final judgment is obtained resolving "all claims against" Wood. The significance of this language as a limit on Art. 9.4(a) is found in the fact that the LC was intended " to secure the prompt payment of *all* obligations of this <u>Section 9.4</u>," which would logically and necessarily include the obligations in 9.4(a).

31.    Harmonizing the various provisions of Art. 9.4 mandates an interpretation that Claimant is responsible for paying all attorneys' fees incurred by Wood in the Tsar Case until all claims against him were resolved by a final, non-appealable judgment. This occurred on June 4, 2007.

32.    By Affidavit filed with this Tribunal dated July 6, 2007, which was provided at the Tribunal's request, Respondent Wood's attorney sets out the documented basis for the recovery of $97,443.82 for attorneys' fees and expenses in the representation of Respondent Wood in the Tsar Case through the end of May 2007. Exhibit B, attached to that Affidavit, shows $2698.19 due for March 2005 whereas Exhibit A to the Affidavit, the actual billing records, shows that amount to be $2148.19, indicating a $550 error. Further, Respondent Wood's attorney states in his Affidavit that fees and expenses incurred in May of 2007 ($4353.75) were incurred while representing his client in Tsar Case-related matters. A close examination of these May 2007 entries, as set out in Affidavit Exhibit A, indicates that these fees and expenses were incurred in an attempt by Respondent Wood to stop the trial court in the Tsar Case from entering (purely as a formality) a dismissal with prejudice of the Tsar Parties' claims against Wood. This procedural step was initiated in order to effect literal compliance with the requirements of SPA Art. 9. (d) and for no other apparent purpose since the Tsar Parties had already non-suited their claims against Wood over a year earlier. Consequently, the May

8

2007 fees and expenses are deemed to have been incurred not in connection with the Tsar Case representation but in connection with this arbitration proceeding, and are not deemed to be reasonable and necessary. Wood's fees and expenses otherwise are considered reasonable and necessary, and having been incurred in Wood's defense against Tsar Party claims and in the prosecution of Wood's counterclaims against the Tsar Parties through the end of May 2007, this Tribunal awards Respondent Wood attorneys' fees and expenses in the amount of $92,540.07 (*i.e.*, $97,443.82 less $550 less $4353.75).

F.    **Specific Performance of Wood's Alleged Release Obligation**

33.    Claimant points to the language of Art. 9.4(e) and asserts that upon being furnished a full and complete release of all matters in the Tsar Case, Wood is obligated to dismiss or release his affirmative claims in that case. Respondents argue threefold that Claimants have not satisfied the condition precedent of not having breached Art. 9.4 (because it has not paid all attorneys' fees of Wood in the Tsar Case), it did not furnish Wood a release "of all matters in the Tsar Case" (which includes Respondent Wood's counterclaims) and that Respondent Wood's obligation is merely an obligation of cooperation, not a contractual obligation to dismiss or release his counterclaims.

34.    Art. 9.4(e) provides as follows:

> "Provided that the Letter of Credit is in place and Buyer Parties have not breached this Section 9.4, Buyer will have full control of the representation of Seller Parties and Scott Y. Wood in the Tsar Case effective as of the Closing, with the right to cancel depositions and reschedule the hearing on Seller Parties' motion for summary judgment, and Scott Y. Wood and the other Buyer Indemnified Parties shall give their full cooperation to the Buyer in the Buyer's post-Closing prosecution and defense of the Tsar Case and Scott Y. Wood will, at Buyer's request and upon being furnished a full and complete release of all matters in the Tsar Case, either dismiss or release the claims that he has asserted individually in the Tsar Case. Upon request, Seller parties will deliver to the Buyer an executed form of motion for the substitution of counsel substituting Fulbright & Jaworski L.L.P. for the current attorney for Seller Parties and Scott Y. Wood in the Tsar Case."

35.    In its ruling of June 22, 2007, the Tribunal reserved a decision on this issue until it heard further argument from counsel and had an opportunity to ask further questions and obtain answers at the hearing on the merits, the same having occurred at the hearing on June 26, 2007.

9

36.     The Tribunal finds that Claimant was not in breach of Section 9.4, although it does have an obligation to pay certain of Wood's attorneys' fees as provided above. That Claimant was not in breach is evident from an affidavit of Mr. Wood (Claimants' Ex. 150), filed in federal court, in which he testified as follows:

> "13. In regard to those payments, after PennTex paid ERG's first request for payment, we were informed by PennTex's counsel that PennTex would not pay any portion of my fees and expenses incurred for prosecuting my claims against the Tsar Case defendants. PennTex's counsel stated PennTex would only pay the costs and expense related to my defense in that Case. Although this was not our understanding of the indemnity provision, we did not object and ERG gave PennTex a credit for prosecution costs previously paid by PennTex when ERG submitted its second request for payment. PennTex only paid the amount of the second request with the credit. ERG's third request for payment was only for defense costs. The Tsar Case defendants subsequently nonsuited all their claims against me individually. As result, ERG has not requested that PennTex pay any additional costs after the third request was made."

37.     It is clear that Respondent Wood did not bill Claimant his attorneys' fees for prosecuting his Tsar Case counterclaims, and Claimant did not refuse a demand for such payment, for most of the pendency of the Tsar Case after the Closing of the transaction between Claimant and Respondents.

38.     Respondents note, however, that by letter of February 28, 2007 (Respondents' Ex. 63), ERG's attorney requested payment of Wood's fees for the prosecution of his claims. Claimant is not required to pay those fees for 30 days, so no breach could have occurred until approximately April 1, 2007. Thus, the record of these proceedings reflects that Respondents did not make a specific request for recovery of Respondent Wood's Tsar Case-related attorneys' fees and expenses until well after this arbitration was commenced.

39.     At that point in time, both parties were fiercely — and in the view of the Tribunal, in good faith —contesting this issue in this arbitration and Claimant had delivered to Respondents a release of Tsar's and Cheatham's claims against Respondents. While the Tribunal does not hold that this was sufficient to discharge Claimant's obligations to Respondents, it cannot find a material breach by Claimant sufficient to discharge Wood's alleged obligation under Art. 9.4(e).

40.    Even if Claimant was in breach after April 1, 2007, that breach can be cured by payment of Wood's remaining attorneys' fees in the Tsar Case, as discussed above.

41.    As for Wood's argument that Claimant did not furnish him with a release "of all matters in the Tsar Case" because the release did not release his affirmative claims in that case, this argument is rejected. The obvious import of a requirement for Claimant to furnish Wood a release "of all matters" is that it must provide a release of all matters *against* Wood, which is the point of the indemnity obligation of Art. 9.4. This is confirmed by harmonizing Art. 9.4(e) with 9.4(d), which latter provision provides that the LC secures *all* obligations of Art. 9.4, with the LC to be maintained only until all claims against Respondents are resolved.

42.    This brings us to the question of the meaning of the critical language of Art. 9.4(e). Claimant says that Wood contractually agreed to dismiss or release his affirmative claims if Claimant obtained a release of the claims against him. Respondents, however, say that this provision is only an obligation of cooperation and does not compel him to release or dismiss his claims.

43.    The critical language of Art. 9.4(e) is this: "Wood . . . shall give [his] full cooperation to [Claimant] in [its] post-Closing prosecution and defense of the Tsar Case and Scott Y. Wood will, at [Claimant's] request, and upon being furnished a full and complete release of all matters in the Tsar Case, either dismiss or release the claims that he has asserted individually in the Tsar Case." It is undisputed, however, that Claimant never assumed representation of Wood in the Tsar Case, as was contemplated in subsection (e), and therefore, Claimant never actually prosecuted Wood's claims or defended Wood in that case. Instead, Wood's attorney, John Zukowski, continued to fully represent Wood in that case.

44.    In determining the meaning of this provision, the affidavit of Tom Stabley (Claimant's Ex. 6) is relevant. In that affidavit, Mr. Stabley testified as follows:

> "One of the key deal points that was discussed during these negotiations was who would bear the costs and risks associated with what is defined in the 2005 Stock Purchase Agreement as the 'Tsar Case.' The Tsar Case had been pending in a state district court in Houston, Texas since July 2004, and involved claims that had been brought by and against both the company to be transferred, ERG Illinois, Inc. ("ERG"), as well as claims that had been brought by and against Scott Y. Wood individually. Upon closing of the contemplated transaction, either PennTex or Shaner, as the new owner of ERG, would obviously become responsible for ERG's

potential liability in the Tsar Case. In addition, Scott Wood had been insistent from the outset of the negotiations that the proposed transaction be structured so that he would have unlimited indemnity protection against his own potential individual liability in the Tsar Case. Under these circumstances, the negotiators for PennTex and Shaner were understandably desirous of avoiding the existence of any impediment to their ability to control the future conduct of litigation in the Tsar Case, including their ability to settle that litigation in whole or in part. The negotiators for PennTex and Shaner viewed Wood's retention of an unfettered right to control his individual plaintiff's claims asserted in the Tsar Case as creating such a potential impediment, and communicated this concern to Wood and his representatives during the negotiations, as well as their desire to address this potential impediment in the proposed agreement in a manner that would require Wood to cooperate with the efforts of the new owner or owners of ERG to resolve the Tsar Case by dismissing or releasing his individual plaintiff's claims asserted therein if requested to do so.

"The negotiators of the 2005 Stock Purchase Agreement, including Scott Y. Wood, ultimately agreed to deal with responsibility for the Tsar Case in a special five-part section, Section 9.4, entitled 'Indemnification Provision for Seller's Benefit Regarding Specific Litigation.' As is reflected in the language of Section 9.4, although PennTex agreed to provide Scott Y. Wood with full indemnity protection with respect to Wood's own individual exposure in the Tsar Case, PennTex insisted in return that Wood and the other Buyer Indemnified Parties identified in the Agreement give PennTex full control over the representation of Seller Parties and Scott Y. Wood effective as of the date of the Closing. In further support of PennTex's right to control the Tsar Case, Scott Y. Wood and the other Buyer Indemnified Parties provided a contractual commitment to give PennTex their full cooperation in the prosecution and defense of the Tsar Case, including Scott Y. Wood's agreement that, upon request, and upon being furnished a full and complete release of all matters in the Tsar Case, he would dismiss or release his individual claims asserted in the Tsar Case. As previously indicated, Scott Y. Wood was personally involved in the negotiations relating to Section 9.4 of the 2005 Stock Purchase Agreement, including the portion of that section requiring him to release or dismiss his individual claims asserted in the Tsar Case. The commitments of Scott Y. Wood contained in the final negotiated form of Section 9.4 of the 2005 Stock Purchase Agreement were a material factor in PennTex's determination to enter into the Agreement."

45.    The testimony of Mr. Stabley was not rebutted or refuted by Respondents in any way. Respondent Wood did not provide evidence on this issue, nor did any other witness for Respondents. Neither did Respondents object to the affidavit of Mr. Stabley as summary judgment evidence.

46.    Although technical rules of evidence do not apply in an arbitration proceeding, it is worth noting that parol evidence may be relevant in order to understand the context and circumstances surrounding the negotiation of the SPA. Moreover, Mr. Stabley's evidence does not violate the parol evidence rule because it is not inconsistent with the terms of the contract.

47.    The logical and even compelling conclusion that must be drawn from the operative language of Art. 9.4(e) ("Scott Y. Wood will, at Buyer's request and upon being furnished a full and complete release of all matters in the Tsar Case, either dismiss or release the claims that he has asserted individually in the Tsar Case") is that Respondent Wood was most interested in being protected against any individual liability in the Tsar Case in which a $35 million claim against Respondents was pending, and that he was willing to surrender his own affirmative claims in order to be protected against personal liability. The testimony of Mr. Stabley tends to support and confirm this view. The Tsar Parties nonsuited Respondent Wood in May of 2006 , and a "with-prejudice" dismissal of those claims was formally entered by the trial judge on June 4, 2007. Clearly, this latter step met the literal requirements of SPA Arts. 9.4(d) and (e).

48.    Mr. Wood's concern to be indemnified is an understandable and rational position, but the logical and compelling implication of the language used in Art. 9.4(e) is that Mr. Wood has contractually bound himself either to dismiss or release his claim once he was presented with a full and complete release of all claims against him. While he was presented with a release on May 2, 2006, he was not given the complete settlement documents so he could determine that it was an unconditional and irrevocable release. Mr. Wood received those settlement documents only very late in the afternoon on June 19, 2007, the day the Tribunal ordered them produced. In the meantime, the judge signed a final judgment in the case on June 4, 2007.

49.    In light of the foregoing, the Tribunal holds that Mr. Wood was required to dismiss or release his counterclaims in the Tsar Case as of June 20, 2007, and the Tribunal grants Claimant's motion requiring that Respondent Wood satisfy his release obligation as set forth in Art. 9.4(e), but subject to the conditions set forth above (i.e., that Claimant pay Wood's attorneys' fees in the amount of $92,540.07).

### G.    Post-Closing Definitive Purchase Price Adjustment

50.    Article 2.2(c)(D) of the SPA provides for a Definitive Purchase Price Adjustment based on Claimant's Post-Closing Estimated Adjustment Amount within 90 days after closing. Claimant originally estimated that the Purchase Price should be adjusted downwards in their favor by approximately $383,000. Respondents, on the other hand, estimated that the Purchase Price should be increased by approximately $182,000.

51.    Chris Hulbert and Tom Stabley, appearing on behalf of Claimant, testified that an agreement was reached in July 2005 to resolve this issue for $90,585.06. *See* Claimant's Exhibit Nos. 92, 93, 94, 95, 96, 97. Doug Lacey testified for Respondents, and agreed that he reached an oral agreement with Claimants in July 2005 for this amount, but that it was not binding because he had no authority to enter into such an agreement. Claimant prepared a written agreement, executed by Lance T. Shaner on behalf of Claimant Penntex, which incorporated the terms of the alleged oral agreement. Respondents, however, never executed this written agreement.

52.    The Tribunal finds that the parties intended that this would be a binding agreement only after it was reduced to writing and signed by both parties, with Scott Y. Wood signing it on behalf of Respondents, which never happened. Therefore, the Tribunal finds that there was no binding agreement to resolve the issue for $90,585.60.

53.    Howard Blunk testified for the Claimant as an expert witness regarding the post-closing price adjustment issue. Mr. Blunk, who appears well qualified to opine on this issue, testified that after careful examination of all relevant documents, he disagreed with both sides, and that in his opinion the proper adjustment should be a downward Purchase Price adjustment in favor of the Claimant in the amount of $88,776.84.

54.    Respondents countered with the testimony of Frank Kinkead, the Controller of ERG Resources. Mr. Kinkead testified that certain corrections should be made to the Joint Account Billings that Respondent ERG had sent to the non-operators prior to closing because of errors in the well count for certain joint interest properties, in particular the North Lawrence Unit. He opined that Respondent ERG had the right to correct the Joint Interest Billings as late as May 2005, five months after Closing, and to send out new, corrected billings to the non-operators, even though Claimant Penn-Tex had taken over as operator in January 2005. When asked if Respondent ERG had ever actually sent out new billings to the non-operators to correct

14

those errors, he answered "no," that it had not done so.  Additional witnesses for Claimant testified that Penn-Tex never sent post-Closing bills to the non-operators correcting bills sent by ERG prior to Closing on account of these alleged errors.

55.    SPA Art. 2.2(c)(A) (2) and (3) allows Purchase Price Adjustments, increasing the Purchase Price for:

"(2)    All joint interest billings prepared by the Company prior to Closing for which the Company is owed reimbursement by third parties;

(3)    All other expenses that have not been included in any joint interest billing less the Company's share of such expenses; . . ."

These are the provisions relied on by Respondents.

56.    Article 2.2(c)(2) does not apply because the alleged errors in the North Lawrence Unit well count were not billed by ERG prior to closing, and thus, they do not fall within its clear language of "joint interest billings prepared by the Company prior to Closing."

57.    The alleged errors also do not fall within the language of Art. 2.2. (c)(3), which refers to "expenses." An erroneous well count cannot be properly considered as expenses. Thus, this provision clearly does not apply.

58.    For these reasons, Respondents' claim to increase the purchase price based on an alleged erroneous well count that was never actually billed by any party must be rejected.

59.    As a result of these findings, the Tribunal need not decide Claimant's argument that Respondents' claim of an erroneous well count was merely an after-the-fact attempt to inflate the purchase price.

60.    Having rejected Respondents' arguments for increasing the North Lawrence unit well count, the Tribunal finds that the testimony and analysis of Mr. Blunk are credible. Thus, the Tribunal finds that the purchase price should be adjusted downwards, that is decreased, in the amount of $88,776.84, and Respondents owe to Claimant PennTex the amount of $88,776.84.

**H.    PennTex's Attorneys' Fees**

61.    Claimant PennTex seeks to recover its attorneys' fees and expenses related to both this arbitration proceeding and the federal court case that resulted in an order compelling Respondent Wood to arbitrate the issues in this proceeding.

62.     Respondents claim that attorneys' fees and expenses may not be awarded due to Articles 11.6(a)(vi) and 11.13 of the SPA. In response, Claimant points to Articles 11.6(a)(vii) allowing the arbitrators to award Damages. The term "Damages" is a defined term in the SPA.

63.     In its ruling of June 22, 2007, the Tribunal decided that "5. All reasonable and necessary attorneys' fees of either party are potentially recoverable for the litigation or the arbitration under Art. 11(a)(vii) of the contract and the definition of Damages. The Tribunal will reserve any decision on awarding any such fees until the conclusion of the case." Since Respondents have not sought recovery of their attorneys' fees for the federal court litigation or the arbitration proceeding, the only attorneys' fees at issue are those of PennTex.

64.     The Tribunal notes Art. 11.6 (a)(vii) of the PSA, allowing it to award Damages in this arbitration proceeding.

65.     The term "Damages" is defined in Art. 1 of the SPA to include: "all damages, losses . . ., liabilities, payments, amounts paid in settlement, obligations, fines, penalties and other costs, (including reasonable and necessary fees and expenses of outside attorneys . . . in connection with any Action or threatened Action of any kind or nature whatsoever." Thus, the parties have expressly agreed in their contract that attorneys' fees will be deemed and treated as damages, fully awardable by the Tribunal.

66.     The term "Action" is defined in SPA Art. 1 to include "any action, appeal, . . . complaint, claim, suit, demand, litigation, arbitration, . . . hearing . . . or proceeding."

67.     SPA Art. 11.6(vi) provides that "Buyer and Seller will equally bear the costs and fees of the arbitration . . .," and Art. 11.13 requires that "each party will bear its own costs and expenses incurred in connection with the preparation, execution and performance of this Agreement and the Transactions including all fees and expenses of . . . legal counsel . . ."

68.     The Tribunal seeks to harmonize these provisions in order to give proper effect to the intent of the Parties. Art. 11.13 requires only that each party bear its own costs and fees in negotiating and drafting the SPA and structuring the related transactions, and therefore, it is irrelevant to the issue of allocating attorneys' fees resulting from litigation or arbitration.

69.     Art. 11.6(a)(vi), on the other hand, speaks directly to the costs and fees of the arbitration and requires their equal allocation. This provision does not provide that the parties will bear their own costs and fees, but instead, it requires that they will be borne equally by the

16

Buyer and Seller. While this provision might be considered to be in conflict with Art. 11.6(a)(vii) and the definition of "Damages" in the SPA, the Tribunal notes that Art. 11.6(a)(vi) never refers expressly to attorneys' fees and expenses.

70.    The text of Article 11.6(a)(vi) of the SPA parallels the text of certain rules of the AAA Commercial Arbitration Rules (the "Rules"), which govern this proceeding. Rule 43(c) provides that the arbitrators "shall assess the fees, expenses and compensation provided in Rules 49, 50 and 51." Rule 49 addresses AAA administrative fees. Rule 50 generally covers witness expenses and those of (in this case) the Tribunal Chair and AAA representatives, providing that those expenses "shall be borne equally by the parties" except in certain circumstances. Rule 51 focuses on the compensation of (in this case) the neutral arbitrator, that is the Tribunal Chair. The similarity of terms in Art. 11.6(a)(vi) and the AAA Rules is striking (costs and fees vs. fees and expenses).

71.    In harmonizing the provisions of the SPA, the Tribunal finds that SPA Art. 11.6(a)(vi) was intended to refer to the subjects covered in AAA Rules 49-51, and that SPA Art. 11.6 (a)(vi) does not address the issue of attorneys' fees and expenses.

72.    SPA Art. 11.6(a) (vii) authorizes the arbitrators to award Damages. Given the SPA definitions of "Damages" and "Action", the Tribunal is expressly given the authority by contract to award reasonable and necessary attorneys' fees and expenses for this arbitration proceeding and any related litigation as part of the damages in this case. This is consistent with AAA Rule 43 (d)(ii), which allows arbitrators to allocate the parties' attorneys' fees and also generally with Texas law, which allows recovery of attorneys' fees for breach of contract.

73.    In light of the foregoing, the Tribunal determines that the AAA administrative fees covered by Rule 49, the expenses specified in Rule 50 and the costs and fees of the Tribunal Chair, as provided for in Rule 51, shall be equally borne by the parties. The Tribunal has not been asked to allocate or award the costs of any witnesses.

74.    As to PennTex's attorneys' fees, PennTex offered the testimony of Todd Shields and Exhibits 127 and 146. Mr. Shields testified that PennTex's reasonable and necessary attorneys' fees are $ 655,541.11, less $37,244.37, which represents the fees for the pre-closing purchase price adjustment claim that was withdrawn by Claimant. Those numbers are for fees only, separate and apart from incurred expenses, through May 2007.

75.     Of these fees, Claimant allocated $394,214.60 to the Wood release obligation claim. Of that amount, $200,198 involves the related federal court litigation initiated by Wood and in which Claimant obtained an order compelling arbitration. Counsel for Claimant later suggested the proper amount to be allocated to the federal court action is $191,250, with the balance to be reallocated to this arbitration proceeding. The Tribunal finds that this claim can be asserted only against Respondent Wood, inasmuch as Wood's contractually-mandated release obligation was personal to him.

76.     Claimant allocated $157,033.04 of its attorneys' fees claim to letter of credit issues. The Tribunal finds that there is no compelling basis for imposing this component of fee recovery against the Respondents jointly and severally; consequently, this component of the fee claim is allocable only against Respondent ERG.

77.     Claimant allocated $45,377.99 to the Post-Closing Purchase Price Adjustment claim. Mr. Shields testified that, in his opinion, Respondents should bear joint and several liability for this amount, while Respondents' counsel argued that this claim can only be made against ERG, not Wood. The Tribunal finds that there is no compelling basis for imposing this component of fee recovery against Respondents jointly and severally; consequently, this component of the fee claim is allocable only against Respondent ERG.

78.     Claimant filed a Hearing Brief and Respondents filed a Response to Claimant's Hearing Brief. In these briefs, the parties discussed the issue of whether attorneys' fees can be awarded if the Claimant does not receive an award of damages.

79.     The Tribunal notes that the Claimant has been awarded damages in this Award — $88,776.60 as a post-closing purchase price adjustment, which was an issue contested by the parties. In addition, Claimant has been awarded other relief of value — the surrender of the LC and an order not to draw on it, as well as specific performance of Wood's Art. 9.4(e) release obligation. Thus, Claimant is entitled to its reasonable and necessary attorneys' fees both under Texas law and the AAA Rules, which are proportional to the subject matter at issue in this case.

80.     The Tribunal has no difficulty in accepting the claim for attorneys' fees against ERG for $45,377.99 relating to the post-closing purchase price claim.

81.     As to the remainder of PennTex's attorneys' fees claim, the Tribunal believes that some of the fees are out of proportion to the subject matter of the case. Further, the Tribunal

notes that PennTex has not prevailed in full, although it certainly has prevailed more fully than Respondents, which reflects the relative strengths and weaknesses of the positions taken by the parties in this case.

82.    The Tribunal notes that the cost of renewing the LC was only $15,000 per annum. Although there were certainly other considerations and value to PennTex to having the LC canceled than just the annual cost, the Tribunal notes that it has found that the condition for returning and not renewing the LC only occurred on June 4, 2007. Under the circumstances, the Tribunal believes that it can only justify awarding $22,500 of PennTex's attorneys' fees for the LC claim. Such fees are found to be reasonable and necessary and are awarded against ERG.

83.    As to the release obligation claim, approximately $191,000 of the claimed $394,214.60 relates to the federal court litigation. Such litigation was filed by Mr. Wood, but upon Claimant's request, it was ordered to arbitration. The Tribunal finds that Claimant is entitled to recover 50% of the fees incurred in such litigation — $95,500 — as part of the Damages provided for by the SPA. These fees are also found to be reasonable and necessary, and are awarded against Mr. Wood.

84.    The remaining $203,214.60 for handling the release obligation relates to the fees incurred by Claimant in this arbitration. The Tribunal awards 60% of these fees — $121,928.76 — which it finds to be reasonable and necessary, and which are also awarded against Mr. Wood.

I.    **Conclusion and Relief Granted**

85.    The Tribunal hereby awards the following relief:

(a)    Claimant PennTex shall pay to Respondent Wood the amount of $92,540.07 for attorneys' fees and expenses incurred by Wood relative to the Tsar Case.

(b)    With respect to Claimant's SPA Post-Closing Purchase Price Adjustment claim, Respondent ERG shall pay Claimant PennTex the amount of $88,776.60, the latter amount to accrue interest at six percent (6%) per annum until paid;

(c)    Regarding Claimant's claim for specific performance requiring the return of the SPA-required LC, Claimant's SPA obligation to retain said LC in force ended no later than June 4, 2007. Respondents Wood and ERG are

therefore jointly and severally responsible for promptly returning to
PennTex the original and all copies of the Letter of Credit and shall not
draw upon, or attempt to draw upon, such LC at any time prior to such
prompt return, conditioned upon PennTex's prior payment of Wood's
attorneys' fees of $92,540.07, as provided above.  Further, Respondents
shall properly assist Claimant in causing such LC to be properly cancelled
pursuant to UCP Pub 500 requirements, including but not limited to
execution of any letter necessary to meet these requirements.

(d)     Regarding Claimant's claim for specific performance by Respondent
        Wood of his contractually-required release obligation, Respondent Wood
        became obligated to provide to Claimant a contractually-related release of
        his Tsar Case counterclaims no later than June 4, 2007.  Respondent Wood
        shall therefore promptly provide Claimant a signed release or dismissal of
        his counterclaims filed in the Tsar Case against the Tsar Parties;

(e)     Claimant's claim for $15,000, the cost of LC renewal, is denied.

(f)     Claimant Shaner having been dismissed from this proceeding, Claimant
        PennTex shall be responsible for performance of all obligations imposed
        on Claimant by the Tribunal, and Claimant PennTex shall be the sole
        beneficiary of such awards as the Tribunal enters in favor of Claimant.

(g)     Respondent Wood shall be responsible for and shall pay to Claimant
        PennTex the sum of $217,428.76 in attorneys' fees, the same having been
        incurred by Claimant in federal court litigation and in this arbitration
        relative to the enforcement against Respondent Wood of Wood's
        contractually-related release obligation (the same having been determined
        to have been reasonably and necessarily incurred and supported by
        documentation made a part of the record of this proceeding);

(h)     Respondent ERG shall be responsible for and shall pay to Claimant
        PennTex attorneys' fees of $ 67,877.99 for fees incurred by PennTex in
        pursuing all of its Claims in this arbitration proceeding, other than those
        incurred by Claimant PennTex relative to the Respondent Wood release

20

obligation referred to in (g) above, the same having been determined to have been reasonably and necessarily incurred and supported by documentation made a part of the record of this proceeding;

(i)     Respondent Wood shall be responsible for and shall pay to Claimant PennTex $14,302 for expenses incurred by Claimant relative to this arbitration and the related federal court litigation; Respondent ERG shall be responsible for and shall pay to Claimant PennTex $7,368.25 for expenses incurred by Claimant relative to this arbitration proceeding, all of which have been submitted, with proper support, as part of the record of this case.

86.    The administrative fees and expenses of the American Arbitration Association totaling $15,550.00 and the compensation and expenses of the neutral arbitrator totaling $29,089.73 shall be borne equally. Therefore, Respondents shall reimburse Claimants the sum of $3,625.00, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by Claimant.

87.    This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims not expressly granted herein are hereby, denied.

88.    This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

August 16, 2007

R. Doak Bishop
Chairman

_____
Frank W. Blue

_____
Allen D. Cummings

obligation referred to in (g) above, the same having been determined to have been reasonably and necessarily incurred and supported by documentation made a part of the record of this proceeding;

(i) Respondent Wood shall be responsible for and shall pay to Claimant PennTex $14,302 for expenses incurred by Claimant relative to this arbitration and the related federal court litigation; Respondent ERG shall be responsible for and shall pay to Claimant PennTex $7,368.25 for expenses incurred by Claimant relative to this arbitration proceeding, all of which have been submitted, with proper support, as part of the record of this case.

86.    The administrative fees and expenses of the American Arbitration Association totaling $15,550.00 and the compensation and expenses of the neutral arbitrator totaling $29,089.73 shall be borne equally.  Therefore, Respondents shall reimburse Claimants the sum of $3,625.00, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by Claimant.

87.    This Award is in full settlement of all claims and counterclaims submitted to this Arbitration.  All claims not expressly granted herein are hereby, denied.

88.    This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

August 16, 2007

R. Doak Bishop
Chairman

Frank W. Blue

Allen D. Cummings

21

**American Arbitration Association**

PennTex Resources L.P. and Lance T.   )
Shaner, Claimants                     )
                                      )
                                      )
Vs.                                   )          AAA No. 180 Y 00437 06
                                      )
                                      )
ERG Illinois Holdings, Inc. and Scott Y)
Wood, Respondents                     )


## DISSENTING OPINION


I have concluded that I cannot sign and must therefore dissent from the Award (the "Award") entered by the Arbitration Panel Chair and the other Party – Appointed Arbitrator in this case. The bases for this Dissenting Opinion are set forth below. Paragraph references are to numbered Paragraphs in the Award. Abbreviated references or capitalized terms have the same meanings given to them in the various filings in this Arbitration proceeding.

1) Paragraphs 16, 17 and 48:  SPA Paragraph 9.4 (e) provides that Respondent Wood "… will, at [Claimant's] request and upon being furnished a full and complete release of all matters in the Tsar Case, either dismiss or release the claims that he has asserted individually in the Tsar Case." The Panel majority does ultimately reach the conclusion that Respondent Wood must provide the SPA – mandated release since Claimant has satisfied the condition precedent set forth in the SPA. However, the reasoning of the majority, as set forth in the above – referenced Paragraphs, is, in my opinion, incorrect. SPA Paragraph 9.4 (e) clearly states that the Claimant had to provide an unconditional release before Respondent Wood was required to undertake certain reciprocal action. However, the majority is incorrect in stating that Respondent Wood was justified in not providing his release until he saw the "Settlement Documents" without which he could not be sure that the release provided him by Claimant was unconditional. The release provided to Respondent Wood was clearly unconditional. If Claimant subsequently entered into Tsar Case – related agreements with others, to which Respondent Wood was not a party, those agreements would not bind Wood. If, for purposes of argument, Claimant (subsequent to the delivery of the unconditional release) had done something to qualify the nature of its unconditional release, Respondent Wood would have an action at law for breach of contract. Consequently, Respondent Wood had no right to see the "Settlement Documents", was not bound by the "Settlement Documents" and, most importantly, a reading of the "Settlement Documents" confirms what had to be the case: they contained nothing which served to render conditional the unconditional release

which had previously been provided by Claimant. Essentially, excusing Respondent Wood's failure to satisfy his SPA Paragraph 9.4 (e) obligation on the theory that the release provided Wood, howsoever unconditional, may not have been what it seemed, is neither correct under the law nor is it justified by anything introduced into the record of this proceeding.

2) Paragraphs 18, 49 and 85 (c): The Panel majority has granted Claimant's claim to specific performance by the Respondents relative to the return to Claimant of the LC. However, it conditions that return on Claimant's payment to Respondents of certain of Respondents' attorney's fees. Those fees were incurred in connection with Respondent Wood's defense and prosecution of claims in the Tsar Case and consequently are totally unrelated to any issue involving the LC or its return. There is nothing in the record of these proceedings justifying this conditionality and no other portion of the Award of the Tribunal is conditional. Effectively the Panel majority has rewritten the SPA in order to impose on Claimant yet another condition to the return of the LC. No one on the Panel disputes that there is no reason why the LC should not be returned and cancelled. Allowing this LC, still a negotiable instrument, to remain in Respondents' hands subject to a condition totally unrelated to the LC dispute is unwarranted. There is no more reason to think that the Claimant will not pay these attorneys fees any more than one should assume that Respondents will not satisfy obligations imposed on them in the Award.

3) Paragraph 30: There is no evidence of record to support the majority's assertion that Respondent Wood's counterclaims in the Tsar case were "…an important part of the strategy of defending Wood…[and] This likely explains the broad language used in subsection (a). It was intended that Claimant pay all attorneys' fees of Wood both in defending the claims against him and in prosecuting those claims." There is evidence of record that demonstrates that Respondent Wood was actively involved in the negotiation of the SPA. If what the majority says is true, how is it that Wood, in Claimant's Exhibit 150 (Wood Affidavit), states that "we did not object" when Claimant asserted that Respondents were only entitled to recovery of attorneys' fees in the defense of Tsar Party claims asserted against Respondent Wood? This is not the reaction of a person who presumably had negotiated hard for the inclusion of "the broad language used in subsection (a)" which the majority believes justifies Respondent Wood's recovery of all his Tsar litigation – related attorneys fees incurred through June 4, 2007.

4) Paragraphs 38 and 39: The majority's opinion is that an SPA breach may or may not have occurred when Claimant failed to timely pay Respondent Wood's attorneys' fees incurred in the Tsar Case. They state that since Respondents did not bill Claimant for those fees until February 28, 2007, no breach could have occurred until 30 days thereafter. Their reasoning ignored SPA Paragraph 9, 4 (a) which required that such fees be billed to the Claimant directly by the service provider. While those fees were incurred in 2005 and 2006, Claimant was never billed for those charges in the manner provided by the SPA, at least not until 2007. Further, there is no support in the record for the majority's statement that no breach could have occurred until 30 days after February 28, 2007. The SPA itself does not contain provisions relating to contract breach so the

majority's grafting a "30 day to breach" provision onto the SPA is not supported by the record of the proceedings or by the applicable law. Finally, Claimant's Exhibit 150, referred to above, amply supports the theory that Respondents not only were not entitled to recovery of attorneys' fees incurred in pursuing Wood's counterclaims against Claimant, but also that they did not even think themselves entitled to those fees.

5) Paragraphs 52 and 60: Contrary to the majority, I have concluded that the record amply demonstrates that Respondent's representative, Mr. Doug Lacey, had both apparent and real authority to bind his principal, Respondent ERG, to the Conclusive Adjustment Amount orally agreed by Lacey and Claimant representatives subsequent to the Closing. That amount is $90,585.60. The record does demonstrate that when this oral agreement was reduced to writing, Respondents refused to sign it, not because of Lacey's lack of authority but because Respondent Wood had concluded that Claimant had got "the best of the deal" (my paraphrase of the evidence) relative to the transactions covered by the SPA. Evidence of record shows that Respondent Wood had urged Lacey to complete the Post Closing transaction expeditiously and that he had agreed to Lacey's oral agreement upon being asked about it by Lacey. Lacey, in turn, communicated this information to Claimant. The SPA contains boilerplate language to the effect that the SPA can only be changed by written agreement of the parties and that subsequent oral agreements are not binding. The record includes several Texas cases where such "boilerplate" was held not to preclude contract parties from entering into a subsequent, binding oral agreement where, as here, such oral agreement was not rendered unenforceable by the Texas Statute of Frauds. The arbitration majority used the testimony of Mr. Howard Blunk to justify an award to Claimant of $88,776.84. I believe it inappropriate for the majority to substitute the opinion of a witness, however qualified or unbiased, for an agreement reached by the parties. If anything, Mr. Blunk's testimony serves to support a finding that the oral agreement reached by the parties was reasonable and based on their understanding of the relevant documents and contract language. They were obviously more familiar with the relevant documentation, and had an extensive working knowledge of same, all of which could surely have caused them to conclude that $90,585.60 was a reasonable number. Mr. Blunk, otherwise a stranger to the transactions covered by the SPA, said the records he saw supported a recovery of a lesser amount; he never stated, however, that the parties' agreement to $90,585.60 was unreasonable.

6) Paragraphs 79, 81 – 84: My belief is that the majority's disposition/allocation of Claimant's attorney's fees is not supported by, and is inconsistent with, the record of these proceedings and is inequitable. The majority states, at Paragraph 79, that Claimant is entitled to a recovery which is "proportional to the subject matter at issue in this case." In Paragraph 81 they state that "some of the fees are out of proportion to the subject matter of this case." I know of no rule of "proportionality" that is applicable in this instance. I am aware of no Texas case that supports this notion of "proportionality" nor was such a case included in the parties' extensive briefing. More importantly, there was no evidence introduced into the record, nor was any argument ever made in the course of the proceedings, which even remotely justifies the invocation of the notion of "proportionality."

The majority appears to be implicitly saying that since this case, on the face of it, involved seemingly "garden variety", commercial issues, it is not right to award Claimant the $618,296.74 in fees incurred in the course of this arbitration and the Federal court action instituted by Respondent Wood. Claimant accounted for every dollar and cent of fees incurred through oral testimony and voluminous billing records admitted as evidence in this proceeding (without objection). Respondent's attorney cross – examined Claimant's testifying attorney regarding these fees and their calculation. Respondent's counsel never attempted to demonstrate that any of these fees had not been incurred or that any of the amounts sought to be recovered were unreasonable in any way. Respondent's counsel never attempted, in argument, to urge the Arbitration Panel to disallow any of these fees for any stated reason. This "proportionality" idea fails to take into account the way the parties and their attorneys litigated this case. To say that the level of engagement was "fierce" would be an understatement. My own paper files in this case, excluding the lengthy arbitration transcript, are maintained in five 16" x 13" x 11" storage boxes. Each and every issue of any substance in this proceeding was argued, briefed, the subject of motions, cross motions, answers, responses, rebuttals, rejoinders and the like up to and actually through the close of hearings on June 26th. Why the parties fought so intensely and expended legal resources so freely is not known to me nor is it relevant. What I know is what the record so clearly reflects: The parties conceded nothing and strenuously litigated each and every substantive issue in the case; at the end of the day, the Claimant completely prevailed save on one minor issue. Respondents and Respondents' counsel did not attack Claimant's proof of fees incurred but the Panel majority, by invoking "proportionality" and other bases not a part of the record (see discussion below), has incorrectly and unfairly deprived the Claimant of all the properly earned fruits of its victory.

Whereas Claimant sought $157, 003.04 for LC – related attorneys' fees, the majority awarded $22,500 apparently by implicitly drawing on the "proportionality" principle: since the LC renewal cost was only $15,000 (and the Claimant lost on this point), how can Claimant recover all it is seeking? This ignores the fact, reflected in the record, that Claimant's attorneys expended substantial time and effort seeking recovery from the Respondents of the LC lest it be impermissibly presented for payment. Claimant was at risk for up to $1,000,000 on the LC and a drawdown would not only have been wrong, but could presumably have impaired Claimant's credit standing (inasmuch as Claimant was required to keep funds in the issuing bank necessary to cover the face value of the LC). The majority also erred by awarding this portion of the recovery only against Respondent ERG. The record clearly demonstrates that Respondent Wood employed a variety of tactics, artifices and stratagems in order to avoid having to return the LC. Primarily, he argued that inasmuch as Claimant had not satisfied the requirements of SPA Paragraph 9.4 (e), there was no obligation on Respondent ERG to return the LC. He continued to make this argument during the arbitration hearing, three weeks after a state court judge had dismissed with prejudice all Tsar Case claims asserted against him personally. The majority rightly determined that Claimant was in no sense in violation of Paragraph 9.4 (e) and that the LC should be returned. Notwithstanding the fact that, but for Respondent Wood, the LC could have been returned to Claimant in a timely way, the

majority feels it appropriate to free Wood from any obligation regarding the recovery of fees rightfully due to Claimant relating to the LC issue.

The majority awarded the Claimant $95,500 of the fees sought by Claimant related to the Federal court litigation that was instituted by Respondent Wood, not the Claimant. Claimant sought recovery of all of its fees incurred in connection with this litigation, that is $191,000. Evidence of record reflects that Respondent Wood was adamantly opposed to participating in this arbitration and went to Federal court for relief. That proceeding was characterized by extensive briefing and argument by both sides (principally regarding the direct benefits estoppel issue). The Federal District Court decision ran to 37 pages, the bulk of which was devoted to a legal issue of first impression in the Fifth Circuit. Claimant prevailed decisively in that proceeding on the two substantive issues raised. Yet, even though this was a vigorously contested case that dealt with novel issues, and even though Respondents did not attack the $191,000 as unreasonable or unsupported, the majority has, without explanation (proportionality?), awarded Claimant 50% of the amount sought.

Claimant sought $203,214.60 in fees incurred in the arbitration of its release claim against Respondent Wood. Claimant prevailed on this claim but, notwithstanding this, the majority awarded Claimant 60% of the amount which was proved up at the hearing. Why or how the 60% recovery was determined is not shown. This was done in spite of the fact (as shown in the arbitration record) that Respondents' attorney actually sought to prevent the state court from entering an order dismissing, with prejudice, all Tsar Case claims *against* Respondent Wood, the beneficiary of this dismissal. The arbitration record demonstrates that Respondents' attorney fought the dismissal in the hope that Respondent Wood would not have to give his SPA – required release to Claimant and could continue to pursue his claims against the Tsar Parties. The judge in the state court proceeding was rightly mystified, if not downright contemptuous, regarding Respondents' attorney's tactic yet, in this arbitration, the Panel majority apparently did not think it right or appropriate to take this behavior into account in awarding Claimant its attorneys' fees. As a consequence the Claimant is now unjustifiably required to absorb over $81,000 in attorneys fees which should have been assessed against the Respondents, again notwithstanding the fact that Respondents never questioned Claimant's fees as being in any way excessive or unreasonable.


FRANK W. BLUE
Arbitrator

 **American Arbitration Association**
*Dispute Resolution Services Worldwide*

*Central Case Management Center*
*Molly Bargenquest*
*Vice President*
*Tracey Patten*
*Assistant Vice President*

August 20, 2007

13455 Noel Road - Suite 1750, Dallas, TX 75240
telephone: 972-702-8222 facsimile: 972-490-9008
internet: http://www.adr.org/

**VIA FACSIMILE & E-MAIL**

J. Todd Shields, Esq.
Fulbright & Jaworski, LLP
1301 McKinney, Suite 5100
Houston, TX 77010-3095

John M. Zukowski, Esq.
Zukowski, Bresenhan & Sinex, L.L.P.
1177 West Loop South, Suite 1100
Houston, TX 77027

Re: 70 180 Y 00437 06
    PennTex Resources, L.P.; Lance T. Shaner
    and
    ERG Illinois Holdings, Inc.; Scott Y. Wood
    - Houston, Texas

Gentlemen:

By direction of the Arbitrators we herewith transmit to you the duly executed Award in the above matter. The Award was agreed to by a majority of the Arbitrators with Frank W. Blue dissenting.

The Award has been executed by a majority of the Arbitrators.

Enclosed please find a financial breakdown. The financial information contained in the Award was calculated as of the date of the Award's preparation. The Association will provide information on any adjustments to same caused by subsequent payments.

As always, please do not hesitate to contact the undersigned if you have any questions.

Sincerely,

Kimberly L. Emerson
Senior Case Manager
800 804 9718
Emersonk@adr.org

*Supervisor Information: Jennifer L. Bell, 972 702 8222, Bellj@adr.org*

KLE
Encl.

cc:    Frank W. Blue, Esq. w/encl. **VIA FACSIMILE & E-MAIL**
       Allen D. Cummings, Esq. w/encl. **VIA FACSIMILE & E-MAIL**
       R. Doak Bishop, Esq. w/encl. **VIA FACSIMILE & E-MAIL**